## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| **MOUNTAIN VALLEY INDEMNITY COMPANY** | § § § § | |
| **Plaintiff,** | § § | |
| **VS.** | § § | **CIVIL ACTION NO. _____** |
| **JOHN ARTHUR, IVAN ARTHUR, AND ANNIE ANDREWS** | § § § | |
| **Defendants.** | § § | |

## ORIGINAL COMPLAINT FOR DECLARATORY RELIEF

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Mountain Valley Indemnity Company, Plaintiff, and files this, its Original Complaint for Declaratory Relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57, and for such pleading would respectfully show the Court the following:

### A.
### Parties

1.     Plaintiff Mountain Valley Indemnity Company ("MVIC") is a New York corporation with its principal place of business at 5630 University Parkway, Winston-Salem, North Carolina, 27105, where its officers direct, control and coordinate the corporation's activities. MVIC's home office is located at 5630 University Parkway, Winston-Salem, North Carolina, 27105. It is therefore a citizen of both New York and North Carolina. MVIC issues homeowners insurance coverage in the State of Texas and is authorized to do so. MVIC brings this insurance coverage suit to determine the rights of the parties in relation to an Underlying Suit tendered to MVIC by its insured for defense and indemnity.

2.      Defendant John Arthur is an individual natural person who is a citizen of the State of Texas, residing in Frisco, Collin County, Texas. At all material times relevant to this suit, Arthur resided in Collin County, Texas. At the time of the events at issue, Arthur was a student attending Baylor University. John Arthur is a defendant in the Underlying Suit. John Arthur may be served with process at 7225 Saint Augustine Dr., Frisco, Texas 75033-3175.

3.      Defendant Ivan Arthur is an individual natural person who is Defendant John Arthur's father, a citizen of the State of Texas, and currently resides in Frisco, Collin County, Texas. At all material times relevant to this suit, Ivan resided in Collin County, Texas. Ivan Arthur may be served with process at 7225 Saint Augustine Dr., Frisco, Texas 75033-3175.

4.      "Annie Andrews" is a pseudonym for an individual natural person whose privacy interests have been protected in the Underlying Suit in which she is the plaintiff. Defendant Andrews resides in Des Moines, Iowa, and is a citizen of Iowa. At the time of the events described in the Underlying Suit, Andrews resided in Waco, McLennan County, Texas, and maintained her permanent residence in Des Moines, Iowa. Andrews was a student attending Baylor University in Waco, Texas, and lived in University Parks on-campus housing. Andrews may be served with process through her authorized representative, attorney Worth D. Carroll at SUMPTER & GONZALEZ L.L.P., 3011 N. Lamar Blvd, Suite 200, Austin, Texas 78705.

**B.**
**Jurisdiction and Venue**

5.      This Court has jurisdiction over the controversy by virtue of the diversity of citizenship set forth above and the amount in controversy under 28 U.S.C. §1332. Defendant Andrews seeks monetary relief of over $1 million in damages in the Underlying Suit, which is at the heart of this coverage dispute.

6.      Venue is proper in the Eastern District, Sherman Division under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this cause occurred in Collin, County Texas. Specifically, the insurance policy made the subject of this suit was issued in Collin County, Texas, and covers property and residents of Collin County, Texas.

**C.**
**Facts**

7.      This is an insurance coverage dispute arising out of an alleged sexual assault incident on the Baylor University campus in Waco, Texas. Defendant Annie Andrews filed suit in Texas state court against Defendant John Arthur, among others, for injuries and damages she claims as a result of a sexual assault ("Underlying Suit").

8.      Plaintiff MVIC is a homeowners insurance carrier that provided personal liability coverage, subject to specific terms, conditions, exclusions and exceptions, to Defendants John Arthur and Ivan Arthur. A true and correct copy of the policy is attached hereto as **Exhibit A.** The insurance policy was issued in Collin County, Texas, and covers property and residents of Collin County, Texas.

9.      Plaintiff MVIC's policy is not triggered by and excludes coverage for the acts and omissions alleged against Defendant John Arthur in the Underlying Suit. Therefore, MVIC seeks declarations that it does not owe any duty to defend or indemnify Defendants John Arthur or Ivan Arthur for claims against them by Defendant Annie Andrews, and that it does not have a duty to pay any amount to Defendant Annie Andrews for any injuries or damages as a result of the incidents alleged to have occurred on November 12, 2017.

10.     The Underlying Suit is styled *Annie Andrews v. Baylor University, Tre'von Lewis, John Arthur, Justin Harris and Dru Dixon,* Cause No. 2019-17683 in the 234th District Court of

Harris County, Texas. The suit was filed over one year ago on March 11, 2019. A true and correct copy of the current live petition is attached hereto as **Exhibit B**.

11.     MVIC had no notice of the suit until a purported *Stowers* letter from Andrews' counsel dated February 19, 2020, was forwarded to MVIC by Defendant John Arthur's counsel in the Underlying Suit.

12.     In the Underlying Suit, Defendant Andrews asserts that while she was a Baylor University student, she was deliberately intoxicated without her consent, raped, and sexually exploited in her Baylor dorm room by four Baylor football players, one of which is identified as Defendant John Arthur. Andrews claims that the events took place during a loud party at one of Baylor's residence halls on November 12, 2017. Andrews asserts that one of the football players surreptitiously added alcohol to her drink, causing her to become intoxicated to the point of incapacitation. Another football player filmed her in compromising interactions and shared them with freshman football players via Snapchat. Andrews asserts that while she was incapacitated, Defendant John Arthur and another football player took turns engaging in sexual activity with her without her consent and while she was incapable of consenting. Andrews also asserts claims against Baylor University. Andrews alleges she suffered emotionally, academically and athletically, that she was forced to withdraw from Baylor, and that she continues to experience psychological problems as a result of the incident.

13.     Against John Arthur specifically, Andrews alleges two counts: "assault" and "negligence," as follows:

**COUNT 7:**
**ASSAULT**
*John Arthur*

117. Annie hereby incorporates by reference paragraphs above as if fully set forth herein. Specifically, Annie alleges that Arthur is liable for assault.
118. Arthur intentionally, knowingly, or recklessly made contact with Annie's

person, by penetrating and contacting Annie's genitals with his mouth and hands.

119. Arthur's contact with Annie was made while Annie was incapacitated and was without Annie's consent.

120. Arthur's conduct was a proximate and producing cause of damage to Annie.

121. Annie's damages include, but are not limited to, physical pain and mental anguish, disfigurement, physical impairment, costs of medical care, and lost earning capacity, all of which have occurred in the past and, in reasonable probability, will continue in the future. Such damages are in excess of the minimum jurisdictional limits of this Court.

*State Court Petition*, **Exhibit B** hereto, at p. 24.

## COUNT 8:
## NEGLIGENCE
### *John Arthur*

122. Annie hereby incorporates by reference paragraphs above as if fully set forth herein. Specifically, Annie alleges that Arthur is liable for negligence.

123. Arthur breached the following duties:

a. the duty to prevent Lewis from engaging in sexual activity with Annie after (i) knowing Annie was unable to consent to sexual activity due to incapacitation from alcohol intoxication, and (ii) knowing that Lewis was attempting to engage in – and actually engaging in – sexual activity with Annie;

b. the duty to not engage in sexual activity with Annie after knowing Annie was unable to consent to sexual activity due to incapacitation from alcohol intoxication; and

c. the duty to obtain informed, affirmative consent from Annie before engaging in sexual activity with Annie.

124. Arthur breached each of these duties.

125. Arthur's conduct was a proximate and producing cause of damage to Annie.

126. Annie's damages include, but are not limited to, physical pain and mental anguish, disfigurement, physical impairment, costs of medical care, and lost earning capacity, all of which have occurred in the past and, in reasonable probability, will continue in the future. Such damages are in excess of the minimum jurisdictional limits of this Court.

127. Exemplary Damages: Arthur's conduct constitutes gross negligence as set out in Tex. Civ. Prac. & Rem. Code § 41.003. Therefore, Annie also seeks exemplary damages.

*State Court Petition*, **Exhibit B** hereto, at pp. 24-25.

14. The homeowners insurance policy MVIC issued to Defendants John Arthur and

Ivan Arthur contains the following terms, conditions, exclusions and exceptions (*see* **Exhibit A**):

### HOMEOWNERS FORM HO 3000 012 13

### DEFINITIONS

B. …certain words and phrases are defined as follows:

> 2. **"Bodily injury"** means bodily harm, sickness or disease, including required care, loss of services and death that results.
>
> …
>
> 8. **"Occurrence"** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in: a. "**bodily injury**"; or b. "**property damage**."

### SECTION II – LIABILITY COVERAGES

### A. COVERAGE E  - Personal Liability

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:

> 1. Pay up to our limit of liability for the damages for which an "insured" is legally liable. Damages include prejudgment interest awarded against an "insured"; and
> 2. Provide a defense at our expense by counsel of our choice even if the suit is groundless, false or fraudulent…

### B. COVERAGE F - Medical Payments to Others

We will pay the necessary medical expenses incurred or medically ascertained within three years from the date of an accident causing "bodily injury." Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. …this coverage applies only:

> 1. To a person on the "insured location" with the permission of an "insured"; or
> 2. To a person off the "insured location", if the "bodily injury"
>     …
>     b. is caused by the activities of an "insured";
>     …

## SECTION II – EXCLUSIONS

### E. Coverage E - Personal Liability And Coverage F - Medical Payments to Others

Coverages E and F do not apply to the following:

1. **Expected Or Intended Injury**

   "Bodily injury" or "property damage" which is expected or intended by an "insured" or which is the result of intentional acts or omissions, or criminal activity, even if the resulting "bodily injury" or "property damage":

   a. Is of a different kind, quality or degree than initially expected or intended; or
   b. Is sustained by a different person, entity or property than initially expected or intended; or
   c. Is committed by an "insured" who lacks the mental capacity to govern their own conduct.

   This exclusion applies regardless of whether an "insured" is charged with or convicted of a crime. However, this Exclusion E.1. does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force by an "insured" to protect persons or property.

   ...

7. **Sexual Molestation, Corporal Punishment Or Physical Or Mental Abuse**
   [*as per Special Provisions - Texas Endorsement SH 01 25 03 13*]

   "Bodily injury" or "property damage" arising out of sexual molestation, corporal punishment or physical or mental abuse.

   For the purposes of this exclusions, abuse is an act which is committed with the intent to harm.

   ...

11. **Fines and Penalties**

    Fines, penalties, double or treble damages; or any other type of added damages intended to punish or deter wrongful conduct rather than as compensation for actual damages.

### SECTION II – CONDITIONS

**A. Limit of Liability**....

**C. Duties After "Occurrence."**

In case of an "occurrence:, you or another "insured" will perform the following duties that apply. We have no duty to provide coverage under this policy if your failure to comply with the following duties is prejudicial to us. You will help us by seeing that these duties are performed:

1. Give written notice to us or our agent as soon as is practical...
2. …
3. Promptly forward to us every notice, demand, summons or other process relating to the "occurrence";
4. …
5. …
6. No "insured" shall, except at such "insured's" own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the "bodily injury."

15.     Defendant John Arthur seeks a defense and indemnity from MVIC under the homeowners policy at issue. Defendant Ivan Arthur is John's father. Both John and Ivan are insureds under the MVIC policy. *See Policy* at **Exhibit A.**

**D.**
**COUNT 1 – DECLARATORY JUDGMENT**

16.     Applying the policy language to the allegations in Underlying Suit, as per the Texas "eight-corners rule," there is no duty to defend under the MVIC policy. The allegations against John Arthur do not constitute an "occurrence," and the allegations fall within the intentional/expected injury exclusion and the sexual molestation exclusion. Additionally, the MVIC excludes coverage for the exemplary damages asserted against John Arthur. Finally, John Arthur's year-long delay in notifying MVIC of the loss violated his duties under the policy and has prejudced MVIC. MVIC has no duty to indemnify under the policy for the same reasons.

17.     Accordingly, MVIC is entitled to a declaratory judgment that it has no duty to defend or indemnify John Arthur or Ivan Arthur for the claims, damages and/or injuries alleged in the Underlying Suit.

18.     MVIC is further entited to a declaratory judgment that there is no coverage of any kind for personal injury or damage claims made against John Arthur or Ivan Arthur by Annie Andrews in the Underlying Suit.

## E.
## Prayer

Wherefore, premises considered, Plaintiff seeks from the Court:

(1) A declaration that the allegations against John Arthur in the Underlying Suit do not constitute an "occurrence" under MVIC's policy;

(2) A declaration that the allegations against John Arthur in the Underlying Suit are excluded by the intentional/expected injury exclusion of MVIC's policy;

(3) A declaration that the allegations against John Arthur in the Underlying Suit are excluded by the sexual molestation exclusion of MVIC's policy;

(4) A declaration that the exemplary damages alleged against John Arthur in the underlying suit are excluded by MVIC's policy;

(5) A declaration that John Arthur's delay in notifying MVIC of the loss prejudiced MVIC in violation of the insureds' duties in the policy;

(6) A declaration that MVIC has no duty to defend John Arthur or Ivan Arthur for any claims made against them arising out of the allegations in the Underlying Suit;

(7) A declaration that MVIC has no duty to indemnify John Arthur or Ivan Arthur for any claims made against them arising out of the allegations in the Underlying Suit;

(8) A declaration that MVIC owes no duty to pay Annie Andrews for any damages she may be awarded against John Arthur or Ivan Arthur arising out of the allegations in the Underlying Petition;

(9) An award of costs pursuant to Federal Rule of Civil Procedure 54(d)(1); and

(10) Such other and further relief as MVIC may show itself justly entitled.

Respectfully submitted,


  /s/ ERIK E. EKVALL                         
Erik E. Ekvall
State Bar No. 06507022
eekvall@ekvallbyrne.com
EKVALL & BYRNE, L.L.P.
4450 Sigma Road, Suite 100
Dallas, Texas 75244
Telephone: (972) 239-0839
Facsimile: (972) 960-9517

**ATTORNEYS FOR PLAINTIFF
MOUNTAIN VALLEY INDEMNITY
COMPANY**

# EXHIBIT A

Mountain Valley
Indemnity Company™
An Adirondack Business

PO Box 3199 ● Winston Salem, NC 27102-3199

Ivan Arthur
John Arthur
7225 Saint Augustine Dr
Frisco, TX 75033-3175

| | |
|---|---|
| Policy Number: | |
| **2004628969** | |
| Named Insured: | |
| **Ivan Arthur** | |
| Policy Period: | **12:01 AM** |
| **3/3/2017 - 3/3/2018** | |
| Date of Notice: | 2/2/2017 |
| Policy Underwritten By: | |
| **MOUNTAIN VALLEY INDEMNITY COMPANY** | |

**24 Hour Claim Reporting: 1-877-248-0555**
**For Policy Information: 1-888-980-7647**
**www.mvic-aie.com**

9307128
  GEICO Insurance Agency
  1 GEICO Blvd
  Fredericksburg VA 22412
  (855) 836-9115

**RESIDENCE PREMISES**
7225 Saint Augustine Dr
Frisco, TX 75033-3175

# ONECHOICE HOMEOWNERS POLICY DECLARATIONS

**TRANSACTION TYPE:**
NEW BUSINESS

**PAYMENT TYPE:**
MORTGAGEE BILLED

Dear Policyholder,

GEICO INSURANCE AGENCY and Mountain Valley Indemnity Company are pleased to present you with your homeowners new business insurance policy.

A bill for your premium is being sent to your mortgagee separately requesting payment of the premium.

In the event of a loss, call our toll free number 1-877-248-0555 for 24-hour claim reporting. Our dedicated professionals are ready to help 24 hours a day, seven days a week.

Thank you for letting us be of service and if you have any questions, please contact GEICO INSURANCE AGENCY at (855) 836-9115.

# MESSAGES

PLEASE REFER TO THE "IMPORTANT NOTICES" SECTION OF THIS POLICY FOR IMPORTANT INFORMATION CONCERNING THIS POLICY.

Your Coverage C Limit has been increased at no additional charge.

## BASIC POLICY COVERAGES

| SECTION I PROPERTY COVERAGES | LIMITS OF LIABILITY |
|---|---|
| A.  DWELLING | $  332,000 |
| B.  OTHER STRUCTURES | $  33,200 |
| C.  PERSONAL PROPERTY | $  166,000 |
| D.  LOSS OF USE | $  66,400 |

### SECTION I DEDUCTIBLE
We will pay only that part of the total of all loss and expense payable under Section I that exceeds: $ 2,500

| SECTION II LIABILITY COVERAGES | LIMITS OF LIABILITY |
|---|---|
| E.  PERSONAL LIABILITY – EACH OCCURRENCE | $  300,000 |
| F.  MEDICAL PAYMENTS TO OTHERS | $  5,000 |

## ADDITIONAL COVERAGES

Blanket Personal Property - Jewelry
 Limit: $5,000

Foundation Coverage
 Limit: $49,800

Water Backup
 Limit: $5,000
 Deductible: $500

## ATTACHMENTS

The following forms, endorsements and exceptions to conditions are part of the policy at time of issue. **Please read them carefully.**

| FORM NO. | EDITION DATE | TITLE |
|---|---|---|
| HO 3000 | 02 13 | HOMEOWNERS SPECIAL FORM |
| SH 01 25 | 03 13 | SPECIAL PROVISIONS - TEXAS |
| HO 04 16 | 10 00 | PREMISES ALARM OR FIRE PROTECTION SYSTEM |
| HO 23 04 | 05 11 | PERSONAL PROPERTY REPLACEMENT COST LOSS SETTLEMENT - TEXAS |
| SH 06 01 | 06 05 | IDENTITY THEFT RESOLUTION ASSISTANCE |
| SH 23 16 | 03 13 | LIMITED WATER BACK UP AND SUMP DISCHARGE OR OVERFLOW COVERAGE - TEXAS |
| SH 23 23 | 03 13 | FOUNDATION COVERAGE - TEXAS |
| SH 23 24 | 03 13 | BLANKET PERSONAL PROPERTY ENDORSEMENT - TEXAS |

*If you have chosen the Scheduled Personal Property Endorsement, please refer to that section which appears later in these policy declarations.*

## PREMIUM INFORMATION

| | |
|---|---|
| BASIC PREMIUM | $ 1,073 |
| ADDITIONAL COVERAGES | $ 157 |
| | |
| TOTAL PREMIUM | $ 1,230 |
| Expense Fee | $ 75 |
| TOTAL | $ 1,305 |

## POLICY CREDITS

Included in the above premium are the following credits:

| | |
|---|---|
| Account Discount | Advanced Quote Discount |
| Burglar Alarm Discount | Fire Alarm Discount |
| Multi-Policy Affinity Discount | Paid in Full Discount |

## MORTGAGEE/ADDITIONAL INSUREDS/ADDITIONAL INTERESTS

**Mortgagee**
Wells Fargo Bank, NA #708 ISAOA
PO Box 5708
Springfield, OH 45501-5708
Loan#: 0215779166

## RATING INFORMATION

| RISK STATE | OCCUPANCY | COUNTY | ZIP CODE | FAMILIES | CONSTRUCTION | YEAR |
|---|---|---|---|---|---|---|
| TX | PRIMARY | COLLIN | 75033 | 1 | MASONRY VENEER | 2000 |

| FEET TO HYDRANT | MILES TO STATION | PROTECTION CLASS | ROOF TYPE | ROOF AGE |
|---|---|---|---|---|
| 0 -500 | 0-5 | 1 | Asphalt or Composition Shingle | 3 |

| PRIMARY HEATING SOURCE | RATING DATE |
|---|---|
| NATURAL GAS | 02-02-2017 |

Includes Copyrighted Material of Insurance Services Office, Inc. with its permission
Copyright, Insurance Services Office, Inc. 1988-2018

## IMPORTANT NOTICES

G13896  07 05

## EXECUTION OF OFFICER'S SIGNATURES

**In Witness Whereof**, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized agent.

Jeffrey Weissmann, Secretary

Andrew Mcguire, President

Countersigned _____    Agency at: _____
                                (Authorized Agent)

SH PN 80   10 15
*IMPORTANT NOTICE*

| | |
|---|---|
| **IMPORTANT NOTICE** | **AVISO IMPORTANTE** |

To obtain information or make a complaint:

Para obtener información o para presentar una queja:

You may contact your agent at (855) 836-9115.

Usted puede comunicarse con su agente al (855) 836-9115.

You may call Mountain Valley Indemnity Company's toll-free telephone number for information or to make a complaint at:

Usted puede llamar al número de teléfono gratuito de Mountain Valley Indemnity Company's para obtener información o para presentar una queja al:

**1-888-980-7647**

**1-888-980-7647**

You may also write to Mountain Valley Indemnity Company at:

Usted también puede escribir a Mountain Valley Indemnity Company:

PO Box 3199
Winston Salem, NC 27102-3199

PO Box 3199
Winston Salem, NC 27102-3199

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights, or complaints at:

Usted puede comunicarse con el Departamento de Seguros de Texas para obtener información sobre compañías, coberturas, derechos, o quejas al:

**1-800-252-3439**

**1-800-252-3439**

You may write the Texas Department of Insurance:

Usted puede escribir al Departamento de Seguros de Texas a:

P.O. Box 149104
Austin, TX 78714-9104
Fax: (512) 490-1007
Web: *www.tdi.texas.gov*
E-mail: *ConsumerProtection@tdi.texas.gov*

P.O. Box 149104
Austin, TX 78714-9104
Fax: (512) 490-1007
Sitio web: *www.tdi.texas.gov*
E-mail: *ConsumerProtection@tdi.texas.gov*

**PREMIUM OR CLAIM DISPUTES:**
Should you have a dispute concerning your premium or about a claim, you should contact the agent or the company first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

**DISPUTAS POR PRIMAS DE SEGUROS O RECLAMACIONES:**
Si tiene una disputa relacionada con su prima de seguro o con una reclamación, usted debe comunicarse con el agente o la compañía primero. Si la disputa no es resuelta, puede comunicarse con el Departamento de Seguros de Texas.

**ATTACH THIS NOTICE TO YOUR POLICY:**
This notice is for your information only and does not become a part or condition of the attached document.

**ADJUNTE ESTE AVISO A SU PÓLIZA:**
Este aviso es solamente para propósitos informativos y no se convierte en parte o en condición del documento adjunto.

## DECLARACIÓN DE DERECHOS DEL CONSUMIDOR
## SEGUROS PARA PROPIETARIO DE VIVIENDA, HABITACIÓN E INQUILINO

### ¿Qué es la Declaración de Derechos?

Esta Declaración de Derechos es un resumen de sus derechos, y no forma parte de su póliza. El Departamento de Seguros de Texas (Texas Department of Insurance - TDI, por su nombre y siglas en inglés) adoptó la Declaración de Derechos y exige que la compañía de seguros le proporcione una copia cuando le expida su póliza.

La ley de Texas le otorga ciertos derechos respecto a su seguro de propietario de vivienda, habitación e inquilino. Esta Declaración de Derechos identifica sus derechos, los cuales han sido especificados por reglamento o por estatuto estatal, pero no incluye todos sus derechos. Tampoco se incluyen aquí algunas de las excepciones. Si su agente, compañía o ajustador le dice que alguno de estos derechos no le corresponde a usted, comuníquese con el Programa de Protección al Consumidor de TDI (TDI Consumer Protection Program, por su nombre en inglés) al 1-800-252-3439, o por medio de correo postal a (111-1A), P. O. Box 149091, Austin, TX 78714-9091, o por correo electrónico a ConsumerProtection@tdi.texas.gov. Para obtener una lista de la ley(es) y/o reglamento(s) en específico que hemos resumido en cada artículo de esta Declaración de Derechos, o si tiene alguna pregunta o comentario, comuníquese con la Oficina del Asesor Público de Seguros (Office of Public Insurance Counsel - OPIC, por su nombre y siglas en inglés) al 1-877-611-6742, por correo postal a 333 Guadalupe, Suite 3-120, Austin, TX 78701, o visite el sitio Web de OPIC en www.opic.texas.gov.

Esta Declaración de Derechos no menciona las responsabilidades suyas. Sus responsabilidades referentes a su seguro pueden ser encontradas en su póliza. No cumplir con sus obligaciones podría afectar sus derechos.

### Cómo obtener información por parte del Departamento de Seguros y su compañía de seguros

1. *INFORMACIÓN QUE PUEDE OBTENER DE TDI.* Usted tiene derecho a llamar gratis a TDI al 1-800-252-3439 para obtener más información sobre:
   - sus derechos como consumidor de seguros;
   - el estado de la licencia de una compañía de seguros o agente;
   - la situación económica de una compañía de seguros;
   - el promedio y tipo de quejas que los consumidores han presentado en contra de una compañía de seguros;
   - la manera en que las compañías de seguros usan el historial de crédito, incluso cuáles la usan y la formula que cada compañía utiliza para las calificaciones de crédito;
   - los precios que la compañía de seguros tiene registrados en el estado;
   - las guías de aseguramiento de la compañía de seguros (sujeto a las excepciones provistas en la Ley de Información Pública, también conocida como la Ley de Archivos Públicos);
   - El Texas FAIR Plan, desingado para ayudar a los consumidores que se les ha negado cobertura al lo menos por does compañías de seguro; y
   - otros asuntos de interés al consumidor.

También puede encontrar alguna de esta información en el sitio Web de TDI en www.tdi.texas.gov.

En www.helpinsure.com, las personas en Texas pueden encontrar más información detallada sobre sus aseguradores actuales y futuros. TDI, en conjunto con OPIC, mantiene este sitio Web para ayudar a las personas en Texas a encontrar un seguro de propiedad residencial y de automóvil personal. Para obtener información sobre las compañías que expiden seguros en Texas, que se encuentran en los 25 principales grupos a nivel nacional, el sitio Web también incluye:

- una lista de las aseguradoras por condado y/o código postal;
- información de contacto detallada para cada aseguradora;
- muestras de los precios y un breve historial de los incrementos y/o reducciones en los precios;
- comparaciones de las formas de pólizas;
- una lista de las formas de pólizas, exclusiones, endosos, y descuentos ofrecidos por cada aseguradora; y
- medidas disciplinarias no confidenciales en contra de cada aseguradora.

2.  *INFORMACIÓN QUE PUEDE OBTENER DE SU COMPAÑÍA DE SEGUROS.*  Usted tiene derecho a que la compañía de seguros tenga un número telefónico al que pueda llamar gratis para hacer preguntas o presentar quejas. Este número lo puede encontrar en un aviso adjunto a su póliza. Las compañías de seguros pequeñas no están obligadas a cumplir con este requisito.

**Lo que debe saber antes de comprar un seguro**

3.  *DECLARACIONES PROHIBIDA.*  Su compañía de seguros o agente tienen prohibido hacer declaraciones falsas, engañosas o embaucadoras con respecto a los seguros.

4.  *SEGURO REQUERIDO POR LA FINANCIERA.*  La financiera no puede exigirle, como condición para financiar el préstamo de su casa u otros servicios de financiamiento para la propiedad, que usted compre seguro por una cantidad que exceda el costo de reemplazo del inmueble y su contenido, sin importar la suma del préstamo de casa u otros arreglos de financiamiento. Para determinar el costo de reemplazo del inmueble, la financiera no puede incluir el valor de mercado del terreno en el que el inmueble está ubicado.

5.  *INFORMACIÓN DE CRÉDITO.*  Una compañía de seguros no puede negarle el seguro basándose solamente en la información de su historial de crédito. Las aseguradoras que utilizan el historial de crédito también tienen que considerar otros factores de aseguramiento independientes al historial de crédito cuando deciden ofrecerle cobertura. (Para obtener información adicional vea la sección de esta Declaración de Derechos titulada *Lo que usted debe saber sobre cómo usan el historial de crédito las compañías de seguros.*)

6.  *RECLAMACIONES POR DAÑOS DE AGUA RELACIONADAS A APARATOS DOMÉSTICOS*.  La compañía de seguros no puede negarle el seguro o aumentar su prima basándose en una reclamación anterior debido a daños de agua relacionados a aparatos domésticos sí:
- el daño ha sido debidamente reparado o remediado, y
- la reparación o remedio fue inspeccionado y certificado.

AVISO: Una compañía puede usar una reclamación por daños de agua relacionada a aparatos domésticos si usted ha presentado tres reclamaciones de este tipo en el transcurso de tres años y la compañía ha pagado por las reclamaciones. Esto incluye reclamaciones presentadas por usted o presentadas a cargo de su propiedad.

7.  *RECLAMACIONES POR DAÑOS CAUSADOS POR EL AGUA O EL MOHO (HONGOS).*  La aseguradora no puede negarle el seguro basándose en una sola reclamación anterior presentada por daños causados por el agua. Una compañía de seguros tampoco puede negarle el seguro si usted tuvo daños previos causados por el moho, o en una reclamación anterior debido al moho si:
- el daño o reclamación debidamente reparó o remedió; y
- la reparación o remedio fue inspeccionado y certificado.

AVISO: Esto incluye las reclamaciones presentadas por usted o presentadas a cargo de su propiedad.

8.  *CONDICIONES EN LAS QUE SE ENCUENTRA LA PROPIEDAD.*  Programa de Inspección Voluntaria: Usted tiene derecho a que se le haga a su propiedad una inspección independiente llevada a cabo por cualquier inspector autorizado por el Comisionado de Seguros. Una vez que el inspector determina que la propiedad reúne ciertos requisitos mínimos y expide el certificado de inspección, ninguna aseguradora puede negarle la cobertura basándose en las condiciones en que se encuentra la propiedad, sin re inspeccionar la propiedad. Si una

aseguradora después le niega la cobertura, la aseguradora tiene que identificar, por escrito, el problema(s) específico(s) que causa que la propiedad no sea asegurable. En el sitio Web de TDI puede encontrar una lista de inspectores a su disposición www.tdi.texas.gov/company/vipagnt.html o puede llamar directamente a TDI al 1-800-252-3439 y pedir la lista.

9.  **RED DE SEGURIDAD.** Si dos compañías de seguros se han negado a venderle un seguro, usted puede tener derecho a comprar un seguro básico de propietario de vivienda mediante el Plan de Acceso Justo a los Seguros en Texas, también conocido como el Texas FAIR Plan. Su propiedad tiene que reunir ciertos requisitos, y la elegibilidad para la cobertura del Texas FAIR Plan tiene que ser restablecida cada dos años. Usted puede obtener una lista de los agentes de seguros que tienen autorización para vender la cobertura de la Asociación Texas FAIR Plan en el sitio Web www.texasfairplan.org o llamando al 1-800-979-6440 (512-505-2200 en Austin).

10.  **COBERTURA CONTRA VENTARRONES.**   Para las propiedades ubicadas en áreas designadas por el Comisionado de Seguros, en ciertos condados en o cerca de la costa, usted puede tener derecho a comprar una cobertura contra ventarrones y granizo por medio de la Asociación de Seguros Contra Tormentas de Texas (Texas Windstorm Insurance Association - TWIA, por su nombre y siglas en inglés), si por lo menos una compañía de seguros que actualmente esté proporcionando cobertura contra ventarrones en el mercado estándar, se ha negado a venderle una cobertura contra ventarrones. Su propiedad tiene que reunir ciertos requisitos, y la elegibilidad para obtener una cobertura TWIA debe ser restablecida cada tres años. Es posible que tenga que restablecer la elegibilidad antes de los tres años si usted le ha hecho cualquier reparación o alteración a su casa. La cobertura contra ventarrones mediante TWIA está limitada a la cantidad máxima fijada anualmente por el Comisionado de Seguros. Este derecho aplica compre o no compre usted otro seguro para su casa. En todos los otros condados las pólizas para propietario de vivienda o habitación incluyen la cobertura contra ventarrones y granizo, a menos que usted solicite que esta cobertura sea eliminada de su póliza.

AVISO: Si usted vive en una zona que tiende a inundarse (Zona V, Zona VE, y Zona VI-130) y su vivienda fue construida, alterada, remodelada, o ampliada después del 1° de septiembre de 2009, usted debe comprar un seguro contra inundaciones, por medio del Programa Nacional de Seguros Contra Inundación (National Flood Insurance Program - NFIP, por su nombre y siglas en inglés) para poder ser elegible para comprar una cobertura contra ventarrones mediante TWIA. Sin embargo, si NFIP no proporciona seguro contra inundaciones en su área, no es requerido que usted lo compre.

11.  **PAGOS ELECTRÓNICOS.**  Si usted autoriza que su aseguradora retire los pagos de su prima directamente de su institución financiera, incluyendo su cuenta de plica, su aseguradora no puede aumentar la cantidad que retira, a menos que:
*   la aseguradora le notifique por medio del correo postal de los Estados Unidos sobre el aumento de prima mínimo 30 días antes de la fecha en que el aumento entrará en vigor; y
*   usted no notifique a la aseguradora que usted se opone al aumento en la cantidad que va a ser retirada de su cuenta, mínimo cinco días antes de la fecha en que el aumento entrará en vigor.

El aviso proporcionado por la aseguradora tiene que incluir un número de teléfono gratuito, una dirección postal y una dirección de correo electrónico (si es que aplica), mediante los cuales usted pueda comunicarse con la aseguradora para oponerse al aumento.

AVISO: Esto no aplica a los aumentos de prima específicamente programados en la póliza original, ni a los aumentos debido a cambios que usted solicita en la póliza, o a un aumento que es menos de $10 o el 10 por ciento del pago del mes anterior.

12.  **AVISO DE REDUCCIÓN DE COBERTURA.**  Si una aseguradora usa un endoso para reducir la cantidad de la cobertura que es proporcionada por su póliza, la aseguradora tiene que darle una explicación por escrito sobre el cambio hecho mediante el endoso. La aseguradora tiene que darle esta explicación a no más tardar del día 30, antes de la fecha en que la nueva póliza o la renovación de la póliza entran en vigor. Una compañía de seguros no puede reducir la cobertura durante la vigencia de la póliza, a menos que usted solicite el cambio. Si usted solicita el cambio, la compañía no está obligada a darle aviso.

13. ***AVISO DE AUMENTO DE PRIMA.***  Si la aseguradora intenta aumentar su prima el 10 por ciento o más en la fecha de renovación, la aseguradora tiene que enviarle un aviso mínimo 30 días antes de la fecha de renovación.

14. ***EXPLICACIÓN DE RECHAZO.***  A petición suya, usted tiene derecho a que se le informe por escrito el motivo por el que se le negó la cobertura. El aviso por escrito tiene que explicar detalladamente el motivo por el que decidieron negarle la cobertura, incluyendo los percances precisos, las circunstancias o los factores de riesgo que lo descalificaron. También tiene que informarle las fuentes de información que utilizó.

AVISO: La obligación de darle una explicación por escrito le corresponde directamente a las compañías de seguros. Los agentes independientes no tienen el deber específico de cotizarle el precio más bajo posible o darle una explicación por escrito del motivo por el que no le ofrecieron el precio más bajo posible.

15. ***PREGUENTAS POR PARTE DE LOS CLIENTES.***  Una compañía de seguros no puede usar preguntas hechas por los clientes como base para negarle a usted la cobertura o para determinar su prima.

AVISO: Preguntas por parte de los clientes incluyen:
- preguntas en general sobre su póliza;
- preguntas sobre el proceso de la compañía para presentar reclamaciones; y
- preguntas para saber si la póliza cubrirá un percance a menos que la pregunta tenga que ver con daños en específico que han ocurrido y que han resultado en una investigación o una reclamación.

16. ***PRECIOS DIFERENTES DENTRO DEL MISMO CONDADO.***  Si una aseguradora subdivide un condado con el propósito de cobrar diferentes precios en cada subdivisión, la diferencia entre el precio más bajo y el más alto no puede exceder el 15 por ciento, a menos que esté justificado por datos actuariales.

17. ***DERECHO A LA PRIVACIDAD.***  Usted tiene derecho a evitar que una compañía de seguros, agente, ajustador, o institución financiera revele sus datos financieros personales a las compañías que no están afiliadas a la compañía de seguros o institución financiera. Algunos ejemplos son: su ingreso, número de seguro social, historial de crédito, y su historial de pago de primas.

Si usted solicita una póliza, la compañía de seguros o institución financiera tiene que avisarle si intenta compartir su información financiera, y darle un mínimo de 30 días para que usted pueda rehusarse a permitir que revelen. El rehusarse a que revelen sus datos se conoce como optar por no participar (opting out, por su nombre en inglés). Si usted compra una póliza, la compañía de seguros o institución financiera tiene que decirle cuál información reúne sobre usted y si intenta compartirla, y darle un mínimo de 30 días para que pueda optar por no participar. Los agentes y ajustadores que intentan compartir sus datos con cualquiera ajeno a la compañía de seguros o institución financiera también tienen que darle un aviso semejante.

Usted puede optar por no participar (opt out) en cualquier momento. Su decisión para optar por no participar permanece vigente, a menos que usted la revoque.

Estas protecciones no aplican a:
- la información que en otros lugares está a disposición del público;
- la información que las compañías de seguros o instituciones financieras están obligadas por ley a revelar; o
- la información que las compañías de seguros o instituciones financieras tienen que compartir para conducer sus actividades normales de negocios.

**Lo que usted debe saber sobre las cancelaciones y no renovaciones**

**Cancelación** significa que <u>antes de terminar</u> la vigencia de la póliza la compañía de seguros:
- termina la póliza;
- reduce o restringe la cobertura bajo la póliza; o

- se rehúsa a ofrecer cobertura adicional a la que usted tiene derecho bajo la póliza.

**Rehusarse a renovar y no renovación** significa que la póliza termina <u>cuando termina</u> la vigencia de la póliza.

El **período de vigencia de la póliza** se muestra en la página de declaraciones al frente de su póliza.

18. *LIMITACIÓN EN LA CANCELACIÓN DE LAS POLIZAS PARA PROPIETARIOS DE VIVIENDA E INQUILINO.* Una vez que el período inicial de la póliza que expidió la compañía ha estado en vigor por 60 días o más, la compañía de seguros no puede cancelar su póliza a menos que:
    - usted no pague la prima a su debido tiempo;
    - usted presente una reclamación fraudulenta;
    - haya un aumento en el riesgo amparado por la póliza, un riesgo que está bajo su control y que resulta en un aumento en la prima de su póliza; o
    - si TDI determina que continuar la póliza resultaría en una infracción a las leyes de seguros.

    Si su póliza ha estado en vigor menos de 60 días, la compañía de seguros no puede cancelarla a menos que:
    - aplique una de las razones arriba mencionadas;
    - la compañía de seguros identifique una situación que:
        - está creando un aumento de riesgo;
        - no fue revelada en la solicitud de seguro; y
        - no es sujeto de una reclamación previa; o
    - la compañía de seguros rechace un reporte de inspección requerida dentro de los 10 días a partir de la fecha en que recibe el reporte. El reporte tiene que haber sido llevado a cabo por un inspector autorizado, o con licencia, y no puede ser de más de 90 días.

19. *LIMITACIÓN EN LA CANCELACIÓN DE LAS PÓLIZAS DE HABITACIÓN.* Una vez que el período inicial de la póliza de habitación ha estado en vigor 90 días, la compañía de seguros no puede cancelarla a menos que:
    - usted no pague la prima en la fecha debida;
    - usted presente una reclamación fraudulenta;
    - haya un aumento en el riesgo amparado por la póliza, un riesgo que está bajo su control y resulta en un aumento en la prima de su póliza; o
    - si TDI determina que continuar la póliza resultaría en una infracción a las leyes de seguros.

20. *AVISO DE CANCELACIÓN.* Para cancelar su póliza, su compañía de seguros tiene que enviarle un aviso al menos 10 días antes de la fecha en que la cancelación entrará en vigor. Su póliza podría estipular más tiempo para este tipo de aviso.

21. *EL DERECHO DEL ASEGURADO PARA CANCELAR LA PÓLIZA.* Usted tiene derecho a cancelar su póliza en cualquier momento y recibir reembolso de la prima no devengada.

22. *CAMBIO EN SU ESTADO CIVIL.* Si su estado civil cambia, usted tiene derecho a continuar con su cobertura de seguro. Usted tiene derecho a una póliza nueva, a su nombre, con coberturas que más se aproximen a las coberturas de su póliza anterior, incluso con la misma fecha de vencimiento. La compañía de seguros no puede fechar la nueva póliza de manera que entre la póliza anterior y la nueva haya un lapso de cobertura.

23. *USO DEL HISTORIAL DE RECLAMACIONES PARA NO RENOVAR O PARA DETERMINAR LA PRIMA DE RENOVACIÓN.* Su compañía de seguros no puede usar, como base para no renovarle su póliza, las reclamaciones que usted ha presentado, a menos que:
    - usted presente tres o más reclamaciones en un período de tres años; y
    - su aseguradora le notifique por escrito, después de la segunda reclamación, que la presentación de una tercera reclamación podría causar que no le renueven la póliza.

La compañía de seguros no puede utilizar los siguientes tipos de reclamaciones para determinar la cantidad de reclamaciones que usted ha presentado o para determinar su prima si su póliza es renovada:

- las reclamaciones debido a daños por causas naturales, incluso daños causados por el mal tiempo;
- las reclamaciones por daños de agua relacionados a aparatos domésticos cuando las reparaciones han sido inspeccionadas y certificadas; o
- las reclamaciones presentadas pero que no fueron pagadas o pagables bajo la póliza.

AVISO: La aseguradora puede contar las reclamaciones relacionadas a los aparatos domésticos si se han presentado y se han pagado tres o más reclamaciones de este tipo en un período de tres años.

24. **EL USO DEL HISTORIAL DE CRÉDITO PARA NO RENOVAR.**  Una compañía de seguros no puede rehusarse a renovar su póliza basándose únicamente en su historial de crédito. Las aseguradoras que utilizan el historial de crédito para decidir si renuevan o no la póliza también tienen que considerar otros factores de aseguramiento independientes a la información de su historial de crédito. (Para obtener más información vea la sección de esta Declaración de Derechos titulada *Lo que usted debe saber sobre cómo usan el historial de crédito las compañías de seguros*.)

25. **AVISO DE CAMBIOS EN LA PÓLIZA.**  Cuando la aseguradora le renueva la póliza tiene que avisarle por escrito sobre cualquier diferencia entre la póliza actual que usted ya tiene y cualquier otra póliza que le está ofreciendo. En ciertos casos la compañía de seguros también tiene que darle una comparación entre la póliza que le está ofreciendo y las pólizas adoptadas por el Comisionado de Seguros.

26. **AVISO DE NO RENOVACIÓN.**  Si la compañía de seguros no le envía por correo postal un aviso de no renovación al menos 30 días antes del vencimiento de su póliza, usted tiene derecho a exigir que la compañía de seguros renueve su póliza.

27. **EXPLICACIÓN DE CANCELACIÓN O DE NO RENOVACIÓN.**  Usted tiene derecho, sujeto a que usted lo solicite, que la compañía de seguros le explique por escrito el motivo por el que decidió cancelar o no renovar la póliza. La explicación por escrito tiene que explicar totalmente el motivo, incluyendo los percances precisos, las circunstancias o los factores de riesgo que lo descalificaron. También tiene que informarle las fuentes de información que utilizó.

### Lo que usted debe saber cuándo presenta una reclamación

28. **TRATO JUSTO.**  Usted tiene derecho a que lo traten justa y honestamente cuando presenta una reclamación. Si cree que una compañía de seguros lo ha tratado injustamente, llame a TDI 1-800-252-3439 o descargue un formulario de queja del sitio Web de TDI en www.tdi.texas.gov. Usted puede llenar el formulario directamente en nuestro sitio Web o enviarla por fax a TDI al 512-490-1007.

29. **OFRECIMIENTO DE LIQUIDACIÓN.**  Usted tiene derecho a rechazar cualquier cantidad que la compañía de seguros le ofrezca para liquidar su reclamación, incluso cualquier valuación injusta. Si usted rechaza el ofrecimiento de una liquidación, sus opciones incluyen el continuar negociando con la aseguradora o buscar remedios legales tales como la mediación, el arbitraje o presentar una demanda. Usted tiene derecho a que su casa sea reparada por cualquier trabajador que usted escoja.

30. **EXPLICACIÓN DEL RECHAZO DE RECLAMACIÓN.**  Su compañía de seguros tiene que decirle por escrito el motivo por el que rechaza la reclamación o parte de la reclamación.

31. **MARCOS DE TIEMPO PARA EL PROCESO Y PAGO DE LAS RECLAMACIONES.**  Cuando presenta una reclamación a cargo de su propia póliza, usted tiene derecho a que sea procesada y pagada prontamente. Si la compañía de seguros no cumple con los marcos de tiempo estipulados para el proceso y pago de las reclamaciones, usted tiene derecho a cobrar un interés anual del 18 por ciento y honorarios de abogado, además de la suma de su reclamación.

Generalmente, dentro de **15 días naturales**, su compañía de seguros tiene que acusar recibo de su reclamación y solicitar cualquier información razonablemente relacionada a la misma. Dentro de **15 días hábiles** (30 días si la compañía razonablemente sospecha incendio premeditado) después de recibir toda la información solicitada, la compañía tiene que aprobar o rechazar la reclamación por escrito. La ley permite que la compañía de seguros extienda este marco de tiempo hasta **45 días** si le avisa que necesita más tiempo y le explica el motivo. Después de notificarle que la reclamación ha sido aprobada, su compañía de seguros tiene que pagarla **dentro de los siguientes cinco días hábiles**.

Si su reclamación es a consecuencia de una catástrofe relacionada al mal tiempo u otro desastre grande de la naturaleza, según lo definido por TDI, los marcos de tiempo para el proceso de estas reclamaciones son extendidos a 15 días adicionales.

32. *EL COBRO DE LOS PAGOS DE LA RECLAMACIÓN.*   Con frecuencia la compañía de seguros expedirá el cheque de la reclamación a nombre de usted y de la compañía hipotecaria u otra financiera y lo enviará directamente a la financiera. En ese caso la financiera tiene que notificarle dentro de 10 días a partir de la fecha en que recibe el cheque, y explicarle lo que tiene que hacer para retirar los fondos.
Una vez que usted solicita los fondos la financiera debe, dentro de los siguientes diez días:
   • permitir que usted retire el dinero; o
   • explicarle en detalle lo que tiene que hacer para retirar el dinero.

Si la financiera no le da los avisos arriba mencionados, o no le paga el dinero después que usted ha cumplido con los requisitos, la financiera tiene que pagarle el 10 por ciento de interés anual sobre los fondos, a partir de la fecha en que el pago o los avisos debieron haberse hecho.

33. *AVISO DE PAGO DE RECLAMACIÓN POR RESPONSABILIDAD CIVIL.*  Su compañía de seguros tiene que darle aviso si intenta pagar una reclamación de responsabilidad civil a cargo de su póliza. La compañía tiene que avisarle por escrito sobre cualquier ofrecimiento inicial que está haciendo para resolver o liquidar la reclamación en contra suya, y tiene que avisarle a más tardar el décimo día a partir de la fecha en que hizo el ofrecimiento. La compañía tiene que avisarle por escrito cuando liquida una reclamación en contra suya, y tiene que avisarle a más tardar el treintavo día a partir de la fecha en que hace la liquidación.

34. *INFORMACIÓN NO REQUERIDA PARA EL PROCESO DE UNA RECLAMACIÓN.*   Usted tiene derecho a rehusarse a proporcionar a su compañía de seguros información que no está relacionada con su reclamación. Además, usted puede rehusarse a proporcionar sus reportes de declaración de impuestos (federal income tax records, por su nombre en inglés), a menos que su aseguradora obtenga una orden judicial (court order, por su nombre en inglés) o si su reclamación está relacionada con la pérdida de ingresos o debido a un incendio.

**Lo que usted debe saber sobre lo que está prohibido en cuestión de discriminación**

35. *SECTORES PROTEGIDOS.*  Una compañía de seguros no puede discriminar en contra suya al rehusarse a asegurarlo, limitarle la cantidad, grado o clase de cobertura a disposición suya; tampoco puede cobrarle un precio diferente por la misma cobertura o rehusarse a renovarle la póliza debido a:
   • su raza, color, religión, sexo, estado civil, incapacidad o incapacidad parcial, u origen nacional; o
   • a menos que lo justifique con una experiencia de pérdidas reales o anticipadas, a causa de la edad o ubicación geográfica.

36. *ANTIGÜEDAD DE LA CASA.*  La compañía de seguros no puede rehusarse a asegurar la propiedad debido a la antigüedad de su casa. Sin embargo, la compañía podría rehusarse a venderle la cobertura de seguro basándose en las condiciones en las que se encuentra su propiedad, incluso las condiciones en que se encuentra la plomería, sistemas de calefacción y aire acondicionado, alambrado, y techo.

37. *VALOR DE LA PROPIEDAD.*  La compañía de seguros no puede rehusarse a asegurar su propiedad porque el valor es muy bajo o porque la compañía ha establecido cantidades mínimas de cobertura.

38. *GUIAS DE ASEGURAMIENTO.* Las guías de aseguramiento no pueden ser injustamente discriminatorias y tienen que estar basadas en principios sólidos de actuario.

39. *IGUALDAD DE TRATO.* A menos que se base en principios sólidos de actuario, la compañía de seguros no puede tratarlo de manera diferente a como trata a otros individuos de su misma clase y que esencialmente presentan el mismo riesgo. Si sostiene pérdidas económicas como resultado de este tipo de discriminación, usted tiene derecho a demandar a la compañía de seguros en una Corte de Distrito del Condado de Travis.

Si el veredicto es a su favor, usted podría recuperar sus pérdidas económicas, los costos de la corte, los honorarios de su abogado y de los testigos peritos necesarios. Si la corte determina que la compañía de seguros intencionadamente infraccionó sus derechos, también podría otorgar a cada reclamante una cantidad de hasta $25,000.

La demanda tendría que presentarla a más tardar para el segundo aniversario de la fecha en que la aseguradora le negó el seguro o cuando la acción injusta ocurrió o en la fecha en que usted razonablemente debió haber descubierto que la acción injusta ocurrió. Si la corte determina que la demanda no tiene fundamento y que usted la presentó de mala fe, o que la presentó con propósitos de acoso, usted estará obligado a pagar los costos de la corte y los honorarios del abogado de la compañía de seguros.

**Lo que usted debe saber sobre cómo usan el historial de crédito las compañías de seguros**

40. *LA ASEGURADORA ESTÁ OBLIGADA A AVISARLE.* Si una compañía de seguros utiliza el historial de crédito para hacer decisiones de aseguramiento o clasificación de póliza, la compañía está obligada a darle una declaración de divulgación del uso del historial de crédito dentro de los 10 días a partir de la fecha en que usted completó la solicitud de seguro.

Esa declaración revelará si la aseguradora obtendrá y utilizará su historial de crédito, y enumerará sus derechos legales específicos, incluyendo:
   - el historial de crédito que las compañías de seguros no pueden usar en contra suya;
   - cómo es que usted puede conseguir que se le hagan excepciones razonables que su aseguradora está obligada a hacer cuando usa el historial de crédito si ciertas circunstancias de la vida afectan negativamente el historial de crédito, por ejemplo: un divorcio, fallecimiento de un familiar cercano o robo de identidad;
   - el aviso* que una aseguradora tiene que enviarle cuando hace una decisión basada en su información de crédito que negativamente afecta su habilidad para obtener o mantener el seguro o requiere que usted pague una prima más alta; y
   - cómo puede usted disputar el historial de crédito y requerir que la aseguradora reclasifique su póliza si el precio fue aumentado debido a información de crédito incorrecta o no verificable.

* El aviso tiene que incluir una descripción de hasta cuatro factores primarios que influenciaron la decisión de la aseguradora.

Las aseguradoras tienen que usar el formulario de Declaración de Divulgación del Uso de Información de Crédito (CD-1), el cual fue adoptado por el Comisionado o un formulario equivalente que antes de usar hayan registrado ante TDI. El formulario CD-1 se encuentra disponible en www.tdi.texas.gov/forms/pcpersonal/pc328crdtds.pdf o puede pedirlo llamando al 1-800-252-3439. En nuestro sitio Web www.tdi.texas.gov/credit/credit.html, usted encontrará información adicional sobre el uso que hacen las aseguradoras del historial de crédito.

**Lo que usted debe saber para ejercer sus derechos**

41. *PRESENTACIÓN DE QUEJAS.* Usted tiene derecho a presentar una queja ante TDI sobre cualquier compañía de seguros y/o asunto de seguros y recibir una pronta investigación y respuesta a su queja. Para hacer esto, usted debe:
   - llamar a la *Línea de Ayuda al Consumidor* de TDI (TDI's Consumer Help Line, por su nombre en inglés),

al 1-800-252-3439, para obtener servicio en inglés y en español;

- escribir a la siguiente dirección, Texas Department of Insurance, Consumer Protection, (111-1A), P. O. Box 149091, Austin, TX 78714-9091;
- enviar un correo electrónico a TDI a ConsumerProtection@tdi.texas.gov;
- enviar su queja por fax al 512- 490-1007;
- descargar o completar el formulario de queja en nuestro sitio Web en www.tdi.texas.gov; o
- llamar a nuestra *Línea para Pedidos de Publicaciones /Formulario de Queja* (TDI Publications/Complaint Form Order Line, por su nombre en inglés) al 1-800-599-SHOP (7467). La línea de pedidos de publicaciones está disponible las 24 horas del día, siete días a la semana.

AVISO: TDI ofrece servicios de intérprete y publicaciones en diferentes formatos. Las personas que necesitan información en diferentes formatos o idiomas pueden llamar a la *Línea de Ayuda al Consumidor de TDI* que se muestra en la parte de arriba.

42. *DERECHO A DEMANDAR.*  Si alguna compañía de seguros infracciona sus derechos, usted puede demandar a la compañía en una corte, incluso en una corte para demandas pequeñas, con o sin abogado.

43. *QUIEN TIENE LA OBLIGACIÓN DE PRESENTAR LAS PRUEBAS.*  Si usted demanda para recuperar bajo su póliza de seguro, la compañía de seguros es la que está obligada a presentar las pruebas del motivo por el que dice que ejerció la exclusión en la póliza y cualquier excepción u otra evasión de cobertura que sea alegada por la aseguradora.

44. *SOLICITUD PARA REGLAMENTOS NUEVOS.*  Usted tiene derecho a pedir por escrito que TDI establezca o cambie reglamentos, respecto a cualquier cuestión de seguros para propiedad residencial que a usted le interese. Envíe su petición por escrito a: Texas Department of Insurance, Attn: Commissioner (113-2A), P.O. Box 149104, Austin, TX 78714-9104.

# CONSUMER BILL OF RIGHTS
# HOMEOWNERS, DWELLING AND RENTERS INSURANCE

<u>AVISO:</u> Este documento es un resumen de sus derechos como asegurado.  Usted tiene el derecho a llamar a su compañía y pedir una copia de estos derechos en español.

### What is the Bill of Rights?

This Bill of Rights is a summary of your rights and does not become a part of your policy.  The Texas Department of Insurance (TDI) adopted the Bill of Rights and requires insurance companies to provide you a copy when they issue your policy.

Texas law gives you certain rights regarding your homeowners, dwelling and renters insurance.  This Bill of Rights identifies your rights specified by rule or by state statute, but it does not include all of your rights.  Also, some exceptions to the rights are not listed here.  Legislative or regulatory changes to statutes or rules may affect your rights as an insured. If your agent, company, or adjuster tells you that one of these rights does not apply to you, contact TDI's Consumer Protection Program at 1-800-252-3439, by mail at Mail Code 111-1A, P.O. Box 149091, Austin, TX 78714-9091, or by email at ConsumerProtection@tdi.texas.gov.  For a list of the specific law(s) and/or rule(s) summarized in each item of this Bill of Rights, or if you have questions or comments contact the Office of Public Insurance Counsel (OPIC) toll free at 1-877-611-6742, by mail at 333 Guadalupe, Suite 3-120, Austin, TX 78701, or visit the OPIC website at www.opic.texas.gov.

This Bill of Rights does not address your responsibilities.  Your responsibilities concerning your insurance can be found in your policy.  Failure to meet your obligations may affect your rights.

### Getting Information from the Department of Insurance and Your Insurance Company

1.  *INFORMATION FROM TDI.* You have the right to call TDI free of charge at 1-800-252-3439 to learn more about:
    - your rights as an insurance consumer;
    - the license status of an insurance company or agent;
    - the financial condition of an insurance company;
    - the complaint ratio and type of consumer complaints filed against an insurance company;
    - use of credit information by insurance companies, including which insurance companies use it and access to each company's credit scoring model;
    - an insurance company's rates filed with the state;
    - an insurance company's underwriting guidelines (subject to exemptions in the Public Information Act, also known as the Open Records Act);
    - the Texas FAIR Plan, designed to help consumers who have been denied coverage by at least two insurance companies; and
    - other consumer concerns.

You can also find some of this information on the TDI website at www.tdi.texas.gov.

At www.helpinsure.com, Texans can find more detailed information on their current and prospective insurers. TDI, in conjunction with OPIC, maintains this website to help Texans shop for residential property insurance and personal automobile insurance. For companies writing in Texas that are in the top 25 company groups nationally, the site also includes:
    - a list of insurers by county and/or ZIP code;
    - detailed contact information for each insurer;

- sample rates and a brief history of increases and/or decreases in the rates;
- policy form comparisons;
- a list of policy forms, exclusions, endorsements, and discounts offered by each insurer; and
- non-confidential disciplinary actions against each insurer.

2. **INFORMATION FROM YOUR INSURANCE COMPANY.**  You have the right to a toll-free number to call your insurance company free of charge with questions or complaints.  You can find this number on a notice accompanying your policy.  This requirement does not apply to small insurance companies.

### What you should know before you buy insurance

3. **PROHIBITED STATEMENTS.**  Your insurance company or agent is prohibited from making false, misleading, or deceptive statements to you relating to insurance.

4. **LENDER-REQUIRED INSURANCE.**  A lender cannot require you to purchase insurance on your property in an amount that exceeds the replacement cost of the dwelling and its contents as a condition of financing a residential mortgage or providing other financing arrangements for the property, regardless of the amount of the mortgage or other financing arrangements. In determining the replacement cost of the dwelling, a lender cannot include the fair market value of the land on which a dwelling is located.

5. **CREDIT INFORMATION.**  An insurance company cannot deny you insurance solely on the basis of credit information. Insurers who use credit information must also consider other underwriting factors independent of credit information when deciding whether to offer coverage. (For additional information see the section of this Bill of Rights titled *What you should know about insurance companies' use of credit information*.)

6. **APPLIANCE-RELATED WATER DAMAGE CLAIMS.**  An insurance company cannot deny you insurance or increase your premium based on a prior appliance-related water damage claim if:
- the damage has been properly repaired or remediated; and
- the repair or remediation was inspected and certified.

NOTE: A company can use an appliance-related water damage claim if you file three or more such claims in a 3-year period and the company has paid the claims. A claim includes a claim filed by you or a claim filed on your property.

7. **WATER CLAIMS/MOLD DAMAGE OR CLAIMS.**  An insurance company cannot deny you insurance based solely on a single prior water damage claim. An insurance company also cannot deny you insurance because of prior mold damage or a prior mold claim if:
- the damage or claim was properly repaired or remediated; and
- the repair or remediation was inspected and certified.

NOTE: A claim includes a claim filed by you or a claim filed on your property.

8. **PROPERTY CONDITION.**  Voluntary Inspection Program: You have the right to have an independent inspection of your property by any person authorized by the Commissioner of Insurance to perform inspections. Once the inspector determines that your property meets certain minimum requirements and issues you an inspection certificate, no insurer may deny coverage based on property conditions without reinspecting your property. If an insurer then denies coverage, the insurer must identify, in writing, the specific problem(s) that makes your property uninsurable.  You can find a list of available inspectors on the TDI website at www.tdi.texas.gov/company/vipagnt.html or you can contact TDI for the list directly at 1-800-252-3439.

9. **SAFETY NET.**  You may have the right to buy basic homeowners insurance through the Texas Fair Access to Insurance Requirements Plan, also known as the Texas FAIR Plan, if you have been denied coverage by two insurance companies. Your property must meet certain requirements, and eligibility for FAIR Plan coverage must

be re-established every two years. You can access a list of insurance agents who are authorized to sell this coverage on the Texas FAIR Plan Association website at www.texasfairplan.org or by calling 1-800-979-6440 (512-505-2200 in Austin).

10. **WINDSTORM COVERAGE.**  For property located in areas designated by the Commissioner in certain counties on or near the coast, you may have the right to buy windstorm and hail coverage from the Texas Windstorm Insurance Association (TWIA), if you have been denied windstorm coverage by one insurance company in the standard market currently providing windstorm coverage. Your property must meet certain requirements, and eligibility for TWIA coverage must be re-established every three years. You may have to re-establish eligibility sooner than every three years if you have made any repairs or alterations to your home. Windstorm coverage through TWIA is limited to a maximum amount set each year by the Commissioner of Insurance. This right applies whether or not you buy other insurance for your house. In all other counties your homeowners or dwelling policy includes windstorm and hail coverage unless you request that this coverage be removed from your policy.

NOTE: If you live in a certain flood zone (Zone V, Zone VE and Zone V1-130) and your dwelling was constructed, altered, remodeled, or enlarged after September 1, 2009, you must purchase flood insurance through the National Flood Insurance Program (NFIP) in order to be eligible to purchase windstorm coverage through TWIA. However, if NFIP does not provide flood insurance in your area, you are not required to purchase it.

11. **ELECTRONIC PAYMENTS.**  If you authorize your insurer to withdraw your premium payments directly from your financial institution, including your escrow account, your insurer cannot increase the amount withdrawn unless:

- the insurer notifies you by U.S. mail of the increase in premium at least 30 days prior to its effective date; and
- you do not notify the insurer that you object to the increase in the amount to be withdrawn at least five days prior to the increase.

The notice provided by the insurer must include a toll-free number, a mailing address and an email address (if applicable), through which you can contact the insurer to object to the increase.

NOTE: This does not apply to premium increases specifically scheduled in the original policy, to increases based on policy changes you request, or to an increase that is less than $10 or 10 percent of the previous month's payment.

12. **NOTICE OF REDUCED COVERAGE.**  If an insurer uses an endorsement to reduce the amount of coverage provided by your policy, the insurer must give you a written explanation of the change made by the endorsement. The insurer must provide the explanation not later than the 30th day before the effective date of the new or renewal policy. An insurance company cannot reduce coverage during the policy period unless you request the change. If you request the change, the company is not required to provide notice.

13. **NOTICE OF PREMIUM INCREASE.**  If your insurer intends to increase your premium by 10 percent or more upon renewal, the insurer must send you notice of the rate increase at least 30 days before your renewal date.

14. **EXPLANATION OF DENIAL.**  Upon request, you have the right to be told in writing why you have been denied coverage. The written statement must fully explain the decision, including the precise incidents, circumstances, or risk factors that disqualified you. It must also state the sources of information used.

NOTE: The obligation to provide a written explanation applies to insurance companies directly. An independent agent does not have a specific duty to quote the lowest possible rate to a consumer or to provide a written statement explaining why the agent did not offer the consumer the lowest possible rate.

15. **CUSTOMER INQUIRY.**  An insurance company cannot use a customer inquiry as a basis for denying you coverage or determining your premium.

NOTE: A customer inquiry includes:

- general questions about your policy;
- questions concerning the company's claims filing process; and
- questions about whether the policy will cover a loss unless the question concerns specific damage that has occurred and that results in an investigation or claim.

16. *RATE DIFFERENTIAL WITHIN A COUNTY.*  If an insurer subdivides a county for the purposes of charging different rates for each subdivision, the difference between the lowest and the highest rate cannot exceed 15 percent unless actuarially justified.

17. *RIGHT TO PRIVACY.*  You have the right to prevent an insurance company, agent, adjuster, or financial institution from disclosing your personal financial information to companies that are not affiliated with the insurance company or financial institution. Some examples are income, social security number, credit history, and premium payment history.

If you apply for a policy, the insurance company or financial institution must notify you if it intends to share financial information about you and give you at least 30 days to refuse. This refusal is called "opting out." If you buy a policy, the insurance company or financial institution must tell you what information it collects about you and whether it intends to share any of the information, and give you at least 30 days to opt out. Agents and adjusters who intend to share your information with anyone other than the insurance company or financial institution must give you similar notices.

You can opt out at any time. Your decision to opt out remains in effect unless you revoke it.

These protections do not apply to information:
- publicly available elsewhere;
- insurance companies or financial institutions are required by law to disclose; or
- insurance companies or financial institutions must share in order to conduct ordinary business activities.

**What you should know about cancellation and nonrenewal**

**Cancellation** means that **before the end** of the policy period the insurance company:
- terminates the policy;
- reduces or restricts coverage under the policy; or
- refuses to provide additional coverage to which you are entitled under the policy.

**Refusal to renew** and **nonrenewal** mean the policy terminates **at the end** of the policy period.

The **policy period** is shown on the declarations page at the front of your policy.

18. *LIMITATION ON CANCELLATION FOR HOMEOWNERS AND RENTERS POLICIES.*  After your initial homeowners or renters policy with your company has been in effect for 60 days or more, that insurance company cannot cancel your policy unless:
- you don't pay your premium when due;
- you file a fraudulent claim;
- there is an increase in the hazard covered by the policy that is within your control and results in an increase in the premium rate of your policy; or
- TDI determines continuation of the policy would result in violation of insurance laws.

If your policy has been in effect for less than 60 days, your insurance company cannot cancel your policy unless:
- one of the reasons listed above applies;
- the insurance company identifies a condition that:

- creates an increase in hazard;
- was not disclosed on your application; and
- is not the subject of a prior claim; or
- the insurance company rejects a required inspection report within 10 days after receiving the report. The report must be completed by a licensed or authorized inspector and cannot be more than 90 days old.

19. **LIMITATION ON CANCELLATION FOR DWELLING POLICIES.**  After your initial dwelling policy with your company has been in effect for 90 days, that insurance company cannot cancel your policy unless:

- you don't pay your premium when due;
- you file a fraudulent claim;
- there is an increase in the hazard covered by the policy that is within your control and results in an increase in the premium rate of your policy; or
- TDI determines continuation of the policy would result in violation of insurance laws.

20. **NOTICE OF CANCELLATION.**  To cancel your policy, your insurance company must mail notice at least 10 days prior to the effective date of the cancellation. Your policy may provide for even greater notice.

21. **POLICYHOLDER'S RIGHT TO CANCEL.**  You have the right to cancel your policy at any time and receive a refund of the remaining premium.

22. **CHANGE IN MARITAL STATUS.**  If your marital status changes, you have the right to continue your insurance coverage. You have a right to a new policy in your name with coverages that most nearly approximate the coverages of your prior policy, including the same expiration date. The insurance company cannot date the new policy so that a gap in coverage occurs.

23. **USE OF CLAIMS HISTORY TO NONRENEW OR DETERMINE RENEWAL PREMIUM.**  Your insurance company cannot use claims you filed as a basis to nonrenew your policy unless:

- you file three or more claims in any 3-year period; and
- your insurer notified you in writing after the second claim that filing a third claim could result in nonrenewal of your policy.

Your insurance company cannot use the following types of claims to determine the number of claims you have filed or to determine your premium if your policy is renewed:

- claims for damage from natural causes, including weather-related damage;
- appliance-related water damage claims where the repairs have been inspected and certified; or
- claims filed but not paid or payable under the policy.

NOTE: An insurance company can count appliance-related claims if three or more such claims are filed and paid within a 3-year period.

24. **USE OF CREDIT INFORMATION TO NONRENEW.**  An insurance company cannot refuse to renew your policy solely on the basis of credit information. Insurers who use credit information must also consider other underwriting factors independent of credit information when deciding whether to renew coverage. (For additional information see the section of this Bill of Rights titled *What you should know about insurance companies' use of credit information.*)

25. **NOTICE OF CHANGE IN POLICY FORM.**  Your insurer must notify you in writing of any difference between your current policy and each policy offered to you when the policy renews. In certain instances your insurance company must also provide a comparison between the policy offered and policies adopted by the Commissioner of Insurance.

26. **NOTICE OF NONRENEWAL.**  If the insurance company does not mail you notice of nonrenewal at least 30 days before your policy expires, you have the right to require the insurance company to renew your policy.

27. **EXPLANATION OF CANCELLATION OR NONRENEWAL.**  Upon request, you have the right to a written explanation of an insurance company's decision to cancel or nonrenew your policy. The written statement must fully explain the decision, including the precise incidents, circumstances, or risk factors that disqualified you. It must also state the sources of information used.

### What you should know when you file a claim

28. **FAIR TREATMENT.**  You have the right to be treated fairly and honestly when you make a claim.  If you believe an insurance company has treated you unfairly, call TDI at 1-800-252-3439 or download a complaint form from the TDI website at www.tdi.texas.gov.  You can complete a complaint form on-line via the internet or fax a completed form to TDI at 512-490-1007.

29. **SETTLEMENT OFFER.**  You have the right to reject any settlement amount, including any unfair valuation, offered by the insurance company.  If you reject a settlement offer, your options include continuing to negotiate with the insurer or pursuing legal remedies, such as mediation, arbitration, or filing a lawsuit.  You have the right to have your home repaired by the repair person of your choice.

30. **EXPLANATION OF CLAIM DENIAL.**  Your insurance company must tell you in writing why your claim or part of your claim was denied.

31. **TIMEFRAMES FOR CLAIM PROCESSING AND PAYMENT.**  When you file a claim on your own policy, you have the right to have your claim processed and paid promptly.  If the insurance company fails to meet required claims processing and payment deadlines, you have the right to collect 18 percent annual interest and attorney's fees in addition to your claim amount.

Generally, within **15 calendar days**, your insurance company must acknowledge receipt of your claim and request any additional information reasonably related to your claim.  Within **15 business days** (30 days if the company reasonably suspects arson) after receipt of all requested information, the company must approve or deny your claim in writing.  The law allows the insurance company to extend this deadline up to **45 days** if it notifies you that more time is needed and tells you why.

After notifying you that your claim is approved, your insurance company must pay the claim **within 5 business days**.

If your claim results from a weather-related catastrophe or other major natural disaster as defined by TDI, these claims handling deadlines are extended for an additional 15 days.

32. **RELEASE OF CLAIM FUNDS.**  Often an insurance company will make a claim check payable to you and your mortgage company or other lender and will send it to the lender.  In that case, the lender must notify you within 10 days of receipt of the check and tell you what you must do to get the funds released to you.

Once you request the funds from the lender, within 10 days the lender must:
- release the money to you; or
- tell you in specific detail what you must do to get the money released.

If the lender does not provide the notices mentioned above or pay the money to you after all requirements have been met, the lender must pay you interest on the money at 10 percent per year from the time the payment or the notices were due.

33. *NOTICE OF LIABILITY CLAIM SETTLEMENT.* Your insurance company must notify you if it intends to pay a liability claim against your policy. The company must notify you in writing of an initial offer to compromise or settle a claim against you no later than the 10th day after the date the offer is made. The company must notify you in writing of any settlement of a claim against you no later than the 30th day after the date of the settlement.

34. *INFORMATION NOT REQUIRED FOR CLAIM PROCESSING.* You have the right to refuse to provide your insurance company with information that does not relate to your claim. In addition, you may refuse to provide your federal income tax records unless your insurer gets a court order or your claim involves lost income or a fire loss.

### What you should know about prohibited discrimination

35. *PROTECTED CLASSES.* An insurance company cannot discriminate against you by refusing to insure you; limiting the amount, extent or kind of coverage available to you; charging you a different rate for the same coverage; or refusing to renew your policy:
   - because of race, color, religion, gender, marital status, disability or partial disability, or national origin; or
   - unless justified by actual or anticipated loss experience, because of age or geographic location.

36. *AGE OF HOUSE.* An insurance company cannot refuse to insure your property based on the age of your house. However, an insurance company may refuse to sell you insurance coverage based on the condition of your property, including the condition of your plumbing, heating, air conditioning, wiring and roof.

37. *VALUE OF PROPERTY.* An insurance company cannot refuse to insure your property because the value is too low or because the company has established minimum coverage amounts.

38. *UNDERWRITING GUIDELINES.* Underwriting guidelines may not be unfairly discriminatory and must be based on sound actuarial principles.

39. *EQUAL TREATMENT.* Unless based on sound actuarial principles, an insurance company may not treat you differently from other individuals of the same class and essentially the same hazard. If you sustain economic damages as a result of such unfair discrimination, you have the right to sue that insurance company in Travis County District Court.

If your suit prevails, you may recover economic damages, court costs and attorney and necessary expert witness fees. If the court finds the insurance company knowingly violated your rights, it may award up to an additional $25,000 per claimant.

You must bring the suit on or before the second anniversary of the date you were denied insurance or the unfair act occurred or the date you reasonably should have discovered the occurrence of the unfair act. If the court determines your suit was groundless and you brought the lawsuit in bad faith, or brought it for the purposes of harassment, you will be required to pay the insurance company's court costs and attorney fees.

### What you should know about insurance companies' use of credit information

40. *REQUIRED DISCLOSURE.* If an insurance company uses credit information to make underwriting or rating decisions, the company must provide you a disclosure statement within 10 days after receiving your completed application for insurance.

The disclosure indicates whether the insurer will obtain and use your credit information and lists your specific legal rights, including:
   - credit information insurance companies cannot use against you;
   - how you can get reasonable exceptions that your insurer is required to make to its use of credit information if certain life events, such as divorce, death of a close family member, or identity theft, hurt your credit;
   - the notice* an insurer must send you when making a credit-based decision that harms your ability to get or

keep insurance or requires you to pay a higher premium; and

- how you can dispute credit information and require an insurer to re-rate your policy if the rate was increased because of inaccurate or unverifiable credit information.

\* The notice must include a description of up to four primary factors that influenced the action taken by the insurer.

Insurers must use the disclosure form (CD-1) adopted by the Commissioner or an equivalent disclosure form filed prior to use with TDI. The CD-1 is available at www.tdi.texas.gov/forms/pcpersonal/pc328crdtds.pdf or by calling 1-800-252-3439. Additional information regarding insurers' use of credit information is available at www.tdi.texas.gov/credit/credit.html.

### What you should know about enforcing your rights

41. **FILING COMPLAINTS.**  You have the right to complain to TDI about any insurance company and/or insurance matter and to receive a prompt investigation and response to your complaint. To do so, you should:

- call TDI's **Consumer Help Line** at 1-800-252-3439 for service in both English and Spanish;
- write to the Texas Department of Insurance, Consumer Protection, Mail Code 111-1A, P.O. Box 149091, Austin, Texas 78714-9091;
- e-mail TDI at ConsumerProtection@tdi.texas.gov;
- fax your complaint to (512) 490-1007;
- download or complete a complaint form online from the TDI website at www.tdi.texas.gov; or
- call the TDI Publications/Complaint Form order line at 1-800-599-SHOP (7467). The order line is available 24 hours a day, 7 days a week.

**NOTE:** TDI offers interpreter services and publications in alternate formats. Persons needing more information in alternate layouts or languages can call the *TDI Consumer Help Line* listed above.

42. **RIGHT TO SUE.**  If an insurance company violates your rights, you may be able to sue that company in court, including small claims court, with or without an attorney.

43. **BURDEN OF PROOF.**  If you sue to recover under your insurance policy, the insurance company has the burden of proof as to any application of an exclusion in the policy and any exception to or other avoidance of coverage claimed by the insurer.

44. **REQUESTING NEW RULES.**  You have the right to ask in writing that TDI make or change rules on any residential property insurance issue that concerns you. Send your written request to: Texas Department of Insurance, Attn: Commissioner (113-2A), P.O. Box 149104, Austin, TX 78714-9104.

# National General Insurance Group
# Privacy Notice

*The National General Insurance Group\* is giving you this notice to tell you how we may collect and share nonpublic personal information about you and the accounts you have with a company (or companies) in the National General Insurance Group. This notice also advises you of your right to keep this information from being shared with affiliates of the National General Insurance Group\*\* or other business associates (non-affiliates) under certain circumstances and your right to limit marketing, in some cases.*

### What Nonpublic Personal Information Do We Collect About You?

We collect non-public personal information about you from the following sources:

- Information we receive from you, such as information on applications or other forms, which may include your name, address, e-mail address, social security number and driving history.
- Information about your transactions with us, our affiliates, or others, such as your account balance and payment history.
- Information we receive from outside sources such as consumer reporting agencies, insurance agencies and state motor vehicle departments which may provide information on your credit history, credit score, driving and accident history, or prior insurance coverage in place.

### How Do We Protect The Information That We Collect About You and Your Accounts?

To protect the privacy and security of nonpublic personal information we collect about you, we restrict access to the information to our employees, agents and subcontractors who need this information to provide products and services to you. We maintain physical, electronic, and procedural safeguards that comply with applicable federal and state laws and regulations to guard your non-public personal information. We strive to keep our information about you accurate. If you tell us of an error, we update our records promptly. If you wish to review or correct personal information on your account, please write to us at the address on your account statement or other account materials.

### Do We Share The Information We Collect About You and Your Accounts?

Yes, to provide you with superior service, inform you of product and service opportunities that may be of interest to you, or for other business purposes, **we may share** all of the nonpublic personal information we collect about you and your accounts, as described above, as permitted by law. Our sharing of information about you is subject to Your Rights, described below.

**For Vermont Residents Only:** Based on Vermont law, we do not share nonpublic personal information about you with affiliates or non-affiliated third parties, other than as permitted by law. We automatically treat your accounts as if you made the Information Sharing and Affiliate Marketing opt out elections described below.

### What Types of Affiliates and Non-affiliated Third Parties Do We Share Information About You With?

Subject to Your Rights, detailed below, **we may share** nonpublic personal information about you with the following types of affiliates and non-affiliated third parties:

- Financial service providers, such as, credit card issuers, insurance companies, and insurance agents.
- Non-financial companies, such as credit reporting agencies, manufacturers, motor vehicle dealers, retailers, direct marketers, telecommunications companies, airlines, and publishers.
- Companies that perform marketing services on our behalf or with other institutions with which we have joint marketing agreements.
- Others, such as educational institutions.
- **We may also share** nonpublic personal information about you with affiliates and non-affiliated third parties, as permitted by law.

**\*Reference to the National General Insurance Group in this notice includes the following companies**:  National General Insurance Company, National General Assurance Company, National General Insurance Online, Inc., Integon Casualty Insurance Company, Integon General Insurance Corporation, Integon Indemnity Corporation, Integon National Insurance Company, Integon Preferred Insurance Company, New South Insurance Company,  MIC General Insurance Corporation,  Home State County Mutual Insurance Company – (Administered by Integon National Insurance Company,  National General Insurance Company, or Imperial Fire & Casualty Insurance Company), National General  Motor Club, Inc., National Health Insurance Company, Agent Alliance Insurance Company, National General Premier Insurance Company, Imperial Fire & Casualty Insurance Company, Adirondack Insurance Exchange, Mountain Valley Indemnity Company, New Jersey Skylands Insurance Association,  New Jersey Skylands Insurance Company, and Century-National Insurance Company.

**\*\*Affiliates of the National General Insurance Group include**: companies in the National General Insurance Group referenced in this notice, and companies that now or in the future control, are controlled by, or are under common control with a company in the National General Insurance Group.

06159 (08012016)

**Do We Share Information About Former Customers?**

Yes, subject to Your Rights - detailed below, **we may share** all of the nonpublic personal information described above about our former customers with the same types of affiliates and non-affiliated third parties, as described above, as permitted by law.

**Your Rights:**

### Information Sharing

- If you want a company in the National General Insurance Group not to share nonpublic personal information about you with affiliates, non-affiliated third parties, or both, **you may opt out of Information Sharing**. That is, you may direct the company in the National General Insurance Group not to share information (other than as permitted by law). Information Sharing permitted by law includes, for example, sharing with companies that work for a company in the National General Insurance Group to provide the product or services you request and sharing with affiliates information about our transactions or experiences with you for everyday business purposes.
- Your Information Sharing opt out direction will apply to nonpublic personal information, as described above, that the company in the National General Insurance Group has collected about you and your existing accounts.

### Affiliate Marketing

- Federal law gives you the right to limit some but not all marketing from the companies in the National General Insurance Group and their affiliates. You may limit companies in the National General Insurance Group and their affiliates from marketing their products or services to you **based on nonpublic personal information about you that they receive from a company in the National General Insurance Group.** This information includes income, account information, credit history, and payment history.
- Your choice to limit Affiliate Marketing will apply to nonpublic information about you and your existing account.

**How to Opt Out of Information Sharing or Limit Affiliate Marketing:**

- If you wish to opt out of Information Sharing with affiliates, or with non-affiliated third parties, or with both, or to limit Affiliate Marketing, other than as permitted by law, please complete the form below and return it to the following address:

  Mountain Valley Indemnity Company
  PO Box 3199
  Winston-Salem, NC 27102-3199

- Each time you establish a new account with a company in the National General Insurance Group, you will receive a privacy notice and an opportunity to opt out of Information Sharing and limit Affiliate Marketing for that account, as permitted by law.
- If you have a joint account with another person, either of you may opt out of Information Sharing or limit Affiliate Marketing (other than as permitted by law) for both of you.

-----------------------------------------------------------------------------------------------------------

I direct my information not be shared with affiliates or with non-affiliated third parties, and to limit Affiliate Marketing, other than as permitted by law.

Ivan Arthur
_____                2004628969
Named Insured                                   _____
                                                Account (Policy) Number:

_____                _____
Signature                                       Date

John Arthur
_____
Co-Named Insured

_____                _____
Signature                                       Date

Note: No action is required if you wish to permit information sharing as described in this notice. If you have already told us not to share your information on this account, you do not need to tell us again.

06159 (08012016)

AGENCY CUSTOMER ID: _____

 **ACORD®**

# TEXAS PERSONAL LINES  SUPPLEMENT

| AGENCY | | | APPLICANT / NAMED INSURED | |
|---|---|---|---|---|
| GEICO Insurance Agency | | | Ivan Arthur | |
| POLICY NUMBER | EFFECTIVE DATE | CARRIER | | NAIC CODE |
| 2004628969 | 3/3/2017 | MOUNTAIN VALLEY INDEMNITY | | 10205 |

## USE OF CREDIT INFORMATION DISCLOSURE

Insurer's Name:  Mountain Valley Indemnity Company

Insurer's Address:  PO Box 3199

Winston Salem, NC 27102-3199

Telephone Number (Toll free if available):  1-888-980-7647

We [x] **will** [ ]  **will not** (choose one) obtain and use credit information on you or any other member(s) of your household as a part of the insurance credit scoring process.

If you have questions regarding this disclosure, contact the insurer at the above address or phone number. For information or other questions, contact the Texas Department of Insurance at 1-800-252-3439 or P.O Box 149091, MC 111-1A, Austin, Texas 78714.

*Section 559.053 of the Texas Insurance Code requires an insurer or its agents to disclose to its customers whether credit information will be obtained on the applicant or insured or on any other member(s) of the applicant's or insured's household and used as part of the insurance credit scoring process.*

*If credit information is obtained or used on the applicant or insured, or on any member of the applicant's or insured's household, the insurer shall disclose to the applicant the name of each person on whom credit information was obtained or used and how each person's credit information was used to underwrite or rate the policy. An insurer may provide this information with this disclosure or in a separate notice.*

*Adverse effect means an action taken by an insurer in connection with the underwriting of insurance for a consumer that results in the denial of coverage, the cancellation or nonrenewal of coverage, or the offer to and acceptance by a consumer of a policy form, premium rate, or deductible other than the policy form, premium rate, or deductible for which the consumer specifically applied.*

*Credit information is any credit related information derived from a credit report itself, or provided in an application for personal insurance. The term does not include information that is not credit-related, regardless of whether the information is contained in a credit report or in an application for insurance coverage or is used to compute a credit score.*

*Credit score or insurance score is a number or rating derived from a mathematical formula, computer application, model, or other process that is based on credit information and used to predict the future insurance loss exposure of a consumer.*

### SUMMARY OF CONSUMER PROTECTIONS CONTAINED IN CHAPTER 559

**PROHIBITED USE OF CREDIT INFORMATION**

*An insurer may not:*

*(1) use a credit score that is computed using factors that constitute unfair discrimination;*
*(2) deny, cancel, or nonrenew a policy of personal insurance solely on the basis of credit information without consideration of any other applicable underwriting factor independent of credit information; or*
*(3) take an action that results in an adverse effect against a consumer because the consumer does not have a credit card account without consideration of any other applicable factor independent of credit information.*

CD-1
PC328 Rev. 08/08

*An insurer may not consider an absence of credit information or an inability to determine credit information for an applicant for insurance coverage or insured as a factor in underwriting or rating an insurance policy unless the insurer:*

*(1) has statistical, actuarial, or reasonable underwriting information that: (A) is reasonably related to actual or anticipated loss experience; and (B) shows that the absence of credit information could result in actual or anticipated loss differences;*
*(2) treats the consumer as if the applicant for insurance coverage or insured had neutral credit information, as defined by the insurer; or*
*(3) excludes the use of credit information as a factor in underwriting and uses only other underwriting criteria.*

## NEGATIVE FACTORS

*An insurer may not use any of the following as a negative factor in any credit scoring methodology or in reviewing credit information to underwrite or rate a policy of personal insurance:*

*(1) a credit inquiry that is not initiated by the consumer;*
*(2) an inquiry relating to insurance coverage, if so identified on a consumer's credit report; or*
*(3) a collection account with a medical industry code, if so identified on the consumer's credit report.*

*Multiple lender inquiries made within 30 days of a prior inquiry, if coded by the consumer reporting agency on the consumer's credit report as from the home mortgage or motor vehicle lending industry, shall be considered by an insurer as only one inquiry.*

## EFFECT OF EXTRAORDINARY EVENTS

*An insurer shall, on written request from an applicant for insurance coverage or an insured, provide reasonable exceptions to the insurer's rates, rating classifications, or underwriting rules for a consumer whose credit information has been directly influenced by a catastrophic illness or injury, by the death of a spouse, child, or parent, by temporary loss of employment, by divorce, or by identity theft. In such a case, the insurer may consider only credit information not affected by the event or shall assign a neutral credit score.*

*An insurer may require reasonable written and independently verifiable documentation of the event and the effect of the event on the person's credit before granting an exception. An insurer is not required to consider repeated events or events the insurer reconsidered previously as an extraordinary event.*

*An insurer may also consider granting an exception to an applicant for insurance coverage or an insured for an extraordinary event not listed in this section. An insurer is not out of compliance with any law or rule relating to underwriting, rating, or rate filing as a result of granting an exception under this article.*

## NOTICE OF ACTION RESULTING IN ADVERSE EFFECT

*If an insurer takes an action resulting in an adverse effect with respect to an applicant for insurance coverage or insured based in whole or in part on information contained in a credit report, the insurer must provide to the applicant or insured within 30 days certain information regarding how an applicant or insured may verify and dispute information contained in a credit report.*

## DISPUTE RESOLUTION; ERROR CORRECTION

*If it is determined through the dispute resolution process established under Section 611(a)(5), Fair Credit Reporting Act (15 U.S.C. Section 1681i), as amended, that the credit information of a current insured was inaccurate or incomplete or could not be verified and the insurer receives notice of that determination from the consumer reporting agency or from the insured, the insurer shall re-underwrite and re-rate the insured not later than the 30th day after the date of receipt of the notice.*

*After re-underwriting or re-rating the insured, the insurer shall make any adjustments necessary within 30 days, consistent with the insurer's underwriting and rating guidelines. If an insurer determines that the insured has overpaid premium, the insurer shall credit the amount of overpayment. The insurer shall compute the overpayment back to the shorter of the last 12 months of coverage; or the actual policy period.*

CD-1
**PC328 Rev. 08/08**

AGENCY CUSTOMER ID: _____



# TEXAS PERSONAL LINES  SUPPLEMENT
## (SPANISH VERSION)

| AGENCY | APPLICANT / NAMED INSURED | | |
|---|---|---|---|
| GEICO Insurance Agency | Ivan Arthur | | |
| **POLICY NUMBER** | **EFFECTIVE DATE** | **CARRIER** | **NAIC CODE** |
| 2004628969 | 3/3/2017 | MOUNTAIN VALLEY INDEMNITY | 10205 |

### EL DECLARACIÓN DE DIVULGACIÓN DEL USO DE INFORMACIÓN DE CRÉDITO

Nombre del asegurador:     Mountain Valley Indemnity Company

Dirección:     PO Box 3199

Winston Salem, NC 27102-3199

Número de teléfono: (si es posible para llamar gratis):   1-888-980-7647

Nosotros [x] **Sí** [ ] **No** (marque uno) obtendremos y usaremos información de crédito de usted o de algún otro miembro de su hogar como parte del proceso de evaluación de crédito para seguros.

Si tiene preguntas con respecto a esta declaración de divulgación puede comunicarse con el asegurador a la dirección o teléfono indicado arriba. Para más información o preguntas llame o escriba al Texas Department of Insurance al 1-800-252-3439 o P.O. Box 149091, MC 111-1A, Austin, Texas 78714.

*Sección 559.053 del Código de Seguros de Texas requiere que el asegurador o sus agents informen a sus clientes si van a obtener información de crédito del solicitante o asegurado o de cualquier miembro(s) del hogar del solicitante o asegurado, y también que les informen si van a utilizar la información como parte del proceso de clasificación de crédito para la venta del seguro.*

*Si el asegurador obtuvo o utilizó información de crédito del solicitante o asegurado, o de cualquier miembro del hogar del solicitante o asegurado, el asegurador tiene que revelar el nombre de cada una de las personas sobre las cuales obtuvo o utilizó los datos, y la manera en que la información de crédito de cada una de dichas personas se utilizó en la evaluación del riesgo o clasificación de la póliza. El asegurador puede suministrar esta información por medio de esta divulgación de datos o en un aviso por separado.*

*El efecto adverso significa una acción tomada por un asegurador con respecto al proceso de evaluación del consumidor cual resulta en el rechazo de la cobertura, la cancelación o rechazo de renovar la cobertura, o el ofrecimiento al y la aceptación por parte del consumidor de un tipo de póliza, tarifa o deducible que no es el tipo de póliza, tarifa o deducible que el consumidor específicamente solicitó.*

*Información de crédito consiste de cualquier información en relación a crédito, derivado de un crédito mismo o proporcionado en una aplicación para el seguro personal. El término no incluye información que no es relacionada de crédito, a pesar de si la información se contiene en un informe del crédito o en una aplicación para la cobertura o es utilizada para computar una clasificación de crédito.*

*La clasificación de crédito o clasificación de seguro es el número o categoría derivado de una formula matemática, de una aplicación de la computadora, un modelo, o de otro proceso que se basa fiado información y utilizado para predecir la exposición futura de seguro de un consumidor.*

### RESUMEN DE LAS PROTECCIONES AL CONSUMIDOR CONTENIDAS EN EL CAPÍTULO 559

**USO PROHIBIDO DE LA INFORMACIÓN DE CRÉDITO**

*El asegurador no puede:*

*(1) Utilizar una clasificación de crédito que se computa utilizando factores que constituyen discriminación injusta.*

*(2) Negar, cancelar o no renovar una póliza de seguro personal únicamente con base a la información de crédito sin prestar consideración a cualquier otro factor independiente de la información de crédito que aplique al proceso de evaluación; o*

*(3) Ejercer una acción que provoque un resultado adverso para el consumidor debido a que el consumidor no tiene una cuenta de tarjeta de crédito sin prestar consideración a cualquier otro factor ajeno a la información de crédito.*

CD-1
PC328 Rev. 08/08

The ACORD name and logo are registered marks of ACORD

*El asegurador no puede considerar la ausencia de información de crédito o la inhabilidad para conseguir información respecto al crédito de un solicitante de seguro o asegurado como factor en el proceso de evaluación o clasificación de una póliza de seguro a menos que el asegurador:*

*(1) Tenga información estadística, actuarial o razonable de seguros que: (A) sea razonablemente correspondiente a una pérdida actual o anticipada; y (B) muestre que la ausencia de información de crédito puede resultar en diferencias en las pérdidas actuales o anticipadas.*

*(2) Trate al solicitante o asegurado como si fuera un consumidor con información neutral de crédito, según definición de el asegurador, o*

*(3) Excluya el uso de información de crédito como factor en el proceso de evaluación y utilice solamente otro criterio para la evaluación.*

## FACTORES NEGATIVOS

*Para evaluar o clasificar una póliza de seguro personal el asegurador no puede utilizar en ninguna de sus metodologías de evaluación o revisión de crédito nada de lo mencionado a continuación:*

*(1) Una indagación de crédito que no fue iniciada por el consumidor.*

*(2) Una indagación respecto a cobertura de seguro, si así esta identificada en un reporte de crédito del consumidor; o*

*(3) Una cuenta de cobro con clave industrial médica, si así está identificada en el reporte de crédito del consumidor.*

*El asegurador tiene que considerar como siendo una sola indagación todas las indagaciones múltiples de acreedores que se hicieron dentro de los 30 días previos a la indagación, si codificadas en el reporte de la agencia reportadora como provenientes de la industria de financiamiento de casa o auto.*

## EFECTOS DE ACONTECIMIENTOS EXTRAORDINARIOS

*El asegurador tiene que, previa solicitud por escrito del solicitante de seguro o asegurado, ofrecer al consumidor cuya información de crédito fue influenciada por una enfermedad o lesión catastrófica, fallecimiento de cónyuge, hijo o padre, pérdida de empleo, divorcio o robo de identidad, las excepciones razonables en sus tarifas, clasificación de póliza o reglamentos de evaluación. En dichos casos el asegurador puede considerar solamente la información de crédito que no fue afectada por el percance o tiene que asignar una clasificación neutral de crédito.*

*Antes de conceder las excepciones el asegurador puede requerir documentación del acontecimiento, por escrito e independientemente verificable, y del efecto que el percance tuvo en la información de crédito del individuo. El asegurador no es obligado a considerar acontecimientos repetidos o acontecimientos reconsiderados previamente como acontecimientos extraordinarios.*

*El asegurador también puede considerar otorgar una excepción al solicitante o asegurado por un percance extraordinario no mencionado en esta sección. El asegurador no estaría infraccionando ninguna ley o reglamento de evaluación, clasificación o tarifas si otorga una excepción bajo este artículo.*

## AVISO DE ACCIÓN CON RESULTADO DE EFECTO ADVERSO

*Si un asegurador ejerce una acción que resulte en un efecto adverso para el solicitante de seguro o asegurado basándose solamente o en una fracción información contenida en el reporte de crédito, el asegurador tiene que suministrar al solicitante o asegurado, dentro de los 30 días, cierta información sobre cómo puede el solicitante o asegurado verificar o disputar la información contenida en el reporte de crédito.*

## RESOLUCIÓN DE DISPUTAS Y CORRECCIÓN DE ERRORES

*Si por medio de un proceso de resolución de disputas establecido bajo la Sección 611(a)(5) de la Ley de para Reportes Justos de Crédito, Inciso 15 U.S.C. Sección 1681i, según enmiendas, se determina que la información del crédito de un individuo que actualmente está asegurado es inexacta o incompleta o no puede ser verificada, y el asegurador recibe aviso de la determinación de la agencia reportadora de crédito o del asegurado, el asegurador tiene que reevaluar y reclasificar al asegurado a más tardar el treintavo día a partir de la fecha de recibo del aviso.*

*Después de reevaluar y reclasificar al asegurado el asegurador tiene que hacer cualquier ajuste necesario dentro de los 30 días, consistente con las normas de evaluación y clasificación de el asegurador. Si un asegurador determina que el asegurado ha sobrepagado en su prima el asegurador tiene que acreditarle la cantidad que pagó de más. El asegurador tiene que computar el sobrepago retroactivamente al período más corto de los previos 12 meses de cobertura; o al período actual de la póliza.*

CD-1
PC328 Rev. 08/08

# *IMPORTANT NOTICE*
# *INSURANCE SCORING*

Named Insured: Ivan Arthur
Policy Number: 2004628969

At the time of your application for insurance, we obtained and used a credit-based insurance score for the named insured listed above. Such insurance scoring is based on information contained in consumer credit reports.

The insurance score is NOT the sole factor in determining the cost of your policy, but is used in combination with the traditional factors to provide you with the best premium for which you qualify.

If you determine that any of your consumer reports contain an inaccuracy that has since been corrected by the consumer reporting agency, or, if you feel your insurance score has improved, please contact your agent. If an improved score results in a lower premium, your agent will be able to issue you a new policy.

SH PN 57   07 13

## IMPORTANT FLOOD INSURANCE NOTICE

Your homeowners or dwelling policy does NOT provide coverage for loss caused by flood or mudslide, which is defined, in part, by the National Flood Insurance Program as:

A general and temporary condition of partial or complete inundation of normally dry land areas from overflow of inland or tidal waters or from the unusual and rapid accumulation or runoff of surface waters from any source.

If you are required by your mortgage lender to have flood insurance on your property, or if you feel that your property is susceptible to flood damage, insurance covering damage from flood is available on most buildings and contents in participating communities through the National Flood Insurance Program.

Information about flood insurance and whether your community participates in the program can be obtained from your insurance company, from your insurance agent/broker, or directly from the National Flood Insurance Program by calling 1-800-638-6620 or via their website at http://www.floodsmart.gov.

SHPH37   09 08

SH PN 46   09 13

## *TEXAS HOMEOWNERS DEDUCTIBLE NOTICE*

Your homeowners policy contains a basic deductible that applies to all loss payable under Section I of your policy. You are responsible for the portion of the loss up to that deductible amount.  In addition, your policy may include a windstorm or hail deductible.  This higher deductible replaces the basic deductible when a covered loss is caused by wind or hail.  The basic deductible and the windstorm or hail deductible, if applicable, appear on the Policy Declarations Page included with this policy.

Several optional endorsements also contain separate deductible provisions.  Each deductible provision applies only to the coverage provided in that endorsement.

| OPTIONAL ENDORSEMENT | DEDUCTIBLE AMOUNT |
| --- | --- |
| Equipment Breakdown Coverage | $250 |
| Limited Water Back Up And Sump Discharge Or Overflow Coverage | $500 or $1,000 |
| Owned Motorized Golf Cart Physical Loss Coverage | $500 |
| Identity Fraud Expense Coverage | $250 |
| Security Plus Endorsement | $100 (Refrigerated Property Coverage) |
| Security Plus Elite Endorsement | $100 (Refrigerated Property Coverage) |

Please review your policy for complete information on your coverage and deductibles. If you have any questions, contact your independent agent or broker.

## *POLLUTION EXCLUSION DISCLOSURE NOTICE*

Your policy contains pollution exclusions.   Please review your policy for complete coverage information.   If you have questions about this notice or any of your insurance needs, please contact your insurance agent.

SH PN 75   03 13

# ONECHOICE HOMEOWNERS POLICY
## TABLE OF CONTENTS

|  | Page |
|---|---|
| AGREEMENT | 1 |
| DEFINITIONS | 1 |
| DEDUCTIBLE | 2 |

**SECTION I**

| | Page |
|---|---|
| PROPERTY COVERAGES | 2 |
| Coverage A – Dwelling | 2 |
| Coverage B – Other Structures | 2 |
| Coverage C – Personal Property | 3 |
| Coverage D – Loss of Use | 5 |
| Additional Coverages | 5 |
| PERILS INSURED AGAINST | 8 |
| EXCLUSIONS | 11 |
| CONDITIONS | 13 |

**SECTION II**

| | Page |
|---|---|
| LIABILITY COVERAGES | 16 |
| Coverage E – Personal Liability | 16 |
| Coverage F – Medical Payments To Others | 16 |
| EXCLUSIONS | 16 |
| ADDITIONAL COVERAGES | 20 |
| CONDITIONS | 20 |

**SECTIONS I AND II**

| | Page |
|---|---|
| CONDITIONS | 21 |

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

HO 3000    02 13

*HOMEOWNERS SPECIAL FORM*

**AGREEMENT**

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

**DEFINITIONS**

**A.** In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household. "We", "us" and "our" refer to the Company providing this insurance.

**B.** In addition, certain words and phrases are defined as follows:

  **1.** "Aircraft Liability", "Hovercraft Liability", "Motor Vehicle Liability" and "Watercraft Liability", subject to the provisions in **b.** below, mean the following:

    **a.** Liability for "bodily injury" or "property damage" arising out of the:

      **(1)** Ownership of such vehicle or craft by an "insured";

      **(2)** Maintenance, occupancy, operation, use, loading or unloading of such vehicle or craft by any person;

      **(3)** Entrustment of such vehicle or craft by an "insured" to any person;

      **(4)** Failure to supervise or negligent supervision of any person involving such vehicle or craft by an "insured"; or

      **(5)** Vicarious liability, whether or not imposed by law, for the actions of a child or minor involving such vehicle or craft.

    **b.** For the purpose of this definition:

      **(1)** Aircraft means any contrivance used or designed for flight except model or hobby aircraft not used or designed to carry people or cargo;

      **(2)** Hovercraft means a self-propelled motorized ground effect vehicle and includes, but is not limited to, flarecraft and air cushion vehicles;

      **(3)** Watercraft means a craft principally designed to be propelled on or in water by wind, engine power or electric motor; and

      **(4)** Motor vehicle means a "motor vehicle" as defined in **7.** below.

  **2.** "Bodily injury" means bodily harm, sickness or disease, including required care, loss of services and death that results.

  **3.** "Business" means:

    **a.** A trade, profession or occupation engaged in on a full-time, part-time or occasional basis; or

    **b.** Any other activity engaged in for money or other compensation, except the following:

      **(1)** One or more activities, not described in **(2)** through **(4)** below, for which no "insured" receives more than $2,000 in total compensation for the 12 months before the beginning of the policy period;

      **(2)** Volunteer activities for which no money is received other than payment for expenses incurred to perform the activity;

      **(3)** Providing home day care services for which no compensation is received, other than the mutual exchange of such services; or

      **(4)** The rendering of home day care services to a relative of an "insured".

  **4.** "Employee" means an employee of an "insured", or an employee leased to an "insured" by a labor leasing firm under an agreement between an "insured" and the labor leasing firm, whose duties are other than those performed by a "residence employee".

  **5.** "Insured" means:

    **a.** You and residents of your household who are:

      **(1)** Your relatives; or

      **(2)** Other persons under the age of 21 and in the care of any person described in **a.(1)** of this provision;

    **b.** Under Section II:

      **(1)** With respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person included in **a.** above. "Insured" does not mean a person or organization using or having custody of these animals or watercraft in the course of any "business" or without consent of the owner; or

      **(2)** With respect to a "motor vehicle" to which this policy applies:

        **(a)** Persons while engaged in your employ or that of any person included in **a.** above; or

        **(b)** Other persons using the vehicle on an "insured location" with your consent.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Under both Sections **I** and **II**, when the word an immediately precedes the word "insured", the words an "insured" together mean one or more "insureds".

6.  "Insured location" means:

    **a.**  The "residence premises";

    **b.**  The part of other premises, other structures and grounds used by you as a residence; and

    **(1)**  Which is shown in the Declarations; or

    **(2)**  Which is acquired by you during the policy period for your use as a residence;

    **c.**  Any premises used by you in connection with a premises described in **a.** and **b.** above;

    **d.**  Any part of a premises:

    **(1)**  Not owned by an "insured"; and

    **(2)**  Where an "insured" is temporarily residing;

    **e.**  Vacant land, other than farm land, owned by or rented to an "insured";

    **f.**  Land owned by or rented to an "insured" on which a one or two family dwelling is being built as a residence for an "insured";

    **g.**  Individual or family cemetery plots or burial vaults of an "insured"; or

    **h.**  Any part of a premises occasionally rented to an "insured" for other than "business" use.

7.  "Motor vehicle" means:

    **a.**  A self-propelled land or amphibious vehicle; or

    **b.**  Any trailer or semi-trailer which is being carried on, towed by or hitched for towing by a vehicle described in **a.** above.

8.  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

    **a.**  "Bodily injury"; or

    **b.**  "Property damage".

9.  "Property damage" means physical injury to, destruction of, or loss of use of tangible property.

10.  "Residence employee" means:

    **a.**  An employee of an "insured", or an employee leased to an "insured" by a labor leasing firm, under an agreement between an "insured" and the labor leasing firm, whose duties are related to the maintenance or use of the "residence premises", including household or domestic services; or

    **b.**  One who performs similar duties elsewhere not related to the "business" of an "insured".

    A "residence employee" does not include a temporary employee who is furnished to an "insured" to substitute for a permanent "residence employee" on leave or to meet seasonal or short-term workload conditions.

11.  "Residence premises" means:

    **a.**  The one family dwelling where you reside;

    **b.**  The two family dwelling where you reside in at least one of the family units; or

    **c.**  That part of any other building where you reside;

    and which is shown as the "residence premises" in the Declarations.

    "Residence premises" also includes other structures and grounds at that location.

## DEDUCTIBLE

Unless otherwise noted in this policy, the following deductible provision applies:

Subject to the policy limits that apply, we will pay only that part of the total of all loss payable under Section **I** that exceeds the deductible amount shown in the Declarations.

## SECTION I – PROPERTY COVERAGES

### A. Coverage A – Dwelling

1.  We cover:

    **a.**  The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling; and

    **b.**  Materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling or other structures on the "residence premises".

2.  We do not cover land, including land on which the dwelling is located.

### B. Coverage B – Other Structures

1.  We cover other structures on the "residence premises" set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

2.  We do not cover:

    **a.**  Land, including land on which the other structures are located;

    **b.**  Other structures rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage;

    **c.**  Other structures from which any "business" is conducted; or

    **d.**  Other structures used to store "business" property. However, we do cover a structure that contains "business" property solely

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

owned by an "insured" or a tenant of the dwelling provided that "business" property does not include gaseous or liquid fuel, other than fuel in a permanently installed fuel tank of a vehicle or craft parked or stored in the structure.

3.  The limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage **A**. Use of this coverage does not reduce the Coverage **A** limit of liability.

**C.  Coverage C – Personal Property**

**1.  Covered Property**

We cover personal property owned or used by an "insured" while it is anywhere in the world. After a loss and at your request, we will cover personal property owned by:

**a.**  Others while the property is on the part of the "residence premises" occupied by an "insured"; or

**b.**  A guest or a "residence employee", while the property is in any residence occupied by an "insured".

**2.  Limit For Property At Other Locations**

**a.  Other Residences**

Our limit of liability for personal property usually located at an "insured's" residence, other than the "residence premises", is 10% of the limit of liability for Coverage **C**, or $1,000, whichever is greater. However, this limitation does not apply to personal property:

**(1)**  Moved from the "residence premises" because it is:

**(a)**  Being repaired, renovated or rebuilt; and

**(b)**  Not fit to live in or store property in; or

**(2)**  In a newly acquired principal residence for 30 days from the time you begin to move the property there.

**b.  Self-storage Facilities**

Our limit of liability for personal property owned or used by an "insured" and located in a self-storage facility is 10% of the limit of liability for Coverage **C**, or $1,000, whichever is greater. However, this limitation does not apply to personal property:

**(1)**  Moved from the "residence premises" because it is:

**(a)**  Being repaired, renovated or rebuilt; and

**(b)**  Not fit to live in or store property in; or

**(2)**  Usually located in an ""insured's" residence, other than the "residence premises".

**3.  Special Limits Of Liability**

The special limit for each category shown below is the total limit for each loss for all property in that category. These special limits do not increase the Coverage **C** limit of liability.

**a.**  $200 on money, bank notes, bullion, gold other than goldware, silver other than silverware, platinum other than platinumware, coins, medals, scrip, stored value cards and smart cards.

**b.**  $1,000 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, personal records, passports, tickets and stamps. This dollar limit applies to these categories regardless of the medium (such as paper or computer software) on which the material exists.

This limit includes the cost to research, replace or restore the information from the lost or damaged material.

**c.**  $1,000 on watercraft of all types, including their trailers, furnishings, equipment and outboard engines or motors.

**d.**  $1,000 on trailers or semi-trailers not used with watercraft of all types.

**e.**  $1,000 for loss by theft of jewelry, watches, furs, precious and semiprecious stones.

**f.**  $500 for loss by theft of firearms.

**g.**  $2,500 for loss by theft of silverware, silver-plated ware, goldware, gold-plated ware, platinumware, platinum-plated ware and pewterware. This includes flatware, hollowware, tea sets, trays and trophies made of or including silver, gold or pewter.

**h.**  $2,500 on property, on the "residence premises", used primarily for "business" purposes.

**i.**  $1,000 on property, away from the "residence premises", used primarily for "business" purposes. However, this limit does not apply to antennas, tapes, wires, records, disks or other media that are:

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

    **(1)** Used with electronic equipment that reproduces, receives or transmits audio, visual or data signals; and

    **(2)** In or upon a "motor vehicle".

**j.** $1,000 on portable electronic equipment that:

    **(1)** Reproduces, receives or transmits audio, visual or data signals;

    **(2)** Is designed to be operated by more than one power source, one of which is a "motor vehicle's" electrical system; and

    **(3)** Is in or upon a "motor vehicle".

**k.** $250 for antennas, tapes, wires, records, disks or other media that are:

    **(1)** Used with electronic equipment that reproduces, receives or transmits audio, visual or data signals; and

    **(2)** In or upon a "motor vehicle".

**l.** $5,000 on owned "computer equipment" located on the "residence premises" or at an "insured" student's residence. $2,000 on owned "computer equipment" away from the "residence premises". "Computer equipment" means:

    **(1)** computer hardware, software, "media", operating systems or networks; and

    **(2)** other electronic parts, equipment or systems solely designed for use with or connected to equipment in **(1)** above.

"Media" means the storage device upon which software is stored. This includes blank cassette tapes or disks used solely with the computer or peripheral device. The "media" will be covered only up to its retail value, if pre-programmed, or the retail value of the "media" in blank or unexposed form, if blank or self-programmed.

**m.** $5,000 in the aggregate for loss by theft of trading cards, collectibles, comic books and figurines, including any of these that are part of a collection.

**4. Property Not Covered**

We do not cover:

**a.** Articles separately described and specifically insured, regardless of the limit for which they are insured, in this or other insurance;

**b.** Animals, birds or fish;

**c.** "Motor vehicles".

    This includes a "motor vehicle's" equipment and parts.  However, this Paragraph **4.c.**

does not apply to:

    **(1)** Portable electronic equipment that:

        **(a)** Reproduces, receives or transmits audio, visual or data signals; and

        **(b)** Is designed so that it may be operated from a power source other than a "motor vehicle's" electrical system.

    **(2)** "Motor vehicles" not required to be registered for use on public roads or property which are:

        **(a)** Used solely to service an "insured's" residence; or

        **(b)** Designed to assist the handicapped;

**d.** Aircraft meaning any contrivance used or designed for flight including any parts whether or not attached to the aircraft.

    We do cover model or hobby aircraft not used or designed to carry people or cargo;

**e.** Hovercraft and parts. Hovercraft means a self-propelled motorized ground effect vehicle and includes, but is not limited to, flarecraft and air cushion vehicles;

**f.** Property of roomers, boarders and other tenants, except property of roomers and boarders related to an "insured";

**g.** Property in an apartment regularly rented or held for rental to others by an "insured", except as provided in **E.10.** Landlord's Furnishings under Section I – Property Coverages;

**h.** Property rented or held for rental to others off the "residence premises";

**i.** "Business" data, including such data stored in:

    **(1)** Books of account, drawings or other paper records; or

    **(2)** Computers and related equipment.

    We do cover the cost of blank recording or storage media, and of prerecorded computer programs available on the retail market;

**j.** Credit cards, electronic fund transfer cards or access devices used solely for deposit, withdrawal or transfer of funds except as provided in **E.6.** Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money under Section I – Property Coverages; or

**k.** Water or steam.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Form No.   HO 3000   02 13

Page No.   5 of 23

**D. Coverage D – Loss Of Use**

The limit of liability for Coverage **D** is the total limit for the coverages in **1.** Additional Living Expense, **2.** Fair Rental Value and **3.** Civil Authority Prohibits Use below.

**1.   Additional Living Expense**

If a loss covered under Section **I** makes that part of the "residence premises" where you reside not fit to live in, we cover any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living.

Payment will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

**2.   Fair Rental Value**

If a loss covered under Section **I** makes that part of the "residence premises" rented to others or held for rental by you not fit to live in, we cover the fair rental value of such premises less any expenses that do not continue while it is not fit to live in.

Payment will be for the shortest time required to repair or replace such premises.

**3.   Civil Authority Prohibits Use**

If a civil authority prohibits you from use of the "residence premises" as a result of direct damage to neighboring premises by a Peril Insured Against, we cover the loss as provided in **1.** Additional Living Expense and **2.** Fair Rental Value above for no more than two weeks.

**4.   Loss Or Expense Not Covered**

We do not cover loss or expense due to cancellation of a lease or agreement.

The periods of time under **1.** Additional Living Expense, **2.** Fair Rental Value and **3.** Civil Authority Prohibits Use above are not limited by expiration of this policy.

**E.   Additional Coverages**

**1.   Debris Removal**

a.   We will pay your reasonable expense for the removal of:

(1)   Debris of covered property if a Peril Insured Against that applies to the damaged property causes the loss; or

(2)   Ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.

This expense is included in the limit of liability that applies to the damaged property. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit is available for such expense.

b.   We will also pay your reasonable expense, up to $500, for the removal from the "residence premises" of:

(1)   Your tree(s) felled by the peril of Windstorm or Hail or Weight of Ice, Snow or Sleet; or

(2)   A neighbor's tree(s) felled by a Peril Insured Against under Coverage **C**;

provided the tree(s):

(3)   Damage(s) a covered structure; or

(4)   Does not damage a covered structure, but block(s) a ramp or other fixture designed to assist a handicapped person to enter or leave the dwelling building.

The $500 limit is the most we will pay in any one loss regardless of the number of fallen trees. No more than $500 of this limit will be paid for the removal of any one tree.

This coverage is additional insurance.

**2.   Reasonable Repairs**

a.   We will pay the reasonable cost incurred by you for the necessary measures taken solely to protect covered property that is damaged by a Peril Insured Against from further damage.

b.   If the measures taken involve repair to other damaged property, we will only pay if that property is covered under this policy and the damage is caused by a Peril Insured Against. This coverage does not:

(1)   Increase the limit of liability that applies to the covered property; or

(2)   Relieve you of your duties, in case of a loss to covered property, described in **B.4.** under Section **I** – Conditions.

**3.   Trees, Shrubs And Other Plants**

We cover trees, shrubs, plants or lawns, on the "residence premises", for loss caused by the following Perils Insured Against:

a.   Fire or Lightning;

b.   Explosion;

c.   Riot or Civil Commotion;

d.   Aircraft;

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Form No.   HO 3000   02 13

Page No.   6 of 23

e. Vehicles not owned or operated by a resident of the "residence premises";

f. Vandalism or Malicious Mischief; or

g. Theft.

We will pay up to 5% of the limit of liability that applies to the dwelling for all trees, shrubs, plants or lawns. No more than $500 of this limit will be paid for any one tree, shrub or plant. We do not cover property grown for "business" purposes.

This coverage is additional insurance.

**4. Fire Department Service Charge**

We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response.

This coverage is additional insurance. No deductible applies to this coverage.

**5. Property Removed**

We insure covered property against direct loss from any cause while being removed from a premises endangered by a Peril Insured Against and for no more than 30 days while removed.

This coverage does not change the limit of liability that applies to the property being removed.

**6. Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money**

a. We will pay up to $500 for:

(1) The legal obligation of an "insured" to pay because of the theft or unauthorized use of credit cards issued to or registered in an "insured's" name;

(2) Loss resulting from theft or unauthorized use of an electronic fund transfer card or access device used for deposit, withdrawal or transfer of funds, issued to or registered in an "insured's" name;

(3) Loss to an "insured" caused by forgery or alteration of any check or negotiable instrument; and

(4) Loss to an "insured" through acceptance in good faith of counterfeit United States or Canadian paper currency.

All loss resulting from a series of acts committed by any one person or in which

any one person is concerned or implicated is considered to be one loss.

This coverage is additional insurance. No deductible applies to this coverage.

b. We do not cover:

(1) Use of a credit card, electronic fund transfer card or access device:

(a) By a resident of your household;

(b) By a person who has been entrusted with either type of card or access device; or

(c) If an "insured" has not complied with all terms and conditions under which the cards are issued or the devices accessed; or

(2) Loss arising out of "business" use or dishonesty of an "insured".

c. If the coverage in **a.** above applies, the following defense provisions also apply:

(1) We may investigate and settle any claim or suit that we decide is appropriate. Our duty to defend a claim or suit ends when the amount we pay for the loss equals our limit of liability.

(2) If a suit is brought against an "insured" for liability under **a.(1)** or **(2)** above, we will provide a defense at our expense by counsel of our choice.

(3) We have the option to defend at our expense an "insured" or an "insured's" bank against any suit for the enforcement of payment under **a.(3)** above.

**7. Loss Assessment**

a. We will pay up to $1,000 for your share of loss assessment charged during the policy period against you, as owner or tenant of the "residence premises", by a corporation or association of property owners. The assessment must be made as a result of direct loss to property, owned by all members collectively, of the type that would be covered by this policy if owned by you, caused by a Peril Insured Against under Coverage **A**, other than:

(1) Earthquake; or

(2) Land shock waves or tremors before, during or after a volcanic eruption.

The limit of $1,000 is the most we will pay with respect to any one loss, regardless of the number of assessments. We will only

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

apply one deductible, per unit, to the total amount of any one loss to the property described above, regardless of the number of assessments.

**b.** We do not cover assessments charged against you or a corporation or association of property owners by any governmental body.

**c.** Paragraph **P.** Policy Period under Section **I –** Conditions does not apply to this coverage.

This coverage is additional insurance.

**8. Collapse**

**a.** The coverage provided under this Additional Coverage – Collapse applies only to an abrupt collapse.

**b.** For the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

**c.** This Additional Coverage – Collapse does not apply to:

**(1)** A building or any part of a building that is in danger of falling down or caving in;

**(2)** A part of a building that is standing, even if it has separated from another part of the building; or

**(3)** A building or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**d.** We insure for sudden and accidental direct physical loss to covered property involving abrupt collapse of a building or any part of a building if such collapse was caused by one or more of the following:

**(1)** The Perils Insured Against named under Coverage **C**;

**(2)** Decay, of a building or any part of a building, that is hidden from view, unless the presence of such decay is known to an "insured" prior to collapse;

**(3)** Insect or vermin damage, to a building or any part of a building, that is hidden from view, unless the presence of such damage is known to an "insured" prior to collapse;

**(4)** Weight of contents, equipment, animals or people;

**(5)** Weight of rain which collects on a roof; or

**(6)** Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

**e.** Loss to an awning, fence, patio, deck, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under **d.(2)** through **(6)** above, unless the loss is a direct result of the collapse of a building or any part of a building.

**f.** This coverage does not increase the limit of liability that applies to the damaged covered property.

**9. Glass Or Safety Glazing Material**

**a.** We cover:

**(1)** The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window;

**(2)** The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window when caused directly by earth movement; and

**(3)** The direct physical loss to covered property caused solely by the pieces, fragments or splinters of broken glass or safety glazing material which is part of a building, storm door or storm window.

**b.** This coverage does not include loss:

**(1)** To covered property which results because the glass or safety glazing material has been broken, except as provided in **a.(3)** above; or

**(2)** On the "residence premises" if the dwelling has been vacant for more than 60 consecutive days immediately before the loss, except when the breakage results directly from earth movement as provided in **a.(2)** above. A dwelling being constructed is not considered vacant.

**c.** This coverage does not increase the limit of liability that applies to the damaged property.

**10. Landlord's Furnishings**

We will pay up to $2,500 for your appliances, carpeting and other household furnishings, in each apartment on the "residence premises" regularly rented or held for rental to others by an "insured", for loss caused by a Peril Insured

Against in Coverage **C**, other than Theft.

This limit is the most we will pay in any one loss regardless of the number of appliances, carpeting or other household furnishings involved in the loss.

This coverage does not increase the limit of liability applying to the damaged property.

**11. Ordinance Or Law**

**a.** You may use up to 10% of the limit of liability that applies to Coverage **A** for the increased costs you incur due to the enforcement of any ordinance or law which requires or regulates:

**(1)** The construction, demolition, remodeling, renovation or repair of that part of a covered building or other structure damaged by a Peril Insured Against;

**(2)** The demolition and reconstruction of the undamaged part of a covered building or other structure, when that building or other structure must be totally demolished because of damage by a Peril Insured Against to another part of that covered building or other structure; or

**(3)** The remodeling, removal or replacement of the portion of the undamaged part of a covered building or other structure necessary to complete the remodeling, repair or replacement of that part of the covered building or other structure damaged by a Peril Insured Against.

**b.** You may use all or part of this ordinance or law coverage to pay for the increased costs you incur to remove debris resulting from the construction, demolition, remodeling, renovation, repair or replacement of property as stated in **a.** above.

**c.** We do not cover:

**(1)** The loss in value to any covered building or other structure due to the requirements of any ordinance or law; or

**(2)** The costs to comply with any ordinance or law which requires any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants in or on any covered building or other structure.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

This coverage is additional insurance.

**12. Grave Markers**

We will pay up to $1,000 for grave markers, including mausoleums, on or away from the "residence premises" for loss caused by a Peril Insured Against under Coverage **C**.

This coverage does not increase the limits of liability that apply to the damaged covered property.

**SECTION I – PERILS INSURED AGAINST**

**A. Coverage A – Dwelling And Coverage B – Other Structures**

**1.** We insure against sudden and accidental direct physical loss to property described in Coverages **A** and **B**.

**2.** We do not insure, however, for loss:

**a.** Excluded under Section **I** – Exclusions;

**b.** Involving collapse, including any of the following conditions of property or any part of the property:

**(1)** An abrupt falling down or caving in;

**(2)** Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

**(3)** Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to **(1)** or **(2)** above;

except as provided in **E.8.** Collapse under Section **I** – Property Coverages; or

**c.** Caused by:

**(1)** Freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This provision does not apply if you have used reasonable care to:

**(a)** Maintain heat in the building; or

**(b)** Shut off the water supply and drain all systems and appliances of water.

However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to

**Includes copyrighted material of Insurance Services Office, Inc. with its permission.**

Form No.   HO 3000   02 13
Page No.   9 of 23

continue the water supply and maintain heat in the building for coverage to apply.

For purposes of this provision a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment;

(2) Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

  (a) Fence, pavement, patio or swimming pool;

  (b) Footing, foundation, bulkhead, wall, or any other structure or device that supports all or part of a building, or other structure;

  (c) Retaining wall or bulkhead that does not support all or part of a building or other structure; or

  (d) Pier, wharf or dock;

(3) Theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

(4) Vandalism and malicious mischief, and any ensuing loss caused by any intentional and wrongful act committed in the course of the vandalism or malicious mischief, if the dwelling has been vacant for more than 60 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant;

(5) Mold, fungus or wet rot; or.

(6) Any of the following:

  (a) Wear and tear, marring, deterioration;

  (b) Mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself;

  (c) Smog, rust or other corrosion, or dry rot;

  (d) Smoke from agricultural smudging or industrial operations;

  (e) Contamination or discharge, dispersal, seepage, migration, release or escape of pollutants unless the contamination or discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against named under Coverage **C**.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

  (f) Settling, shrinking, bulging or expansion, including resultant cracking, of bulkheads, pavements, patios, footings, foundations, walls, floors, roofs or ceilings;

  (g) Birds, rodents, or insects;

  (h) Nesting or infestation, or discharge or release of waste products or secretions, by any animals;

  (i) Animals owned or kept by an "insured"; or

  (j) Growth of trees, shrubs, plants or lawns, whether or not such growth is above or below the surface of the ground.

**Exception To c.(6)**

Unless the loss is otherwise excluded, we cover loss to property covered under Coverage **A** or **B** resulting from a sudden and accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance on the "residence premises". This includes the cost to tear out and replace any part of a building, or other structure, on the "residence premises", but only when necessary to repair the system or appliance. However, such tear out and replacement coverage only applies to other structures if the water or steam causes actual damage to a building on the "residence premises".

We do not cover loss to the system or appliance from which this water or steam escaped.

For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, down spout or similar fixtures or equipment.

Section **I** – Exclusion **A.3.** Water, Paragraphs **a.** and **c.** that apply to surface water and water below the surface of the ground do not apply to loss by water covered under **c.(5)** and **(6)** above.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Under **2.b.** and **c.** above, any ensuing loss to property described in Coverages **A** and **B** not precluded by any other provision in this policy is covered.

## B. Coverage C – Personal Property

We insure for direct physical loss to the property described in Coverage **C** caused by any of the following perils unless the loss is excluded in Section **I – Exclusions**.

### 1. Fire Or Lightning

### 2. Windstorm Or Hail

This peril includes loss to watercraft of all types and their trailers, furnishings, equipment, and outboard engines or motors, only while inside a fully enclosed building.

This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

### 3. Explosion

### 4. Riot Or Civil Commotion

### 5. Aircraft

This peril includes self-propelled missiles and spacecraft.

### 6. Vehicles

### 7. Smoke

This peril means sudden and accidental damage from smoke, including the emission or puffback of smoke, soot, fumes or vapors from a boiler, furnace or related equipment.

This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

### 8. Vandalism Or Malicious Mischief

### 9. Theft

**a.** This peril includes attempted theft and loss of property from a known place when it is likely that the property has been stolen. Any theft must be promptly reported to the police.

**b.** This peril does not include loss caused by theft:

(1) Committed by an "insured";

(2) In or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

(3) From that part of a "residence premises"

rented by an "insured" to someone other than another "insured"; or

(4) That occurs off the "residence premises" of:

(a) Trailers, semi-trailers and campers;

(b) Watercraft of all types, and their furnishings, equipment and outboard engines or motors; or

(c) Property while at any other residence owned by, rented to, or occupied by an "insured", except while an "insured" is temporarily living there. Property of an "insured" who is a student is covered while at the residence the student occupies to attend school as long as the student has been there at any time during the 90 days immediately before the loss.

### 10. Falling Objects

This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

### 11. Weight Of Ice, Snow Or Sleet

This peril means weight of ice, snow or sleet which causes damage to property contained in a building.

### 12. Sudden and Accidental Discharge Or Overflow Of Water Or Steam

**a.** This peril means sudden and accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

**b.** This peril does not include loss:

(1) To the system or appliance from which the water or steam escaped;

(2) Caused by or resulting from freezing except as provided in Peril Insured Against **14.** Freezing;

(3) On the "residence premises" caused by sudden and accidental discharge or overflow which occurs off the "residence premises"; or

(4) Caused by mold, fungus or wet rot.

**c.** In this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain,

gutter, downspout or similar fixtures or equipment.

d. Section I – Exclusion **A.3.** Water, Paragraphs **a.** and **c.** that apply to surface water and water below the surface of the ground do not apply to loss by water covered under this peril.

### 13. Sudden And Accidental Tearing Apart, Cracking, Burning Or Bulging

This peril means sudden and accidental tearing apart, cracking, burning or bulging of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

We do not cover loss caused by or resulting from freezing under this peril.

### 14. Freezing

a. This peril means freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance but only if you have used reasonable care to:

(1) Maintain heat in the building; or

(2) Shut off the water supply and drain all systems and appliances of water.

However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply.

b. In this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

### 15. Sudden And Accidental Damage From Artificially Generated Electrical Current

This peril does not include loss to tubes, transistors, electronic components or circuitry that is a part of appliances, fixtures, computers, home entertainment units or other types of electronic apparatus.

### 16. Volcanic Eruption

This peril does not include loss caused by earthquake, land shock waves or tremors.

## SECTION I – EXCLUSIONS

A. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

### 1. Ordinance Or Law

Ordinance Or Law means any ordinance or law:

a. Requiring or regulating the construction, demolition, remodeling, renovation or repair of property, including removal of any resulting debris. This Exclusion **A.1.a.** does not apply to the amount of coverage that may be provided for in **E.11.** Ordinance Or Law under Section I – Property Coverages;

b. The requirements of which result in a loss in value to property; or

c. Requiring any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

This Exclusion **A.1.** applies whether or not the property has been physically damaged.

### 2. Earth Movement

Earth Movement means:

a. Earthquake, including land shock waves or tremors before, during or after a volcanic eruption;

b. Landslide, mudslide or mudflow;

c. Subsidence or sinkhole; or

d. Any other earth movement including earth sinking, rising, erosion, creeping, expanding, bulging, cracking, settling, contracting or shifting.

This Exclusion **A.2.** applies regardless of whether any of the above, in **A.2.a.** through **A.2.d.,** is caused by an act of nature or is otherwise caused.

However, direct loss by fire, explosion or theft resulting from any of the above, in **A.2.a.** through **A.2.d.** is covered.

### 3. Water

This means:

a. Flood, surface water, waves, including tidal wave and tsunami, tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind, including storm surge;

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Form No.   HO 3000   02 13
Page No.   12 of 23

b.  Water which:

   **(1)** Backs up through sewers or drains; or

   **(2)** Overflows or is otherwise discharged from a sump, sump pump or related equipment;

c.  Water below the surface of the ground, regardless of its source, including water which exerts pressure on, or seeps, leaks or flows through a building, sidewalk, driveway, patio, foundation, swimming pool or other structure; or

d.  Waterborne material carried or otherwise moved by any of the water referred to in **A.3.a.** through **A.3.c.** of this exclusion.

This Exclusion **A.3.** applies regardless of whether any of the above, in **A.3.a.** through **A.3.d.**, is caused by an act of nature or is otherwise caused.

This Exclusion **A.3.** applies to, but is not limited to, escape, overflow or discharge, for any reason, of water or waterborne material from a dam, levee, seawall or any other boundary or containment system.

However, sudden and accidental direct physical loss by fire, explosion or theft resulting from any of the above, in **A.3.a.** through **A.3.d.**, is covered.

**4. Power Failure**

Power Failure means the failure of power or other utility service if the failure takes place off the "residence premises". But if the failure results in a loss, from a Peril Insured Against on the "residence premises", we will pay for the loss caused by that peril.

**5. Neglect**

Neglect means neglect of an "insured" to use all reasonable means to save and preserve property at and after the time of a loss.

**6. War**

War includes the following and any consequence of any of the following:

a.  Undeclared war, civil war, insurrection, rebellion or revolution;

b.  Warlike act by a military force or military personnel; or

c.  Destruction, seizure or use for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

**7. Nuclear Hazard**

This Exclusion **A.7.** pertains to Nuclear Hazard to the extent set forth in **M.** Nuclear Hazard Clause under Section **I** – Conditions.

**8. Intentional Loss**

Intentional Loss means any loss arising out of any intentional act or criminal activity an "insured" commits or conspires to commit with the intent to cause a loss.

In the event of such loss, no "insured" is entitled to coverage, even "insureds" who did not commit or conspire to commit the act causing the loss.

This exclusion applies even if:

a.  an "insured" is not charged with, or convicted of a crime; or

b.  the loss is of a different kind, quality or degree than intended or reasonably expected.

**9. Governmental Action**

Governmental Action means the destruction, confiscation or seizure of property described in Coverage **A, B** or **C** by order of any governmental or public authority.

This exclusion does not apply to such acts ordered by any governmental or public authority that are taken at the time of a fire to prevent its spread, if the loss caused by fire would be covered under this policy.

**10. Soil Conditions**

Soil conditions, includes, but is not limited to corrosive action, chemicals, compounds, elements, suspensions, crystal formations or gels in the soil.

**11. Seepage**

Seepage means continuous or repeated seepage or leakage of water, steam or fuel or the presence of condensation, humidity, moisture or vapor over a period of weeks, months, or years:

a.  from a plumbing, heating, air conditioning or automatic fire protection system or from within a domestic appliance; or

b.  from within or around any plumbing fixtures, including, but not limited to, shower stalls, shower baths, tub installations, sinks, faucets, drains, basins or other fixtures including walls, ceilings or floors.

**12. Day Care**

Any activities causing property damage arising out of home day care services provided by an "insured" and for which an "insured" receives

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

monetary or other compensation, not including the mutual exchange of such services or the rendering of home day car services to a relative of an "insured".

**B.** We do not insure for loss to property described in Coverages **A** and **B** caused by any of the following. However, any ensuing loss to property described in Coverages **A** and **B** not precluded by any other provision in this policy is covered.

1. Weather conditions. However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in **A.** above to produce the loss.

2. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

3. Faulty, inadequate or defective:

    **a.** Planning, zoning, development, surveying, siting;

    **b.** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

    **c.** Materials used in repair, construction, renovation or remodeling; or

    **d.** Maintenance;

    of part or all of any property whether on or off the "residence premises".

## SECTION I – CONDITIONS

**A.** **Insurable Interest And Limit Of Liability**

Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

1. To an "insured" for more than the amount of such "insured's" interest at the time of loss; or

2. For more than the applicable limit of liability.

**B.** **Duties After Loss**

In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an "insured" seeking coverage, or a representative of either:

1. Give prompt notice to us or our agent;

2. Notify the police in case of loss by theft;

3. Notify the credit card or electronic fund transfer card or access device company in case of loss as provided for in **E.6.** Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money under Section **I** – Property Coverages;

4. Protect the property from further damage. If repairs to the property are required, you must:

    **a.** Make reasonable and necessary repairs to protect the property; and

    **b.** Keep an accurate record of repair expenses;

5. Cooperate with us in the investigation of a claim;

6. Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

7. As often as we reasonably require:

    **a.** Show the damaged property;

    **b.** Provide us with records and documents we request and permit us to make copies; and

    **c.** Submit to examination under oath, while not in the presence of another "insured", and sign the same;

8. Send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

    **a.** The time and cause of loss;

    **b.** The interests of all "insureds" and all others in the property involved and all liens on the property;

    **c.** Other insurance which may cover the loss;

    **d.** Changes in title or occupancy of the property during the term of the policy;

    **e.** Specifications of damaged buildings and detailed repair estimates;

    **f.** The inventory of damaged personal property described in **6.** above;

    **g.** Receipts for additional living expenses incurred and records that support the fair rental value loss; and

    **h.** Evidence or affidavit that supports a claim under **E.6.** Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money under Section **I** – Property Coverages, stating the amount and cause of loss.

**C.** **Loss Settlement**

In this Condition **C.**, the terms "cost to repair or replace" and "replacement cost" do not include the increased costs incurred to comply with the enforcement of any ordinance or law, except to the extent that coverage for these increased costs is provided in **E.11.** Ordinance Or Law under Section **I** – Property Coverages. Covered property losses

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Form No.   HO 3000   02 13
Page No.   14 of 23

are settled as follows:

1. Property of the following types:

   a. Personal property;

   b. Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings;

   c. Structures that are not buildings;

   d. Grave markers, including mausoleums;

   e. cesspools, septic tanks and septic fields; and

   f. swimming pools

   at actual cash value at the time of loss but not more than the amount required to repair or replace.

2. Buildings covered under Coverage **A** or **B** at replacement cost without deduction for depreciation, subject to the following:

   a. If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of any deductible and without deduction for depreciation, but not more than the least of the following amounts:

      (1) The limit of liability under this policy that applies to the building;

      (2) The replacement cost of that part of the building damaged with material of like kind and quality and for like use; or

      (3) The necessary amount actually spent to repair or replace the damaged building.

      If the building is rebuilt at a new premises, the cost described in **(2)** above is limited to the cost which would have been incurred if the building had been built at the original premises.

   b. If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

      (1) The actual cash value of that part of the building damaged; or

      (2) That proportion of the cost to repair or replace, after application of any deductible and without deduction for depreciation, that part of the building

damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

   c. To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

      (1) Excavations, footings, foundations, piers, or any other structures or devices that support all or part of the building, which are below the undersurface of the lowest basement floor;

      (2) Those supports described in **(1)** above which are below the surface of the ground inside the foundation walls, if there is no basement; and

      (3) Underground flues, pipes, wiring and drains.

   d. We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss as noted in **2.a.** and **b.** above.

      However, if the cost to repair or replace the damage is both:

      (1) Less than 5% of the amount of insurance in this policy on the building; and

      (2) Less than $2,500;

      we will settle the loss as noted in **2.a.** and **b.** above whether or not actual repair or replacement is complete.

   e. You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss to buildings on an actual cash value basis. You may then make claim for any additional liability according to the provisions of this Condition **C.** Loss Settlement, provided you notify us, within 180 days after the date of loss, of your intent to repair or replace the damaged building.

**D. Loss To A Pair Or Set**

In case of loss to a pair or set we may elect to:

1. Repair or replace any part to restore the pair or set to its value before the loss; or

2. Pay the difference between actual cash value of the property before and after the loss.

**E. Appraisal**

If you and we fail to agree on the amount of loss,

Form No.   HO 3000   02 13

Page No.   15 of 23

either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

Each party will:

1.   Pay its own appraiser; and

2.   Bear the other expenses of the appraisal and umpire equally.

### F.   Other Insurance And Service Agreement

If a loss covered by this policy is also covered by:

1.   Other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss; or

2.   A service agreement, this insurance is excess over any amounts payable under any such agreement. Service agreement means a service plan, property restoration plan, home warranty or other similar service warranty agreement, even if it is characterized as insurance.

### G.   Suit Against Us

No action can be brought against us unless there has been full compliance with all of the terms under Section **I** of this policy and the action is started within two years after the date of loss.

### H.   Our Option

If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the damaged property with material or property of like kind and quality.

### I.   Loss Payment

We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and:

1.   Reach an agreement with you;

2.   There is an entry of a final judgment; or

3.   There is a filing of an appraisal award with us.

### J.   Abandonment Of Property

We need not accept any property abandoned by an "insured".

### K.   Mortgage Clause

1.   If a mortgagee is named in this policy, any loss payable under Coverage **A** or **B** will be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.

2.   If we deny your claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

   **a.**   Notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

   **b.**   Pays any premium due under this policy on demand if you have neglected to pay the premium; and

   **c.**   Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Paragraphs **E.** Appraisal, **G.** Suit Against Us and **I.** Loss Payment under Section **I** – Conditions also apply to the mortgagee.

3.   If we decide to cancel or not to renew this policy, the mortgagee will be notified at least 10 days before the date cancellation or non-renewal takes effect.

4.   If we pay the mortgagee for any loss and deny payment to you:

   **a.**   We are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

   **b.**   At our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, we will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

5.   Subrogation will not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

### L.   No Benefit To Bailee

We will not recognize any assignment or grant any coverage that benefits a person or organization holding, storing or moving property for a fee regardless of any other provision of this policy.

### M.   Nuclear Hazard Clause

1.   "Nuclear Hazard" means any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Form No.   HO 3000   02 13
Page No.   16 of 23

2. Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against.

3. This policy does not apply under Section I to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

**N. Recovered Property**

If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery. At your option, the property will be returned to or retained by you or it will become our property. If the recovered property is returned to or retained by you, the loss payment will be adjusted based on the amount you received for the recovered property.

**O. Volcanic Eruption Period**

One or more volcanic eruptions that occur within a 72 hour period will be considered as one volcanic eruption.

**P. Policy Period**

This policy applies only to loss which occurs during the policy period.

**Q. Concealment Or Fraud**

We provide coverage to no "insureds" under this policy if, whether before or after a loss, an "insured" has:

1. Intentionally concealed or misrepresented any material fact or circumstance;

2. Engaged in fraudulent conduct; or

3. Made false statements;

relating to this insurance.

**R. Property Insurance Adjustment**

The limit of liability shown on the Policy Declarations for Coverage **A** – Dwelling may be revised at each policy anniversary for inflation. Any other limits of liability that are based on a relationship to Coverage A will also be revised. We will not reduce the limit of liability shown on the Policy Declarations without your consent. Any adjustment in premium will be made based on premium rates in use by us at the time the change is made.

## SECTION II – LIABILITY COVERAGES

**A. Coverage E – Personal Liability**

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:

1. Pay up to our limit of liability for the damages for

which an "insured" is legally liable. Damages include prejudgment interest awarded against an "insured"; and

2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when our limit of liability for the "occurrence" has been exhausted by payment of a judgment or settlement.

**B. Coverage F – Medical Payments To Others**

We will pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of an accident causing "bodily injury". Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household except "residence employees". As to others, this coverage applies only:

1. To a person on the "insured location" with the permission of an "insured"; or

2. To a person off the "insured location", if the "bodily injury":

   a. Arises out of a condition on the "insured location" or the ways immediately adjoining;

   b. Is caused by the activities of an "insured";

   c. Is caused by a "residence employee" in the course of the "residence employee's" employment by an "insured"; or

   d. Is caused by an animal owned by or in the care of an "insured".

## SECTION II – EXCLUSIONS

**A. "Motor Vehicle Liability"**

1. Coverages **E** and **F** do not apply to any "motor vehicle liability" if, at the time and place of an "occurrence", the involved "motor vehicle":

   a. Is registered for use on public roads or property;

   b. Is not registered for use on public roads or property, but such registration is required by a law, or regulation issued by a government agency, for it to be used at the place of the "occurrence"; or

   c. Is being:

      (1) Operated in, or practicing for, any pre-arranged or organized race, speed contest or other competition;

      (2) Rented to others;

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

(3) Used to carry persons or cargo for a charge; or

(4) For any "business" purpose except for a motorized golf cart while on a golfing facility.

2. If Exclusion **A.1.** does not apply, there is still no coverage for "motor vehicle liability" unless the "motor vehicle" is:

a. In dead storage on an "insured location";

b. Used to service an "insured's" residence;

c. Designed to assist the handicapped and, at the time of an "occurrence", it is:

(1) Being used to assist a handicapped person; or

(2) Parked on an "insured location";

d. Designed for recreational use off public roads and:

(1) Not owned by an "insured"; or

(2) Owned by an "insured" provided the "occurrence" takes place on an "insured location" as defined in **Definitions B. 6.a., b., d., e.** or **h.**; or

e. A motorized golf cart that is owned by an "insured", designed to carry up to 4 persons, not built or modified after manufacture to exceed a speed of 25 miles per hour on level ground and, at the time of an "occurrence", is within the legal boundaries of a golfing facility and is parked or stored there, or being used by an "insured" to:

(1) Play the game of golf or for other recreational or leisure activity allowed by the facility;

(2) Travel to or from an area where "motor vehicles" or golf carts are parked or stored; or

(3) Cross public roads at designated points to access other parts of the golfing facility.

B. **"Watercraft Liability"**

1. Coverages **E** and **F** do not apply to any "watercraft liability" if, at the time of an "occurrence", the involved watercraft is being:

a. Operated in, or practicing for, any prearranged or organized race, speed contest or other competition. This exclusion does not apply to a sailing vessel or a predicted log cruise;

b. Rented to others;

c. Used to carry persons or cargo for a charge; or

d. Used for any "business" purpose.

2. If Exclusion **B.1.** does not apply, there is still no coverage for "watercraft liability" unless, at the time of the "occurrence", the watercraft:

a. Is stored;

b. Is a sailing vessel, with or without auxiliary power, that is:

(1) Less than 26 feet in overall length; or

(2) 26 feet or more in overall length and not owned by or rented to an "insured"; or

c. Is not a sailing vessel and is powered by:

(1) An inboard or inboard-outdrive engine or motor, including those that power a water jet pump, of:

(a) 50 horsepower or less and not owned by an "insured"; or

(b) More than 50 horsepower and not owned by or rented to an "insured"; or

(2) One or more outboard engines or motors with:

(a) 25 total horsepower or less;

(b) More than 25 horsepower if the outboard engine or motor is not owned by an "insured";

(c) More than 25 horsepower if the outboard engine or motor is owned by an "insured" who acquired it during the policy period; or

(d) More than 25 horsepower if the outboard engine or motor is owned by an "insured" who acquired it before the policy period, but only if:

(i) You declare them at policy inception; or

(ii) Your intent to insure them is reported to us in writing within 45 days after you acquire them.

The coverages in **(c)** and **(d)** above apply for the policy period.

Horsepower means the maximum power rating assigned to the engine or motor by the manufacturer.

C. **"Aircraft Liability"**

This policy does not cover "aircraft liability".

D. **"Hovercraft Liability"**

This policy does not cover "hovercraft liability".

E. **Coverage E – Personal Liability And Coverage F – Medical Payments To Others**

Form No.   HO 3000   02 13
Page No.   **18 of 23**

Coverages **E** and **F** do not apply to the following:

1.  **Expected Or Intended Injury**

    "Bodily injury" or "property damage" which is expected or intended by an "insured" or which is the result of intentional acts or omissions, or criminal activity, even if the resulting "bodily injury" or "property damage":

    a.  Is of a different kind, quality or degree than initially expected or intended; or

    b.  Is sustained by a different person, entity or property than initially expected or intended; or

    c.  Is committed by an "insured" who lacks the mental capacity to govern their own conduct.

    This exclusion applies regardless of whether an "insured" is charged with or convicted of a crime. However, this Exclusion **E.1.** does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force by an "insured" to protect persons or property;

2.  **"Business"**

    a.  "Bodily injury" or "property damage" arising out of or in connection with a "business" conducted from an "insured location" or engaged in by an "insured", whether or not the "business" is owned or operated by an "insured" or employs an "insured".

        This Exclusion **E.2.** applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the "business".

    b.  This Exclusion **E.2.** does not apply to the rental or holding for rental of an "insured location";

        (1)  On an occasional basis if used only as a residence;

        (2)  In part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

        (3)  In part, as an office, school, studio or private garage;

3.  **Professional Services**

    "Bodily injury" or "property damage" arising out of the rendering of or failure to render professional services;

4.  **"Insured's" Premises Not An "Insured Location"**

    "Bodily injury" or "property damage" arising out

of a premises:

    a.  Owned by an "insured";

    b.  Rented to an "insured"; or

    c.  Rented to others by an "insured";

    that is not an "insured location";

5.  **War**

    "Bodily injury" or "property damage" caused directly or indirectly by war, including the following and any consequence of any of the following:

    a.  Undeclared war, civil war, insurrection, rebellion or revolution;

    b.  Warlike act by a military force or military personnel; or

    c.  Destruction, seizure or use for a military purpose.

    Discharge of a nuclear weapon will be deemed a warlike act even if accidental;

6.  **Communicable Disease**

    "Bodily injury" or "property damage" which arises out of the transmission of or exposure to a communicable disease, bacteria, parasite, virus or other organism by an "insured";

7.  **Sexual Molestation, Corporal Punishment Or Physical Or Mental Abuse**

    "Bodily injury" or "property damage" arising out of sexual molestation, corporal punishment or physical or mental abuse;

8.  **Controlled Substance**

    "Bodily injury" or "property damage" arising out of the use, sale, manufacture, delivery, transfer or possession by any person of a Controlled Substance as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812. Controlled Substances include but are not limited to cocaine, LSD, marijuana and all narcotic drugs. However, this exclusion does not apply to the legitimate use of prescription drugs by a person following the orders of a licensed health care professional with prescriptive authority for controlled substances;

9.  **Home Day Care**

    "Bodily injury" or "property damage" arising out of home day care services provided by an "insured" and for which an "insured" receives monetary or other compensation, not including the mutual exchange of such services or the rendering of home day care services to a relative of an "insured";

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Form No.   HO 3000   02 13
Page No.   19 of 23

**10. Pollution**

"Bodily injury" or "property damage" arising out of fuel, vapors, fumes, acids, toxic chemicals, toxic gasses, toxic liquids, toxic solids, waste material or other irritants, contaminants or pollutants; or

**11. Fines and Penalties**

Fines, penalties, double or treble damages; punitive or vindictive damages; or any other type of added damages intended to punish or deter wrongful conduct rather than as compensation for actual damages.

Exclusions **A.** "Motor Vehicle Liability", **B.** "Watercraft Liability", **C.** "Aircraft Liability", **D.** "Hovercraft Liability" and **E.4.** "Insured's" Premises Not An "Insured Location" do not apply to "bodily injury" to a "residence employee" arising out of and in the course of the "residence employee's" employment by an "insured".

**F. Coverage E – Personal Liability**

Coverage **E** does not apply to:

**1.** Liability:

   **a.** For any loss assessment charged against you as a member of an association, corporation or community of property owners, except as provided in **D.** Loss Assessment under Section II – Additional Coverages;

   **b.** Under any contract or agreement entered into by an "insured". However, this exclusion does not apply to written contracts:

      **(1)** That directly relate to the ownership, maintenance or use of an "insured location"; or

      **(2)** Where the liability of others is assumed by you prior to an "occurrence";

     unless excluded in **a.** above or elsewhere in this policy;

**2.** "Property damage" to property owned by an "insured". This includes costs or expenses incurred by an "insured" or others to repair, replace, enhance, restore or maintain such property to prevent injury to a person or damage to property of others, whether on or away from an "insured location";

**3.** "Property damage" to property rented to, occupied or used by or in the care of an "insured". This exclusion does not apply to "property damage" caused by fire, smoke or explosion;

**4.** "Bodily injury" to any person eligible to receive any benefits voluntarily provided or required to be provided by an "insured" under any:

   **a.** Workers' compensation law;

   **b.** Non-occupational disability law; or

   **c.** Occupational disease law;

**5.** "Bodily injury" or "property damage" for which an "insured" under this policy:

   **a.** Is also an insured under a nuclear energy liability policy issued by the:

      **(1)** Nuclear Energy Liability Insurance Association;

      **(2)** Mutual Atomic Energy Liability Underwriters;

      **(3)** Nuclear Insurance Association of Canada;

     or any of their successors; or

   **b.** Would be an insured under such a policy but for the exhaustion of its limit of liability; or

**6.** "Bodily injury" to you or an "insured" as defined under Definition **5.a.**

This exclusion also applies to any claim made or suit brought against you or an "insured":

   **a.** To repay; or

   **b.** Share damages with;

another person who may be obligated to pay damages because of "bodily injury" to an "insured".

**G. Coverage F – Medical Payments To Others**

Coverage **F** does not apply to "bodily injury":

**1.** To a "residence employee" if the "bodily injury":

   **a.** Occurs off the "insured location"; and

   **b.** Does not arise out of or in the course of the "residence employee's" employment by an "insured";

**2.** To any person eligible to receive benefits voluntarily provided or required to be provided under any:

   **a.** Workers' compensation law;

   **b.** Non-occupational disability law; or

   **c.** Occupational disease law;

**3.** From any:

   **a.** Nuclear reaction;

   **b.** Nuclear radiation; or

   **c.** Radioactive contamination;

all whether controlled or uncontrolled or however caused; or

   **d.** Any consequence of any of these; or

**4.** To any person, other than a "residence employee" of an "insured", regularly residing on any part of the "insured location".

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

## SECTION II – ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

### A. Claim Expenses

We pay:

1. Expenses we incur and costs taxed against an "insured" in any suit we defend;

2. Premiums on bonds required in a suit we defend, but not for bond amounts more than the Coverage E limit of liability. We need not apply for or furnish any bond;

3. Reasonable expenses incurred by an "insured" at our request, including actual loss of earnings (but not loss of other income) up to $300 per day, for assisting us in the investigation or defense of a claim or suit; and

4. Interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies.

### B. First Aid Expenses

We will pay expenses for first aid to others incurred by an "insured" for "bodily injury" covered under this policy. We will not pay for first aid to an "insured".

### C. Damage To Property Of Others

1. We will pay, at replacement cost, up to $1,000 per "occurrence" for "property damage" to property of others caused by an "insured".

2. We will not pay for "property damage":

    a. To the extent of any amount recoverable under Section I;

    b. Caused intentionally by an "insured" who is 13 years of age or older;

    c. To property owned by an "insured";

    d. To property owned by or rented to a tenant of an "insured" or a resident in your household; or

    e. Arising out of:

        (1) A "business" engaged in by an "insured";

        (2) Any act or omission in connection with a premises owned, rented or controlled by an "insured", other than the "insured location"; or

        (3) The ownership, maintenance, occupancy, operation, use, loading or unloading of aircraft, hovercraft, watercraft or "motor vehicles".

        This exclusion e.(3) does not apply to a "motor vehicle" that:

        (a) Is designed for recreational use off public roads;

        (b) Is not owned by an "insured"; and

        (c) At the time of the "occurrence", is not required by law, or regulation issued by a government agency, to have been registered for it to be used on public roads or property.

### D. Loss Assessment

1. We will pay up to $1,000 for your share of loss assessment charged against you, as owner or tenant of the "residence premises", during the policy period by a corporation or association of property owners, when the assessment is made as a result of:

    a. "Bodily injury" or "property damage" not excluded from coverage under Section II – Exclusions; or

    b. Liability for an act of a director, officer or trustee in the capacity as a director, officer or trustee, provided such person:

        (1) Is elected by the members of a corporation or association of property owners; and

        (2) Serves without deriving any income from the exercise of duties which are solely on behalf of a corporation or association of property owners.

2. Paragraph I. Policy Period under Section II – Conditions does not apply to this Loss Assessment Coverage.

3. Regardless of the number of assessments, the limit of $1,000 is the most we will pay for loss arising out of:

    a. One accident, including continuous or repeated exposure to substantially the same general harmful condition; or

    b. A covered act of a director, officer or trustee. An act involving more than one director, officer or trustee is considered to be a single act.

4. We do not cover assessments charged against you or a corporation or association of property owners by any governmental body.

## SECTION II – CONDITIONS

### A. Limit Of Liability

Our total liability under Coverage E for all damages resulting from any one "occurrence" will not be more than the Coverage E limit of liability shown in the Declarations. This limit is the same regardless of the number of "insureds", claims made or persons injured. All "bodily injury" and "property

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

damage" resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one "occurrence".

Our total liability under Coverage **F** for all medical expense payable for "bodily injury" to one person as the result of one accident will not be more than the Coverage **F** limit of liability shown in the Declarations.

**B. Severability Of Insurance**

This insurance applies separately to each "insured". This condition will not increase our limit of liability for any one "occurrence".

**C. Duties After "Occurrence"**

In case of an "occurrence", you or another "insured" will perform the following duties that apply. We have no duty to provide coverage under this policy if your failure to comply with the following duties is prejudicial to us. You will help us by seeing that these duties are performed:

1. Give written notice to us or our agent as soon as is practical, which sets forth:

   a. The identity of the policy and the "named insured" shown in the Declarations;

   b. Reasonably available information on the time, place and circumstances of the "occurrence"; and

   c. Names and addresses of any claimants and witnesses;

2. Cooperate with us in the investigation, settlement or defense of any claim or suit;

3. Promptly forward to us every notice, demand, summons or other process relating to the "occurrence";

4. At our request, help us:

   a. To make settlement;

   b. To enforce any right of contribution or indemnity against any person or organization who may be liable to an "insured";

   c. With the conduct of suits and attend hearings and trials; and

   d. To secure and give evidence and obtain the attendance of witnesses;

5. With respect to **C. Damage To Property Of Others** under Section **II - Additional Coverages**, submit to us within 60 days after the loss, a sworn statement of loss and show the damaged property, if in an "insured's" control;

6. No "insured" shall, except at such "insured's" own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the "bodily injury".

**D. Duties Of An Injured Person – Coverage F – Medical Payments To Others**

1. The injured person or someone acting for the injured person will:

   a. Give us written proof of claim, under oath if required, as soon as is practical; and

   b. Authorize us to obtain copies of medical reports and records.

2. The injured person will submit to a physical exam by a doctor of our choice when and as often as we reasonably require.

**E. Payment Of Claim – Coverage F – Medical Payments To Others**

Payment under this coverage is not an admission of liability by an "insured" or us.

**F. Suit Against Us**

1. No action can be brought against us unless there has been full compliance with all of the terms under this Section **II**.

2. No one will have the right to join us as a party to any action against an "insured".

3. Also, no action with respect to Coverage **E** can be brought against us until the obligation of such "insured" has been determined by final judgment or agreement signed by us.

**G. Bankruptcy Of An "Insured"**

Bankruptcy or insolvency of an "insured" will not relieve us of our obligations under this policy.

**H. Other Insurance**

This insurance is excess over other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

**I. Policy Period**

This policy applies only to "bodily injury" or "property damage" which occurs during the policy period.

**J. Concealment Or Fraud**

We do not provide coverage to an "insured" who, whether before or after a loss, has:

1. Intentionally concealed or misrepresented any material fact or circumstance;

2. Engaged in fraudulent conduct; or

3. Made false statements;

relating to this insurance.

**SECTIONS I AND II – CONDITIONS**

**A. Liberalization Clause**

If we make a change which broadens coverage

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

under this edition of our policy without additional premium charge, that change will automatically apply to your insurance as of the date we implement the change in your state, provided that this implementation date falls within 60 days prior to or during the policy period stated in the Declarations.

This Liberalization Clause does not apply to changes implemented with a general program revision that includes both broadenings and restrictions in coverage, whether that general program revision is implemented through introduction of:

1.  A subsequent edition of this policy; or

2.  An amendatory endorsement.

**B.  Waiver Or Change Of Policy Provisions**

A waiver or change of a provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination will not waive any of our rights.

**C.  Cancellation**

1.  You may cancel this policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect.

2.  We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the Declarations. Proof of mailing will be sufficient proof of notice.

    a.  When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.

    b.  When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 10 days before the date cancellation takes effect.

    c.  When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

        (1)  If there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy; or

        (2)  If the risk has changed substantially since the policy was issued.

        This can be done by letting you know at least 30 days before the date cancellation takes effect.

3.  When this policy is canceled, the premium for the period from the date of cancellation to the

expiration date will be refunded pro rata.

4.  If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

**D.  Non-renewal**

We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your mailing address shown in the Declarations, written notice at least 30 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

**E.  Assignment**

Assignment of this policy will not be valid unless we give our written consent.

**F.  Subrogation**

An "insured" may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, an "insured" must sign and deliver all related papers and cooperate with us.

Subrogation does not apply to Coverage **F** or Paragraph **C.** Damage To Property Of Others under Section **II** – Additional Coverages.

**G.  Death**

If any person named in the Declarations or the spouse, if a resident of the same household, dies, the following apply:

1.  We insure the legal representative of the deceased but only with respect to the premises and property of the deceased covered under the policy at the time of death; and

2.  "Insured" includes:

    a.  An "insured" who is a member of your house-hold at the time of your death, but only while a resident of the "residence premises"; and

    b.  With respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

**H.  Coverage Changes**

The coverage provided and the premium for the policy is based on information you have given us. You agree to cooperate with us in determining if this information is correct and complete. You agree that if this information changes, is incorrect or incomplete, we may adjust your coverage and premium accordingly during the policy period.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**Form No.**    HO 3000    02 13
**Page No.**    **23 of 23**

I.  **Continuous Policy**

   Subject to the consent of this Company, this policy
   will be continued in force upon payment of the
   required continuation premium for each successive
   policy period in accordance with the rules, rates,
   forms and premiums then in effect. Failure to pay
   the required premium when due will result in the
   issuance of a legal notice of cancellation.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

SH 01 25   03 13

## *SPECIAL PROVISIONS – TEXAS*

### DEFINITIONS

The following are added to Paragraph **B.**:

12. "Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

13. "Business day" means a day other than a Saturday, Sunday or holiday recognized by the state of Texas.

### SECTION I – PROPERTY COVERAGES

The following is added to Paragraph **E.11. Ordinance Or Law:**

d. If the insured property is located in an area which is eligible for coverage through the Texas Windstorm Insurance Association, the coverage described above also applies to the increased cost you incur due to the repair, replacement or demolition required for the dwelling to comply with the building specifications contained in the Texas Windstorm Insurance Association's plan of operation.

(This is Paragraph **C.11.** in Form HO 4000 and **D.10.** in Form HO 6000.)

### SECTION I – PERILS INSURED AGAINST

For Form **HO 2000**, the introductory paragraph is replaced by the following:

We insure for direct physical loss to the property described in Coverages **A**, **B**, and **C** caused by any of the following perils unless the loss is excluded under Section I – Exclusions.

For Form **HO 4000**, the introductory paragraph is replaced by the following:

We insure for direct physical loss to the property described in Coverage **C** caused by any of the following perils unless the loss is excluded in Section I – Exclusions.

For Form **HO 6000**, the introductory paragraph is replaced by the following:

We insure for direct physical loss to the property described in Coverages **A** and **C** caused by any of the following perils unless the loss is excluded in Section I – Exclusions.

For Forms **HO 2000** and **HO 6000**, Paragraph **12.b.(5)** is deleted.

For Form **HO 4000**, Paragraph **12.b.(4)** is deleted.

For Form **HO 3000**:

Paragraph **A. Coverage A – Dwelling and Coverage B – Other Structures** is replaced by the following:

**A.  Coverage A – Dwelling And Coverage B – Other Structures**

1. We insure against direct physical loss to property described in Coverages **A** and **B**.

2. We do not insure, however, for loss:

   a. Excluded under Section I – Exclusions;

   b. Involving collapse, including any of the following conditions of property or any part of the property:

      (1) An abrupt falling down or caving in;

      (2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

      (3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to **(1)** or **(2)** above;

      except as provided in **E.8. Collapse** under Section I – Property Coverages; or

   c.  Caused by:

      (1) Freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This provision does not apply if you have used reasonable care to:

         (a) Maintain heat in the building; or

         (b) Shut off the water supply and drain all systems and appliances of water.

      However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply.

      For purposes of this provision a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment;

      (2) Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

         (a) Fence, pavement, patio or swimming pool;

         (b) Footing, foundation, bulkhead, wall, or any other structure or device that supports all or part of a

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

building, or other structure;

**(c)** Retaining wall or bulkhead that does not support all or part of a building or other structure; or

**(d)** Pier, wharf or dock;

**(3)** Theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

**(4)** Vandalism and malicious mischief, and any ensuing loss caused by any intentional and wrongful act committed in the course of the vandalism or malicious mischief, if the dwelling has been vacant for more than 60 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant; or

**(5)** Any of the following:

**(a)** Wear and tear, marring, deterioration;

**(b)** Mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself;

**(c)** Smog, rust or other corrosion, or dry rot;

**(d)** Smoke from agricultural smudging or industrial operations;

**(e)** Contamination or discharge, dispersal, seepage, migration, release or escape of pollutants unless the contamination or discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against named under Coverage **C.**

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

**(f)** Settling, shrinking, bulging or expansion, including resultant cracking, of bulkheads, pavements, patios, footings, foundations, walls, floors, roofs or ceilings;

**(g)** Birds, rodents, or insects;

**(h)** Nesting or infestation, or discharge or release of waste products or secretions, by any animals;

**(i)** Animals owned or kept by an "insured"; or

**(j)** Growth of trees, shrubs, plants or lawns, whether or not such growth is above or below the surface of the ground.

**Exception To c.(5)**

Unless the loss is otherwise excluded, we cover loss to property covered under Coverage **A** or **B** resulting from a sudden and accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance on the "residence premises". This includes the cost to tear out and replace any part of a building, or other structure, on the "residence premises", but only when necessary to repair the system or appliance. However, such tear out and replacement coverage only applies to other structures if the water or steam causes actual damage to a building on the "residence premises".

We do not cover loss to the system or appliance from which this water or steam escaped.

For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, down spout or similar fixtures or equipment.

Section **I** – Exclusion **A.3.** Water, Paragraphs **a.** and **c.** that apply to surface water and water below the surface of the ground do not apply to loss by water covered under **c.(5)** above.

Under **2.b.** and **c.** above, any ensuing loss to property described in Coverages **A** and **B** not precluded by any other provision in this policy is covered.

Paragraph **B.12.b.(4)** is deleted.

**SECTION I – EXCLUSIONS**

Paragraph **8. Intentional Loss** is replaced by the following:

**Form No.**  SH 01 25  03 13
**Page No.**  3 of 8

### 8. Intentional Loss

a. Intentional Loss means any loss arising out of any act an "insured" commits or conspires to commit with the intent to cause a loss.

In the event of such loss, no "insured" is entitled to coverage, even "insureds" who did not commit or conspire to commit the act causing the loss.

b. However, this exclusion does not apply to an "insured" who did not cooperate in or contribute to the creation of the loss if that "insured" has:

(1) Filed a police report; and

(2) Cooperated with law enforcement investigation or prosecution relating to any other "insured" causing the intentional loss.

c. If we pay a claim pursuant to Paragraph **8.b.,** our payment to the "insured" is limited to that "insured's" insurable interest in the property less any payments we first made to a mortgagee or other party with a secured interest in the policy. In no event will we pay more than the limit of liability. As a condition of payment for intentional loss caused by another "insured" under this exception to the exclusion, we may require an assignment of rights of recovery to the extent that payment is made by us.

The following exclusion is added:

**"Fungi", Wet Rot Or Microbes**

a. "Fungi", wet rot or microbes means the presence, growth, proliferation, spread or any activity of "fungi", wet rot or microbes.

This exclusion also applies to the cost:

(1) To remove "fungi", wet rot or microbes from property covered under Section I – Property Coverages;

(2) To tear out and replace any part of the building or other covered property as needed to gain access to the "fungi", wet rot or microbes; and

(3) Of testing of air or property to confirm the absence, presence or level of "fungi", wet rot or microbes.

b. This exclusion applies unless the "fungi", wet rot or microbes are located upon the portion of covered property which must be repaired or replaced because of direct physical damage resulting from sudden and accidental discharge or overflow of water which would otherwise be covered under this policy. For purposes of this exclusion, sudden and accidental shall include a loss event that is hidden or concealed for a period of time until it is detectable. A hidden loss must be reported to us no later than 30 days after the date it was detected or should have been detected.

c. However, the exception to this exclusion described in **b.** above does not include:

(1) The cost to treat, contain, remove or dispose of the "fungi", wet rot or microbes beyond that which is required to repair or replace the covered property physically damaged by water;

(2) The cost of any testing of air or property to confirm the absence, presence or level of "fungi", wet rot or microbes whether performed prior to, during or after removal, repair, restoration or replacement;

(3) The cost of any decontamination of the "residence premises"; and

(4) Any increase in loss under Coverage **D** – Loss Of Use and Additional Coverage **1.** Debris Removal resulting from c.(1), (2) and (3).

Direct loss by fire, smoke or explosion resulting from "fungi", wet rot or microbes is covered.

(For Form **HO 3000**, this exclusion is added under Paragraph **A.**)

### SECTION I – CONDITIONS

The following is added to Paragraph **A. Insurable Interest And Limit Of Liability:**

**Policy A Liquidated Demand**

A fire insurance policy, in case of a total loss by fire of property insured, shall be held and considered to be a liquidated demand against the company for the full amount of such policy. This provision shall not apply to personal property.

Paragraph **B. Duties After Loss** is replaced by the following:

### B. Duties After Loss

**1. Your Duties After Loss**

In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an "insured" seeking coverage or a representative of either:

a. Give prompt notice to us or our agent.

b. Notify the police in case of a loss by theft;

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**Form No.**   SH 01 25   03 13
**Page No.**   4 of 8

c. Notify the credit card or electronic fund transfer card or access device company in case of loss as provided for in **E.6.** Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money Coverage under Section **I** – Property Coverages;

d. Protect the property from further damage. If repairs to the property are required, you must:

(1) Make reasonable and necessary repairs to protect the property; and

(2) Keep an accurate record of repair expenses;

e. Cooperate with us in the investigation of a claim;

f. Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

g. As often as we reasonably require:

(1) Show the damaged property;

(2) Provide us with records and documents we request and permit us to make copies; and

(3) Submit to examination under oath, while not in the presence of another "insured", and sign the same;

h. Send to us, within 91 days after our request, your signed, sworn proof of loss on a standard form supplied by us. We must request a signed, sworn proof of loss within 15 days after we receive your written notice, or we waive our right to require a proof of loss. Such waiver will not waive our other rights under this policy.

(1) This proof of loss shall set forth, to the best of your knowledge and belief:

(a) The time and cause of loss;

(b) The interests of all "insureds" and all others in the property involved and all liens on the property;

(c) Other insurance which may cover the loss;

(d) Changes in the title or occupancy of the property during the term of the policy;

(e) Specifications of the damaged buildings and detailed repair estimates;

(f) The inventory of damaged personal property described in **B.1.f.** above;

(g) Receipts for additional living expenses incurred and records that support the fair rental value loss; and

(h) Evidence or affidavit that supports a claim under **E.6.** Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money Coverage under Section **I** – Property Coverages, stating the amount and cause of loss.

(2) If you elect to make claim under the Replacement Cost Coverage of this policy, this proof of loss shall also state, to the best of your knowledge and belief:

(a) The replacement cost of the described dwelling;

(b) The replacement cost of any other building on which loss is claimed; or

(c) The full cost of repair or replacement of loss without deduction for depreciation.

**2. Our Duties After Loss**

a. No later than 15 days after we receive your written notice of claim, we must:

(1) Acknowledge receipt of the claim.

If our acknowledgment of the claim is not in writing, we will keep a record of the date, means and content of our acknowledgment;

(2) Begin any investigation of the claim; and

(3) Specify the information you must provide in accordance with Paragraph **B.1.** Your Duties After Loss above.

We may request more information if during the investigation of the claim such additional information is necessary;

b. After we receive the information we request, we must notify you in writing whether the claim will be paid or has been denied or whether more information is needed:

(1) Within 15 "business days"; or

(2) Within 30 days if we have reason to believe the loss resulted from arson;

**Includes copyrighted material of Insurance Services Office, Inc. with its permission.**

Form No.    SH 01 25   03 13
Page No.    5 of 8

c. If we do not approve payment of your claim or require more time for processing your claim, we must:

   **(1)** Give the reason for denying your claim; or

   **(2)** Give the reasons we require more time to process your claim. But we must either approve or deny your claim within 45 days after requesting more time.

For Forms **HO 2000 and HO 3000**, Paragraph **C.1.** in **Loss Settlement** is replaced by the following:

**1.** Property of the following types:

   **a.** Personal property other than jewelry;

   **b.** Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings;

   **c.** Structures that are not buildings;

   **d.** Grave markers, including mausoleums;

   **e.** Cesspools, septic tanks and septic fields; and

   **f.** Swimming pools;

at actual cash value at the time of loss but not more than the amount required to repair or replace.

For Form **HO 4000**, **C. Loss Settlement** is replaced by the following:

**C. Loss Settlement**

**1.** Covered property losses other than jewelry are settled at actual cash value at the time of loss but not more than the amount required to repair or replace.

**2.** Jewelry losses are settled at replacement cost at the time of loss without deduction for depreciation.

For Form **HO 6000**, Paragraph **C.1.** in **Loss Settlement** is replaced by the following:

**1.** Personal property and grave markers, including mausoleums, at actual cash value at the time of loss but not more than the amount required to repair or replace. This does not include loss to jewelry.

For all forms except **HO 4000**, Paragraph **3.** is added to **C. Loss Settlement:**

**3.** Jewelry at replacement cost at the time of loss without deduction for depreciation.

Paragraph **D. Loss To A Pair Or Set** is replaced by the following:

**D. Loss To A Pair Or Set**

**1.** In case of loss to a pair or set other than jewelry, we may elect to:

   **a.** Repair or replace any part to restore the pair or set to its value before the loss; or

   **b.** Pay the difference between actual cash value of the property before and after the loss.

**2.** Loss to a jewelry pair or set will be settled at replacement cost at the time of loss without deduction for depreciation.

Paragraph **G. Suit Against Us** is replaced by the following:

**G. Suit Against Us**

No suit or action can be brought against us unless there has been full compliance with all of the terms under Section **I** of this policy. Action must be brought against us within two years and one day from the date the cause of action first accrues. A cause of action accrues on the date of the initial breach of our contractual duties as alleged in the action.

Paragraph **I. Loss Payment** is replaced by the following:

**I. Loss Payment**

We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to payment.

If we notify you that we will pay your claim, or part of your claim, we must pay within five "business days" after we notify you. If payment of your claim or part of your claim requires the performance of an act by you, we must pay within five "business days" after the date you perform the act.

In all forms except **HO 4000**, Paragraph **K. Mortgage Clause** is replaced by the following:

**K. Mortgage Clause (Without Contribution)**

**1.** We will pay for any covered loss of or damage to buildings or structures to the mortgagee shown in the Declarations as interests appear.

**2.** The mortgagee has the right to receive loss payment even if the mortgagee has started foreclosure or similar action on the building structure.

**3.** If we deny your claim because of your acts or because you have failed to comply with the terms of this policy, the mortgagee has the right to receive loss payment if the mortgagee:

   **a.** At our request, pays any premium due under this policy, if you have failed to do so;

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Form No.   SH 01 25   03 13

Page No.   6 of 8

    **b.** Submits a signed, sworn statement of loss within 91 days after receiving notice from us of your failure to do so; and

    **c.** Has notified us of any changes in ownership, occupancy or substantial changes in risk known to the mortgagee.

All of the terms of this policy will then apply directly to the mortgagee.

Failure of the mortgagee to comply with **3.a.**, **3.b.** or **3.c.** above shall void this policy as to the interest of the mortgagee.

**4.** If we pay the mortgagee for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this policy:

    **a.** The mortgagee's rights under the mortgage will be transferred to us to the extent of the amount we pay.

    **b.** The mortgagee's right to recover the full amount of the mortgagee's claim will not be impaired.

At our option, we may pay the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**5.** If this policy is cancelled, we will give the mortgagee specifically named in the Declarations written notice of cancellation.

If we cancel the policy, we will give the mortgagee the same number of days' notice of cancellation we give to you.

If you cancel the policy, we will give the mortgagee notice of cancellation to be effective on the date stated in the notice. The date of cancellation cannot be before the 10th day after the date we mail the notice.

We will not give notice of cancellation to any successor or assignee of the mortgagee named in the policy.

**6.** If the property described under Coverage **A** – Dwelling or Coverage **B** – Other Structures is foreclosed upon under the deed of trust, the mortgagee may cancel this policy of insurance and will be entitled to any unearned premium from this policy.

The mortgagee must credit any unearned premium against any deficiency owed by the borrower and return any unearned premium not so credited to the borrower. The unearned premium will be figured using the customary pro rata procedures.

**7.** If we elect not to renew this policy, the mortgagee specifically named in the Declarations will be given 30 days' written notice of the nonrenewal.

(This condition does not apply to Form **HO 4000**.)

Paragraph **Q. Concealment Or Fraud** is replaced by the following:

**Q. Concealment Or Fraud**

We will not provide coverage for the "insured" who, whether before or after a loss, has:

    **1.** Intentionally concealed or misrepresented any material fact or circumstance;

    **2.** Engaged in fraudulent conduct; or

    **3.** Made material false statements;

relating to this insurance.

(This is Paragraph **P.** in Form **HO 4000**.)

The following conditions are added:

**Residential Community Property Clause**

This policy, subject to all other terms and conditions, when covering residential community property, as defined by state law, shall remain in full force and effect as to the interest of each spouse covered, irrespective of divorce or change of ownership between the spouses unless excluded by endorsement attached to this policy, until the expiration of the policy or until cancelled in accordance with the terms and conditions of this policy.

**Catastrophe Claims**

If a claim results from a weather-related catastrophe or a major natural disaster, each claim-handling deadline shown in **B.** Duties After Loss and **I.** Loss Payment is extended for an additional 15 days.

Catastrophe or Major Natural Disaster means a weather-related event which:

    **1.** Is declared a disaster under the Texas Disaster Act of 1975; or

    **2.** Is determined to be a catastrophe by the Texas Department of Insurance.

**SECTION II – EXCLUSIONS**

Paragraph **E.6. Communicable Disease** is replaced by the following:

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Form No.    SH 01 25   03 13
Page No.    7 of 8

6. **Communicable Disease**

"Bodily injury" or "property damage" which arises out of the transmission of sickness or disease by an "insured" through sexual contact;

Paragraph **E.7. Sexual Molestation, Corporal Punishment Or Physical Or Mental Abuse** is replaced by the following:

7. **Sexual Molestation, Corporal Punishment Or Physical Or Mental Abuse**

"Bodily injury" or "property damage" arising out of sexual molestation, corporal punishment or physical or mental abuse.

For the purposes of this exclusion, abuse means an act which is committed with the intent to cause harm;

The following exclusion is added under Paragraph **E. Coverage E – Personal Liability And Coverage F – Medical Payments to Others**:

**"Fungi", Wet or Dry Rot, or Microbes**

"Bodily injury" or "property damage" arising out of "fungi", wet or dry rot, or microbes.

## SECTION II – CONDITIONS

The following condition is added:

**K. Notice Of Offer To Settle Or Of Settlement Of Claim**

1. We will notify you in writing of any initial offer to settle a claim against you under this Section **II.** We will give you notice within 10 days after the date the offer is made.

2. We will notify you in writing of any settlement of a claim against you under this Section **II.** We will give you notice within 30 days after the date of the settlement.

## SECTIONS I AND II – CONDITIONS

Paragraph **C. Cancellation** is replaced by the following:

**C. Cancellation**

1. You may cancel this policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect.

2. We may cancel this policy at any time for the reasons stated in this condition by mailing you notice in writing of the date cancellation takes effect.

   a. If this policy has been in effect for less than 60 days and is not a renewal policy, we may not cancel this policy unless:

      (1) We identify a condition that:

(a) Creates an increased risk of hazard;

(b) Was not disclosed in the application for insurance coverage; and

(c) Is not the subject of a prior claim;

(2) Before the effective date of the policy, we do not accept a copy of a required inspection report that:

(a) Was completed by an inspector licensed by the Texas Real Estate Commission or who is otherwise authorized to perform inspections; and

(b) Is dated not earlier than the 90th day before the effective date of the policy.

An inspection report is deemed accepted unless we reject it before the 11th day after the date we receive it;

(3) You do not pay the premium or any portion of the premium due;

(4) The Texas Department of Insurance determines that continuation of the policy would violate the Texas Insurance Code or any other laws governing the business of insurance in this state;

(5) You submit a fraudulent claim; or

(6) There is an increase in the hazard covered by this policy that is within your control and that would produce an increase in the premium rate of this policy.

The effective date of cancellation cannot be before:

(1) The 10th day after we mail notice if we cancel for reason **(3), (4), (5)** or **(6)** above.

(2) The 30th day after we mail notice if we cancel for any other reason.

b. If this policy has been in effect 60 days or more, or at any time if it is a renewal policy, we may not cancel this policy unless:

(1) You do not pay the premium or any portion of the premium due.

(2) The Texas Department of Insurance determines that continuation of the policy would violate the Texas Insurance Code or any other laws governing the business of insurance in this state.

(3) You submit a fraudulent claim.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**Form No.**    SH 01 25   03 13
**Page No.**    8 of 8

(4) There is an increase in the hazard covered by this policy that is within your control and that would produce an increase in the premium rate of this policy.

The effective date of cancellation cannot be before the 10th day after we mail the notice. Our notice of cancellation must state the reason for cancellation.

3. When this policy is cancelled, we will send you any refund due not later than the 15th "business day" after the effective date of cancellation. The premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

4. If we cancel, our notice to you will state that if this refund is not included with the notice, it will be returned on demand or not later than the 15th "business day" after the date of cancellation.

5. We may not cancel this policy solely because you are an elected official.

Paragraph **D. Nonrenewal** is replaced by the following:

**D. Refusal To Renew**

1. We may not refuse to renew this policy because of claims for losses resulting from natural causes.

2. We may not refuse to renew this policy solely because you are an elected official.

3. We may refuse to renew this policy if you have filed three or more claims under the policy in any three-year period that do not result from natural causes.

If you have filed two claims in a period of less than three years, we may notify you in writing that if you file a third claim during the three-year period, we may refuse to renew this policy by providing you proper notice of our refusal to renew as provided in **4.** below. If we do not notify you after the second claim, we may not refuse to renew this policy because of losses.

A claim does not include a claim that is filed but is not paid or payable under the policy.

4. If we refuse to renew this policy, we must deliver to you, or mail to you at your mailing address shown in the Declarations and any mortgagee named in the Declarations, written notice of our refusal to renew not later than the 30th day before the date on which this policy expires. Proof of mailing will be sufficient proof of notice. If we fail to give you proper notice of our decision not to renew, you may require us to renew the policy.

All other provisions of this policy apply.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

HO 04 16   10 00

## PREMISES ALARM OR FIRE PROTECTION SYSTEM

We acknowledge the installation of an alarm system and/or automatic sprinkler system approved by us on the "residence premises". You agree to maintain this system or systems, for which we have granted a credit, in working order and to let us know promptly of any change, including removal, made to the system(s).

HO 23 04   05 11

*PERSONAL PROPERTY REPLACEMENT COST LOSS SETTLEMENT*
*– TEXAS*

**A. Eligible Property**

1. Covered losses to the following property are settled at replacement cost at the time of the loss:

   a. Coverage **C**; and

   b. If covered in this policy:

      (1) Awnings, outdoor antennas and outdoor equipment; and

      (2) Carpeting and household appliances;

      whether or not attached to buildings.

2. This method of loss settlement will also apply to the following articles or classes of property if they are separately described and specifically insured in this policy and not subject to agreed value loss settlement:

   a. Furs and garments:

      (1) Trimmed with fur; or

      (2) Consisting principally of fur;

   b. Cameras, projection machines, films and related articles of equipment;

   c. Musical equipment and related articles of equipment;

   d. Silverware, silver-plated ware, goldware, gold-plated ware and pewterware, but excluding:

      (1) Pens or pencils;

      (2) Flasks;

      (3) Smoking implements; or

      (4) Jewelry; and

   e. Golfer's equipment meaning golf clubs, golf clothing and golf equipment.

   Personal Property Replacement Cost loss settlement will not apply to other classes of property separately described and specifically insured.

**B. Ineligible Property**

Property listed below is not eligible for replacement cost loss settlement. Any loss will be settled at actual cash value at the time of loss but not more than the amount required to repair or replace.

1. Antiques, fine arts, paintings and similar articles of rarity or antiquity, which cannot be replaced.

2. Memorabilia, souvenirs, collectors items and similar articles, whose age or history contribute to their value.

3. Articles not maintained in good or workable condition.

4. Articles that are outdated or obsolete and are stored or not being used.

**C. Replacement Cost Loss Settlement Condition**

The following loss settlement condition applies to all property described in **A.** above:

1. We will pay no more than the least of the following amounts:

   a. Replacement cost at the time of loss without deduction for depreciation;

   b. The full cost of repair at the time of loss;

   c. The limit of liability that applies to Coverage **C**, if applicable;

   d. Any applicable special limits of liability stated in this policy; or

   e. For loss to any item described in **A.2.a. – e.** above, the limit of liability that applies to the item.

2. If the cost to repair or replace the property described in **A.** above is more than $500, we will pay no more than the actual cash value for the loss until the actual repair or replacement is complete.

3. You may make a claim for loss on an actual cash value basis and then make a claim for any additional liability in accordance with this endorsement provided you notify us, within 180 days after the date of loss, of your intent to repair or replace the damaged property.

All other provisions of this policy apply.

© Insurance Services Office, Inc., 2010

SH 06 01   06 05

## *IDENTITY THEFT RESOLUTION ASSISTANCE*

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

For no additional premium, the following is added to **Additional Coverages** under **SECTION I – PROPERTY COVERAGES**:

### IDENTITY THEFT RESOLUTION ASSISTANCE

We may, at our option and at our expense, refer you to a firm that:

1.  you can authorize to work on your behalf to assist you in reporting and resolving "identity theft"; or

2.  can consult with you on preventative and protective measures you might take if a circumstance causes you to reasonably suspect that you may become or have already become, a victim of "identity theft".

### DEFINITIONS

With respect to the provisions of this endorsement, the following definition is added:

"Identity theft" means an act or series of acts committed or attempted by a third party, using, without authority, identifying information of an "insured" to open new credit accounts or use existing credit information, whether for financial gain or to disguise the third party's true identity.

### EXCLUSIONS

1.  We do not cover your loss or expenses incurred in reporting or resolving the effects of "Identity Theft".

2.  We do not provide this service to any "insured" who directs or commits fraudulent, dishonest or criminal acts, alone or in concert with others, which result in "Identity theft".

### SPECIAL DEDUCTIBLE

No deductible applies to this endorsement.

All other provisions of this policy apply.

SH 23 16   03 13

# *LIMITED WATER BACK-UP AND SUMP DISCHARGE OR OVERFLOW COVERAGE – TEXAS*

| | |
|---|---|
| **Limit of Liability:** | |
| **Deductible**: | |

*Entry may be left blank if shown elsewhere in this policy for this coverage.

**A.   Coverage**

We will pay up to the limit of liability shown in the Schedule for direct physical loss, not caused by the negligence of an "insured", to property covered under Section I caused by water, or waterborne material, which:

1.   Originates from within the dwelling where you reside and backs up through sewers or drains; or

2.   Overflows or is discharged from a:

   a.   Sump, sump pump; or

   b.   Related equipment;

   even if such overflow or discharge results from mechanical breakdown. This coverage does not apply to direct physical loss of the sump pump, or related equipment, which is caused by mechanical breakdown.

This coverage does not increase the limits of liability for Coverages **A, B, C** or **D** stated in the Declarations.

**B.   Section I – Perils Insured Against**

With respect to the coverage described in **A.** above, Paragraph:

**A.2.c.(5)(b)** in Form **HO 3000**;

**1.b.(5)(b)** in Form **HO 3000** with **SH 23 14**;;

**3.i.(2)** in Endorsement **SH 17 20**; and

**2.c.(5)(b)** in Endorsement **SH 17 21**;

is deleted and replaced by the following:

Latent defect, inherent vice or any quality in property that causes it to damage or destroy itself;

**C.   Special Deductible**

The following replaces any other deductible provision in this policy with respect to loss covered under this endorsement.

We will pay only that part of the total of all loss payable under Section I that exceeds the deductible shown in the Schedule. No other deductible applies to this coverage. This deductible does not apply with respect to Coverage **D** – Loss of Use.

**D.   Exclusion**

The Section **I – Water** Exclusion does not apply to the coverage provided under this endorsement.

All other provisions of this policy apply.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

SH 23 23   03 13
*FOUNDATION COVERAGE – TEXAS*
*FORM HO 3000 ONLY*

**SECTION I – PROPERTY COVERAGES**

Under **E. Additional Coverages,** the following coverage is added:

**Foundation Coverage**

**a.** We cover settling, cracking, shrinking, bulging or expansion of the foundation, floor slab or footings that support the dwelling caused by seepage or leakage of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system.

This coverage includes the cost of tearing out and replacing any part of the building necessary to repair the system from which the leakage or seepage occurred.

**b.** We do not cover loss to the system from which the water or steam escaped.

**c.** Our limit of liability for this coverage will not exceed an amount equal to 15% of the Coverage A limit applicable on the date of loss.

**d.** This coverage does not increase the limit of liability that applies to the damaged covered property.

**SECTION I – PERILS INSURED AGAINST**

Paragraph **A.2.c.(5)(f)** is replaced by the following:

**(f)** Settling, shrinking, bulging or expansion, including resultant cracking, of, pavements, patios, footings, foundations, walls, floors, roofs or ceilings, except as specifically provided by this endorsement;

**SECTION I – EXCLUSIONS**

Paragraph **A.11. Seepage** is replaced by the following:

**11. Seepage**

Seepage means continuous or repeated seepage or leakage of water, steam or fuel or the presence of condensation, humidity, moisture or vapor over a period of weeks, months, or years:

**a.** from a plumbing, heating, air conditioning or automatic fire protection system or from within a domestic appliance; or

**b.** from within or around any plumbing fixtures, including, but not limited to, shower stalls, shower baths, tub installations, sinks, faucets, drains, basins or other fixtures including walls, ceilings or floors.

This exclusion applies, except for coverage specifically provided by this endorsement.

Except as stated in this endorsement, we do not provide coverage for any loss precluded by another provision in this policy.

All other provisions of this policy apply.

**Includes copyrighted material of Insurance Services Office, Inc. with its permission.**

SH 23 24   03 13
## BLANKET PERSONAL PROPERTY ENDORSEMENT – TEXAS

| Class Of Personal Property | Amount of Insurance | Premium |
|---|---|---|
| 1. **Jewelry**, meaning individually owned articles of personal adornment composed at least partially of silver, gold, platinum or other precious metals or alloys, whether or not containing pearls, jewels or precious or semi-precious stones. | $ | $ |
| 2. **Furs** and garments trimmed with fur or consisting principally of fur. | | |
| 3. **Cameras**, projection machines, films and related articles of equipment. | | |
| 4. **Musical instruments** and related articles of equipment.  You agree not to perform with these instruments for pay. | | |
| 5. **Silverware**, silver–plated ware, gold-ware, gold–plated ware and pewter-ware, but excluding pens, pencils, flasks, smoking implements or jewelry. | | |
| 6. **Fine Arts**, meaning paintings, etchings, pictures, tapestries and other bona fide works of art (such as valuable rugs, statuary, marbles, bronzes, antique furniture,  rare books, antique silver, manuscripts porcelains, rare glass and bric–a–brac) of  rarity, historical value or artistic merit.  This premium is based on your statement that the property insured is located at the following address: | | |
| 7. **Computer** hardware, software, operating systems or networks, other electronic parts, equipment or systems solely designed for use with or connected to a computer.  Use for "business" purposed does not reduce the amount of insurance. | | |
| | | |
| *Entries may be left blank if shown elsewhere in this policy for this coverage. | | |

We cover the classes of personal property which are indicated above by an amount of insurance.

This coverage is subject to the:

1.  Definitions;

2.  Section I – Conditions; and

3.  Sections I and II – Conditions;

in the policy and all provisions of this endorsement.

Any deductible stated in this policy does not apply to this coverage.

Under **Section I – Property Coverages**, Coverage C – Personal Property, the following is added to **e., g.** and **l.** of

**3.  Special Limit of Liability:**

However, this insurance shall be excess over any amount payable under the Blanket Personal Property endorsement.

**A. Perils Insured Against**

We insure against direct loss to property described only if that loss is a physical loss to property; however, we do not insure loss caused by any of the following:

1.  Wear and tear, gradual deterioration or inherent vice.

2.  Insects or vermin.

3.  War, including the following and any consequence of any of the following:

a.  Undeclared war, civil war, insurrection, rebellion or revolution;

b.  Warlike act by a military force or military personnel; or

c.  Destruction, seizure or use for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

4.  Nuclear Hazard, to the extent set forth in the Nuclear Hazard Clause of Section I – Conditions.

5.  If Fine Arts are covered:

a.  Repairing, restoration or retouching process;

b.  Breakage of art glass windows, glassware, statuary, marble, bric-a-brac, porcelains and similar fragile articles. We cover loss by breakage if caused by:

(1) Fire or lightning;

(2) Explosion, aircraft or collision;

(3) Windstorm, earthquake or flood;

(4) Malicious damage or theft;

(5) Derailment or overturn of a conveyance.

We do not insure loss, from any cause, to property on exhibition at fairgrounds or premises of national or international expositions unless the premises are covered by this policy.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Form No.    SH 23 24   03 13

Page No.    2 of 2

**B.  Territorial Limits**

We cover the property described worldwide.

**C.  Special Provisions**

Fine Arts: You agree that the covered property will be handled by competent packers.

**D.  Conditions**

**1.  Loss Settlement**

**a.  Jewelry**

**(1)** The value of the property will be ascertained at the time of loss or damage.  We will not pay more than the least of the following amounts:

**(a)** The amount for which the article could reasonably be expected to be replaced with one substantially identical to the article lost or damaged; or

**(b)** The amount of insurance for the class, subject to a maximum amount of $10,000 for any individual item.

**(2)** If the property is a pair or set, or consists of several parts when complete, we will:

**(a)** Pay the amount for which the pair, set or complete article could reasonably be expected to be replaced with one substantially identical to the article lost or damaged; or

**(b)** Pay the amount of insurance for the class, subject to a maximum amount of $10,000. At our request, you will surrender that article or property to us if not lost or stolen.

**(3)** In the event lost or stolen property is recovered and we have paid you the maximum amount under this coverage, you will surrender that property to us.

**(4)** We will, at your request, sell back to you, at a price you and we agree upon, any scheduled article you surrendered to us to comply with the terms in **(2)** and **(3)** above.

**b.  Other Property**

**(1)** The value of the property will be ascertained at the time of loss or damage.  We will not pay more than the least of the following amounts:

**(a)** The actual cash value of the property at the time of loss or damage;

**(b)** The amount for which the property could reasonably be expected to be repaired to its condition immediately prior to loss;

**(c)** The amount for which the property could reasonably be expected to be replaced with one substantially identical to the article lost or damaged; or

**(d)** The amount of insurance for the class, subject to a maximum amount of $10,000 for any individual item.

**(2)** The actual cash value condition in **(1)(a)** above does not apply if, at the time of loss, **Coverage C – Personal Property** covered in the policy to which this endorsement is attached is subject to replacement cost loss settlement.

**2.  Pair, Set or Parts Other Than Jewelry**

**a.  Loss to a Pair or Set**

In case of a loss to a pair or set we may elect to:

**(1)** Repair or replace any part to restore the pair or set to its value before the loss; or

**(2)** Pay the difference between actual cash value of the property before and after the loss.

**b.  Parts**

In case of a loss to any part of covered property, consisting of several parts when complete, we will pay for the value of the part lost or damaged.

All other provisions of the policy apply.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

# EXHIBIT B

CAUSE NO. 2019-17683

| | | |
|---|---|---|
| **ANNIE ANDREWS** | § | |
| **Plaintiff** | § | |
| | § | **IN THE 234TH** |
| | § | |
| **v.** | § | **DISTRICT COURT** |
| | § | |
| **BAYLOR UNIVERSITY, TRE'VON** | § | **HARRIS COUNTY, TEXAS** |
| **LEWIS, JOHN ARTHUR, JUSTIN** | § | |
| **HARRIS, AND DRU DIXON** | § | |
| **Defendants** | § | |

## PLAINTIFF'S
## FIRST AMENDED PETITION AND JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Annie Andrews[1] files this First Amended Petition and Jury Demand against defendants, Baylor University ("Baylor"), Tre'von Lewis ("Lewis"), John Arthur ("Arthur"), Justin Harris ("Harris"), and Dru Dixon ("Dixon"), and for cause of action would show:

## I.
## INTRODUCTION

1.      Plaintiff, Annie Andrews ("Annie"), a Baylor student, was deliberately intoxicated without her consent, raped, and sexually exploited in her Baylor dorm room by Baylor football players. These assaults occurred just a few days after the Baylor Board of Regents announced the "successful implementation" of the so called "Pepper Hamilton Report" concerning violence and sexual assaults by Baylor's football team.

2.      After a series of sexual assaults and institutional cover-ups within Baylor's football program were uncovered in 2015, Baylor publicly recognized that its football program

---

[1] A pseudonym has been substituted for Plaintiff's name for all causes of action brought through this petition that would otherwise publish important privacy interests about a sexual assault victim. Furthermore, as this lawsuit raises issues related to sexual abuse regarding Baylor's football team, which has previously garnered national attention, Plaintiff fears for her personal safety as well as that of her family and friends as a result of this filing.

1

comprised a dangerous condition on Baylor's campus. Through its "105 Recommendations" and associated press, Baylor admitted that its football program had an institutional problem related to sexual assault and that there existed "significant concerns about the culture within Baylor's football program."[2] Simply put, Baylor recognized that its football team and campus had a rape problem.

3.      Over the next two years Baylor fired its football coach; it fired its athletic director, and it fired its president. And on November 3, 2017, Baylor declared to the world that it had completed its "105 Recommendations"[3] to address the football team's rape problem.

4.      **Just nine days later**, on November 12, 2017, during a loud party in one of Baylor's Residence Halls, Annie was deliberately intoxicated without her consent by one Baylor Bear football player (Dixon), sexually assaulted by two other Baylor Bear football players (Lewis and Arthur) while she was incapacitated, and sexually exploited by a fourth Baylor Bear football player (Harris). All of this conduct occurred in the Baylor Residence Hall where Annie was required to live as a Baylor freshman.

5.      Annie was deliberately intoxicated without her consent during the party occurring at Baylor's University Parks Residence Hall ("University Parks"). Despite the party's conspicuousness, the loud party continued unabated – without intervention by community leaders, resident directors, or campus police – for over eight hours. By the final hour of the party, Annie had her virginity ripped from her as she lay incapacitated on her University Parks floor.

6.      Annie was deliberately intoxicated without her consent, raped, and sexually exploited in her Residence Hall because of two simple facts: (1) Baylor created and maintained a dangerous

---

[2] "External Report re: Completion of 105 Recommendations," Smith, Gina, Gomez, Leslie (November 3, 2017), Cozen O'Connor, *available at* https://www.baylor.edu/thefacts/doc.php/301337.pdf
[3] *Id.*

2

condition in University Parks by housing its freshman athletes in coed dorms without adequate supervision and security and without adequate policing of underage drinking; and (2) Baylor's resident advisors ignored obvious evidence of the party during which these assaults occurred and failed to intervene, failed to enforce Baylor's alcohol policy prohibiting such underage drinking, failed to enforce Baylor's curfew rules, and failed to stop the party that led to Annie's injury.

7.      In support, Annie would show the Court as follows:

## II.
## DISCOVERY CONTROL PLAN

8.      This case is being conducted under Tex. R. Civ. P. 190.4 (Level 3), and the Court has entered a docket control order governing applicable deadlines.

## III.
## CLAIMS FOR RELIEF

9.      At this time, the full extent of Annie's injury is not known. Based on the current information available, Annie believes that she will seek monetary relief of over $1,000,000.00 in damages. Tex. R. Civ. P. § 47(c)(4).

10.     Annie reserves the right to amend this petition, including this provision, as the case continues.

## IV.
## PARTIES

11.     Plaintiff Annie Andrews is a natural person who currently resides out of state. At all material times relevant to this suit, Annie resided in McLennan County, Texas, and maintained her permanent residence in a county out of state. At the time of the events complained of herein, Annie was a student attending Baylor University and was housed in University Parks. Annie may be served with process through the undersigned attorney.

3

12.     Defendant Baylor is a private university in McLennan County, Texas. Baylor may be served through its Acting President, Linda Livingstone, at Pat Neff Hall, Suite 100, Waco, Texas 76798.

13.     Defendant Tre'von Lewis is a natural person who, upon information and belief, currently resides in Houston, Texas. At all material times relevant to this suit, Lewis resided in and maintained his permanent residence and domicile in Harris County, Texas. At the time of the events complained of herein, Lewis was a freshman student attending Baylor University.

14.     Defendant John Arthur is a natural person who, upon information and belief, currently resides in Frisco, Texas. At all material times relevant to this suit, Lewis resided in Collin County, Texas. At the time of the events complained of herein, Arthur was a student attending Baylor University.

15.     Defendant Justin Harris is a natural person who, upon information and belief, currently resides in New Mexico. At all material times relevant to this suit, Harris resided in Ascension Parish, Louisiana. At the time of the events complained of herein, Harris was a student attending Baylor University.

16.     Defendant Dru Dixon is a natural person who currently resides in Waco, Texas. At all material times relevant to this suit, Dixon resided in McLennan County, Texas. At the time of the events complained of herein, Dixon was a student attending Baylor University.

## V.
## JURISDICTION AND VENUE

17.     **Venue is Proper** – Venue is proper in Harris County because Defendant Lewis resided there when the cause of action accrued. Tex. Civ. Prac. Rem. Code § 15.002(a)(2). Because venue is proper in Harris County as to Lewis, venue is proper as to all defendants. Tex. Civ. Prac. Rem. Code. § 15.005.

18.     **There is Subject Matter Jurisdiction** – This Court has subject matter jurisdiction because the amount in controversy exceeds the minimum jurisdictional limits of this Court.

19.     **There is Personal Jurisdiction** – This Court has personal jurisdiction over Defendants because Defendants (1) committed some or all of the unlawful acts that are the basis of this action within the State of Texas; (2) are residents of the State of Texas; and (3) engage in foreseeable, intentional, continuous, and systematic contacts within the State of Texas.

## VI.
## FACTS

A.     <u>Annie was harmed by Baylor football players in her dorm.</u>

20.     On or around November 12, 2017, Annie was deliberately intoxicated without her consent by one Bear football player (Dixon) in an attempt to intoxicate her, sexually assaulted by two other Bear football players (Lewis and Arthur), and sexually exploited by a fourth (Harris) at University Parks, where the five freshmen lived.

21.     The assaults and exploitation occurred after Dixon surreptitiously added alcohol to Annie's drink in an attempt to intoxicate her. His plan worked, and Annie became intoxicated to the point of incapacitation.

22.     After Annie became incapacitated, Harris filmed – without Annie's knowledge or consent – Annie in compromising interactions and shared them with Baylor's freshman football roster *via* his Snapchat account. Annie did not consent to being filmed, nor did she consent to the videos being shared with Baylor's freshman football roster.

23.     Also after Annie became incapacitated, Lewis and Arthur took turns engaging in sexual activity with Annie – digitally, orally, and genitally contacting and penetrating her vagina. Annie did not consent to sexual penetration, nor could she have – as she was intoxicated to the point of incapacitation.

5

24.     Annie suffered emotionally, academically, and athletically as a result of her sexual assaults and exploitation and she was forced to withdraw from Baylor after a tumultuous and anxiety-ridden semester.

25.     At all times relevant to this Petition, Baylor failed to protect Annie as Baylor negligently discharged its duty to protect its students and tenants.

26.     As a direct and proximate result of Defendants' actions, Annie has suffered and continues to suffer untold psychological damage, profound emotional distress, permanent loss of standing in her community and damage to her reputation, and her future relationships have been negatively affected.

      B.      <u>Baylor created a dangerous condition and failed to intervene.</u>

27.     On November 2017, Annie was housed at University Parks. Dixon, Lewis, Arthur, and Harris were all Baylor athletes and also residents of University Parks.

28.     Baylor owned and managed University Parks – where Baylor housed Annie and the football player defendants.

29.     Baylor is responsible for providing for the security of its students, which it attempts to do in part through its Residence Hall staff.

30.     Baylor is responsible for ensuring that all of its employees – including Residence Hall staff – are properly trained and supervised to perform their jobs.

31.     Baylor is responsible for the acts and omissions of its employees, agents, part-time student workers, and tenants.

32.     Annie was assaulted after she was intoxicated to the point of incapacitation while at a loud party at University Parks after a Baylor football game. The party lasted for eight hours:

throughout the evening and night of November 11, and into the early morning of November 12. Party-goers arrived and left University Parks throughout the night, later than Baylor's curfew policy permitted – and intoxicated party-goers passed through the guard station at University Parks at least once during the party. Loud music blared. Some party-goers, including Annie, became so intoxicated they had to be assisted in climbing the external stairs at University Parks.

33.     Neither the noise level, nor the visible drunkenness of the party-goers, nor the continuing nature of the party, caused Baylor to intervene – even though Baylor purportedly employed Residence Hall staff to enforce its alcohol and curfew policies and police the Residence Halls for alcohol consumption, curfew violations, and sexual activity.

34.     Many of the party-goers and tenants were underage at the party. Alcohol was present and served at the party, and alcohol was located throughout University Parks during the party.

35.     This was not uncommon: similar parties were held at University Parks where alcohol was served to and shared among minors without, or with inadequate, University intervention or supervision. Indicative of this lack of supervision and intervention, there was a similar party in Annie's apartment the night before the party leading to Annie's sexual assault – and Baylor's Residence Hall staff did not intervene. Further indicative of Baylor's lack of supervision and intervention, Baylor Residence Hall staff only entered Annie's dorm room once to conduct a room inspection during her semester at University Parks – and the date and time of that inspection were predetermined and agreed upon by staff and residents. Unsurprisingly, this inspection failed to further Baylor's mission of providing a safe living environment for its students.

36.     Baylor's lack of intervention was especially problematic given Baylor housing its football team in the same Residence Hall in which it housed many of its female athletes,

including newly enrolled freshmen girls, and in which some of the team's prior assaults occurred. Baylor's historic rape problem on its campus and within its football team is well documented. Baylor has been the subject of numerous media reports and lawsuits concerning a culture permissive of sexual assault on campus, as well as Baylor's football players committing sexual assaults against female students on campus and in student housing. Baylor's athletic department is at the heart of this culture. The Waco Tribune has reported a timeline of these assaults and their aftermath, which, upon information and belief, sets forth important and relevant events.[4] One lawsuit involving Baylor alleges that Baylor football players committed "52 acts of rape in five years by at least 31 football players." To highlight Baylor's knowledge of its rape problem within its football team, one former Baylor Regent is quoted as saying that Baylor's football team historically recruited well due to its female students being available for sex to Baylor football recruits and athletes.

37.     Baylor's lack of intervention in underage parties within its freshman athletics housing is further problematic due to its own admission that "[t]he use of alcohol or other drugs can lower inhibitions and create an atmosphere of confusion about whether consent is effectively sought and freely given."

38.     Regardless of its knowledge of and notice regarding its football team's historic rape problem, and it's knowledge of sexual assaults by members of its football team in and around University Parks, Baylor failed to protect Annie from being assaulted by failing to enforce its curfew and no-alcohol policies, failing to provide a secure environment in which to house its female student athletes, assigning its female student athletes to residence quarters in an open apartment environment rather than a traditional, secure dormitory, and failing to provide

---

[4] *See* http://www.wacotrib.com/news/higher_education/timeline-baylor-sexual-assault-controversy/article_abf21ab8-2267-51bf-84d8-6268f4222af0.html (accessed October 15, 2018).

adequate supervision and security at University Parks. And as a foreseeable result of Baylor

failing to comply with its required level of care, Annie was deliberately intoxicated without her

consent by Dixon, sexually assaulted by Lewis and Arthur, and sexually exploited by Harris in

her University Parks apartment.

      C.      <u>Annie's sexual assault was a foreseeable injury on Baylor's campus.</u>

39.     While Baylor purportedly strengthened its Title IX policies and guidelines and hired new

staff before the Fall of 2017, it did not stop its practice of housing its freshman football and

equestrian teams in co-ed Residence Halls without adequate supervision and security. This

practice ignores important factors related to sexual assaults on college campuses:

    a. Sexual assaults usually occur in on-campus housing;
    b. Women in the first semester of their freshmen year are the most at-risk population for being sexually assaulted;
    c. Alcohol use is often a contributing factor regarding on-campus sexual assaults.

40.     Baylor's former president, Ken Starr, recognized the importance of *where* sexual assaults

were occurring and the role that alcohol played in such assaults when he (incorrectly) stated in

June 2016:

> We're an alcohol-free campus. It's not happening on campus, to the best of my knowledge. They are off-campus parties. Those are venues where those bad things have happened.[5]

41.     The Baylor University Board of Regents' Pepper Hamilton Report Findings of Fact

acknowledged "a broader culture and belief by many administrators that sexual violence 'doesn't

happen here.'"[6]

---

[5] May 30, 2016, ESPN Interview with Ken Starr,
http://www.espn.com/espnradio/play?id=15880622.
[6] Baylor University. "Baylor University Board of Regents Findings of Fact," p. 5, available at
https://www.baylor.edu/thefacts/doc.php/266596.pdf (last accessed on May 30. 2019).

42.     While Baylor's president believed – or at least stated – that sexual assaults weren't happening within Baylor's Residence Halls, Baylor's Annual Fire Safety and Security Report tells a different story about *where* these assaults occur:

 – in 2015, of the reported 23 rapes, 21 were reported "on campus residential only,"
 – in 2016, of the reported 11 rapes, 10 were reported "on campus residential only,"
 – in 2017, of the reported 12 rapes, 8 were reported "on campus residential only."[7]

43.     Clearly, Baylor knew or should have known that *where* sexual assaults occurred, *i.e.*: in Residence Halls on campus, mattered. And, while one of Pepper Hamilton's 105 recommendations to Baylor was to "[c]onduct review of past cases from 2011 to 2015 to consider pattern, trends, climate,"[8] Baylor undoubtedly continued with its pattern of housing freshman women athletes in coed Residence Halls, including with the Freshman Football team, without adequate supervision and security and without adequate policing of underage drinking.

 D.     Annie was harmed due to Defendants' actions.

44.     After her assault, Annie became severely anxious and depressed.

45.     Annie's mental state forced her into hiding, and she was often unable to leave her apartment. When she did go out, she often could not avoid continuing exposure to her attackers on campus which became too emotionally taxing to endure.

46.     Annie engaged in self-harm after her assaults, cutting and mutilating herself multiple times after her assaults.

47.     While before her rape, Annie was a nationally ranked equestrienne, popular in school, and an A-student, the trauma Annie suffered has caused her such personal, physical, psychological, and emotional pain that Annie withdrew to her room, stopped participating in

---

[7] https://www.baylor.edu/dps/doc.php/322688.pdf.
[8] Recommendations, p. 2, https://www.baylor.edu/thefacts/doc.php/266597.pdf

10

normal social activities, stopped attending classes, lost her academic standing, and was ultimately forced to withdraw from Baylor.

48.     Annie was forced to move home with her parents. She has been isolated from her peers and become an outcast in her sport, unable to obtain recruitment at another college or university. While she has attempted to continue her education, first at a community college and later at a four-year university, her participation, orientation, class attendance, and concentration have all suffered significantly to the extent that she now receives incomplete and failing grades and she is no longer able to progress normally in even the most fundamental every-day activities.

49.     In reasonable likelihood, Annie may never recover.  The foreseeable and preventable rape she experienced in the Baylor apartment assigned to her has stolen her future from her.

## VII.
## APPLICABLE LAW

50.     Texas law provides protections for students and requires the exercise of reasonable care on the part of Baylor. In *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex. 1998), and *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762 (Tex. 2010), the Supreme Court of Texas recognized the duty imposed on landowners to use ordinary care to protect invitees from acts of third parties if he knows or has reason to know of an unreasonable and foreseeable risk of harm to the invitee. Over the past few years, there have been multiple instances of Baylor football players raping women at Baylor. Specifically, there have been prior instances of sexual assaults in and around University Parks – an apartment complex owned and operated by Baylor University that houses the freshman football team and freshman equestrian team. Baylor, the landowner of University Parks, owed a duty to its residents to protect them from the foreseeable acts of its football players. Given the prior recent history of sexual assaults perpetrated by Baylor's football players and prior instances of rape in and around University

Parks, further sexual assaults perpetrated by Baylor's football players was foreseeable. Baylor failed its tenants by not implementing adequate safety measures and security to protect its University Parks' tenants from sexual assault perpetrated by its football players.

51.     In Texas, one voluntarily entering an affirmative course of action affecting the interests of another is regarded as assuming a duty to act and must do so with reasonable care. *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983); *accord* Newsom v. B.B., 306 S.W.3d 910, 914 (Tex. App.—Beaumont 2010, pet. denied); *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 292 (Tex. 2004); *Bell v. VPSI, Inc.*, 205 S.W.3d 706, 719–20 (Tex. App.—Fort Worth 2006, no pet.).  For instance, though an employer owes no duty to protect the public from the bad acts of an off-duty employee committed off the worksite, such a duty does arise when the employer actually exercises control over the employee's off-duty activities that cause harm. *Loram Maint. of Way, Inc. v. Ianni*, 210 S.W.3d 593, 594 (Tex. 2006). In other words, exercising control creates a duty of care, and the duty is commensurate with the control retained. *Lee Lewis Constr. Co. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001). Baylor – through implementation of it school policies related to alcohol, sexual activity, and curfew, as well as employment of Residence Hall staff to enforce those policies within its Residence Halls – undertook an affirmative course of action to protect its residents from the harms of underage drinking. However, at University Parks, Baylor's undertaking was wholly inadequate in comparison to its actions in other Residence Halls throughout its campus. By voluntarily assuming a duty to protect its student-tenants from the harms associated with underage drinking, including sexual assault, yet failing to reasonably do so at University Parks, Baylor breached its duty to Annie and caused Annie's sexual assault.

52.     A duty in Texas also arises when one creates a dangerous condition. Should a person create a dangerous condition, the person then has the duty to attempt to prevent injury to others "if it reasonably appears or should appear that others in the exercise of their lawful rights may be injured thereby." *Gatten v. McCarley*, 391 S.W.3d 669, 675–76 (Tex. App.—Dallas 2013); *see Buchanan v. Rose*, 159 S.W.2d 109, 110 (Tex. 1942) (stating that when a party negligently creates a dangerous situation it then becomes his duty to do something about it to prevent injury to others if it reasonably appears or should appear to him that others in the exercise of their lawful rights may be injured by the situation); *see also SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 360 (Tex. 1995) (stating that "[o]nly where the party created the dangerous situation or where the party enjoys a special relationship with the other party giving rise to a duty will this general rule not apply," the general rule being that a mere bystander who did not create the dangerous situation had no duty to prevent injury to others). Baylor created and maintained a dangerous condition at University Parks by housing its freshman football team, with a known history of sexual abuse and rape, within a poorly supervised and inadequately policed coed dormitory – which was unfit for freshmen students. Baylor breached its duty by creating this condition and failing to make it safe by employing and training Residence Hall staff to strictly enforce Baylor's alcohol policies and by failing to employ adequate safety and security measures within University Parks.

53.     Texas also recognizes a cause of action for negligent supervision when an employer fails to supervise competent employees and that failure harms a plaintiff. *Morris v. JTM Materials*, 78 S.W.3d 28, 49 (Tex. App.—Fort Worth 2002). Baylor recognizes the ill-effects of alcohol consumption (including aggressive conduct and issues related to sexual consent) and prohibits the use of, and intoxication from, alcohol by anyone on its campus – including in its Residence

Halls. Baylor purports to enforce this strict policy through its Residence Hall staff.  Baylor was negligent in supervising its Residence Hall staff at University Parks to strictly enforce its alcohol and drug policy, thus resulting in the unabated party at University Parks that led to Annie's incapacitation and rape.

54.     Texas also recognizes the cause of action of assault when a person intentionally, knowingly, or recklessly makes contact with a plaintiff's person and causes bodily injury to the plaintiff. *See* Tex. Pen. Code § 22.01(a); *ONI, Inc. v. Swift*, 990 S.W.2d 500, 503 (Tex. App.— Austin 1999, no pet.). Dixon assaulted Plaintiff when he surreptitiously and without consent added alcohol to her drink – thereby causing her to ingest more alcohol than she intended. Lewis and Arthur also assaulted Annie when they sexually assaulted her while she lay incapacitated on her dorm room floor.

55.     Texas recognizes a cause of action for invasion of privacy (intrusion on seclusion) when a person intentionally intrudes on a plaintiff's seclusion and private affairs, and the intrusion would be highly offensive to a reasonable person. *Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex. 1993); *Clayton v. Richards*, 47 S.W.3d 149, 153 (Tex. App.—Texarkana 2001, pet. denied). Harris invaded Annie's privacy when he surreptitiously and non-consensually recorded her compromising interactions by recording her in private and intimate interactions.

56.     Texas also recognizes a cause of action for invasion of privacy (public disclosure of private facts) when a person publicizes something about a plaintiff's private life that is highly offensive to a reasonable person and is not a matter of public concern. *See Star Telegram v. Doe*, 915 S.W.2d 471, 474 (Tex. 1995). Harris invaded Annie's privacy when he surreptitiously and non-consensually recorded her in compromising interactions and publicized them to Baylor's freshman football roster.

## VIII.
## RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

57.    At all times pertinent to this action, the agents, servants, and employees of Baylor were acting within the course and scope of their employment and official duties. Therefore, Baylor is responsible for all damages resulting from the negligent acts and omissions of its agents, servants, and employees pursuant to the doctrine of *respondeat superior*.

58.    Wherever in this Petition it is alleged that Baylor did any act or thing, it is meant that Baylor's agents, officers, servants, borrowed servants, employees, or representatives did such act or thing and that the time such act or thing was done, it was done with the full authorization or ratification of Baylor or was done in the normal and routine course and scope of employment of Baylor's officers, agents, servants, borrowed servants, employees, or representatives.

59.    The principal is vicariously liable for the acts of the agent because of an employer/employee status, agency by estoppel, ostensible agency, or borrowed-servant doctrine.

## IX.
## CAUSES OF ACTION

### COUNT 1:
### NEGLIGENCE – NEGLIGENT SUPERVISION
### *Baylor University*

60.    Annie hereby incorporates by reference paragraphs above as if fully set forth herein.

61.    Specifically, Annie alleges that Baylor is negligent for failing to adequately supervise its Residence Hall staff to adequately enforce Baylor's alcohol policy.

62.    Baylor employs a strict no-alcohol policy on its campus. Specifically, it is a code of conduct violation for a Baylor student "to possess, use, or be under the influence of an alcoholic beverage on the campus or at a University-related activity off campus." Students are subject to a variety of sanctions for possessing, using, or being under the influence of alcohol while on

Baylor's campus – including being suspended, expelled, and being prohibited from living on campus.

63.     Before Annie was sexually assaulted and exploited, Baylor recognized that alcohol use "creates an atmosphere of confusion about whether consent is effectively sought and freely given," thereby increasing the prevalence of sexual assault among intoxicated students. Furthermore, Baylor recognized that "low to moderate doses of alcohol also increase the incidence of a variety of aggressive acts."

64.     Baylor purported to enforce its strict alcohol policy within its student housing through Residence Hall staff – which includes Residence Hall Directors, Assistant Residence Hall Directors, Graduate Apprentice Residence Hall Directors, Community Leaders, and Faculty Members in Residence.

65.     Baylor employed Residence Hall Directors, Assistant Residence Hall Directors, and Community Leaders at University Parks to enforce its alcohol policies.

66.     Baylor's University Parks Residence Hall staff was billed as live-in security, and Baylor purportedly employed its University Parks Residence Hall staff to live within University Parks – presumably to better investigate and enforce its policies.

67.     Upon information and belief, University Parks Residence Hall staff was on duty on the night Annie was sexually assaulted and exploited during the party within Baylor's dorm.

68.     Regardless of the continuing nature of the party, the conspicuousness of the party, the visible drunkenness of the attendees, and the history of drinking and sexual assault within University Parks, University Parks Residence Hall staff failed to intervene on the party, enforce Baylor's alcohol policy on its students at University Parks, and prevent Annie's sexual assault and exploitation.

69.     Baylor did not employ and supervise staff to strictly – or adequately – enforce its alcohol policies, thereby allowing wild parties, and underage drinking, to proliferate at University Parks.

70.     As a result of this failure, Annie became incapacitated at the loud party at University Parks – which continued uninterrupted for eight hours – and was sexually assaulted and exploited by the Baylor football players.

71.     Annie's damages include, but are not limited to, physical pain and mental anguish, disfigurement, physical impairment, costs of medical care, and lost earning capacity, all of which have occurred in the past and, in reasonable probability, will continue in the future. Such damages are in excess of the minimum jurisdictional limits of this Court.

72.     **Exemplary Damages:** Baylor's conduct constitutes gross negligence as set out in Tex. Civ. Prac. & Rem. Code § 41.003. Therefore, Annie also seeks exemplary damages.


### COUNT 2:
### NEGLIGENCE – DANGEROUS ENVIRONMENT
#### Baylor University

73.     Annie hereby incorporates by reference paragraphs above as if fully set forth herein.

74.     Specifically, Annie alleges that Baylor is liable for creating, maintaining, and failing to make safe a dangerous condition at University Parks.

75.     Baylor created and maintained a dangerous condition at University Parks by housing its freshman athletes in a coed Residence Hall without adequate supervision.

76.     More specifically, Baylor directed Annie to live at University Parks in which Baylor also housed its freshman football players.

77.     Regardless of Baylor's knowledge that its football team had a culture permissive of sexual assault and a recent history perpetrating rapes in and around University Parks, Baylor housed Annie in the same Residence Hall as its freshmen football players.

78.     Further, regardless of Baylor's admission that University Parks was not appropriate housing for freshmen and was billed as an "Upper Division Community," Baylor housed Annie and the freshmen football player defendants at University Parks.

79.     Furthermore, Baylor knew that underage alcohol use "creates an atmosphere of confusion about whether consent is effectively sought and freely given," thereby increasing the prevalence of sexual assault among intoxicated students. Baylor also knew that "low to moderate doses of alcohol also increase the incidence of a variety of aggressive acts."

80.     Knowing these facts about alcohol use, its football team's historic rape problem, and University Parks' inadequacy as freshman housing, Baylor did not employ staff to strictly – or adequately – enforce its alcohol policies, thereby allowing parties, and underage drinking, to proliferate at University Parks.

81.     Baylor created a dangerous condition by housing its freshmen athletes within a coed Residence Hall, University Parks, without adequate supervision to strictly enforce its policies and monitor its residents. As a result of this dangerous condition, Annie became incapacitated at the party at University Parks – which continued uninterrupted for eight hours – and was sexually assaulted and exploited by the Baylor football players.

82.     Annie's damages include, but are not limited to, physical pain and mental anguish, disfigurement, physical impairment, costs of medical care, and lost earning capacity, all of which have occurred in the past and, in reasonable probability, will continue in the future. Such damages are in excess of the minimum jurisdictional limits of this Court.

83.   **Exemplary Damages:** Baylor's conduct constitutes gross negligence as set out in Tex. Civ. Prac. & Rem. Code § 41.003. Therefore, Annie also seeks exemplary damages.

## COUNT 3:
## NEGLIGENCE – PREMISES LIABILITY
### *Baylor University*

84.   Annie incorporates all preceding paragraphs as if fully set forth herein. Specifically, Annie alleges that Baylor is liable for negligently maintaining its premises to prevent the foreseeable risk of Annie's sexual assault and exploitation.

85.   Baylor is the owner and possessor of University Parks.

86.   Annie was an invitee.

87.   Baylor knew or reasonably should have known that Annie's attackers posed an unreasonable risk of harm to her. Specifically, Baylor knew that its football team had a historic rape problem. Baylor's historic rape problem on its campus and within its football team is well documented. Baylor has been the subject of numerous media reports and lawsuits concerning a culture permissive of sexual assault on campus, as well as Baylor's football players committing sexual assaults against female students on campus.

88.   Baylor had a duty to use ordinary care to protect Annie from being sexually assaulted, including:

  a)   a duty to prevent underage drinking at University Parks;
  b)   a duty to police underage drinking at University Parks;
  c)   a duty to discourage and intervene on parties at University Parks;
  d)   a duty to intervene on loud and ongoing parties at University Parks;
  e)   a duty to intervene on the ongoing, 8-hour, loud party at University Parks on Nov. 11 and Nov. 12, 2017;
  f)   a duty to house Baylor freshmen women in Residence Halls best suited for freshmen women;

g)    a duty to not house Baylor freshmen women in apartment complexes like University Parks, where Baylor could not effectively enforce its rules and where freshmen women would have a greater risk of harm;

h)    a duty to house freshmen Baylor Football players in a different housing complex than University Parks;

i)    a duty to provide awake, on-duty Residence Hall staff at all times at University Parks;

j)    a duty to provide full time security at University Parks;

k)    a duty to properly train and supervise University Parks Residence Hall staff to protect its residents from the foreseeable risk of harm;

l)    a duty to adequately monitor and supervise University Parks Residence Hall staff to ensure compliance with Baylor's policies on underage drinking, sexual activity, and curfew;

m)    a duty to provide adequate staff, with proper training, to adequately police, secure, and monitor University Parks; and

n)    a duty to provide adequate security in Baylor's common areas.

89.    Baylor breached each of these duties.

90.    Baylor's conduct was a proximate and producing cause of damage to Annie.

91.    Annie's damages include, but are not limited to, physical pain and mental anguish, disfigurement, physical impairment, costs of medical care, and lost earning capacity, all of which have occurred in the past and, in reasonable probability, will continue in the future. Such damages are in excess of the minimum jurisdictional limits of this Court.

92.    **Exemplary Damages:** Baylor's conduct constitutes gross negligence as set out in Tex. Civ. Prac. & Rem. Code § 41.003. Therefore, Annie also seeks exemplary damages.

## COUNT 4:
## NEGLIGENCE – NEGLIGENT AFFIRMATIVE COURSE OF ACTION
### Baylor University

93.    Annie hereby incorporates by reference paragraphs above as if fully set forth herein.

94.    Specifically, Annie alleges that Baylor is negligent by affirmatively undertaking a duty to protect its tenants and students from the harms related to underage drinking, yet doing so unreasonably and inadequately.

95.     Baylor employs a no-alcohol policy on its campus. Specifically, it is a code of conduct violation for a Baylor student "to possess, use, or be under the influence of an alcoholic beverage on the campus or at a University-related activity off campus." Students are subject to a variety of sanctions for possessing, using, or being under the influence of alcohol while on Baylor's campus – including being suspended, expelled, and being prohibited from living on campus.

96.     Before Annie was assaulted, Baylor recognized that alcohol use "creates an atmosphere of confusion about whether consent is effectively sought and freely given," thereby increasing the prevalence of sexual assault among intoxicated students. Furthermore, Baylor recognized that "low to moderate doses of alcohol also increase the incidence of a variety of aggressive acts."

97.     Baylor purported to enforce its alcohol policy within its student housing through Residence Hall staff – which includes Residence Hall Directors, Assistant Residence Hall Directors, Graduate Apprentice Residence Hall Directors, Community Leaders, and Faculty Members in Residence.

98.     Baylor employed Residence Hall Directors, Assistant Residence Hall Directors, and Community Leaders at University Parks to enforce its alcohol policies.

99.     Baylor's University Parks Residence Hall staff was billed as live-in security, and Baylor purportedly employed its University Parks Residence Hall staff to live within University Parks – presumably to better investigate and enforce its policies.

100.    University Parks Residence Hall staff were on duty on the night Annie was sexually assaulted and exploited during the party at University Parks.

101.    Regardless of the continuing nature of the party, the conspicuousness of the party and the drunkenness of the attendees, and the history of drinking within University Parks, University

Parks Residence Hall staff failed to intervene on the party, enforce Baylor's alcohol and curfew policies on its students at University Parks, and prevent Annie's sexual assault and exploitation.

102.    Although Baylor undertook a duty to police drinking on campus and enforce its alcohol policy, Baylor did so unreasonably. Baylor failed to adequately enforce its alcohol policies, thereby allowing loud parties, and underage drinking, to proliferate at University Parks.

103.    As a result of this failure, Annie became incapacitated at the party at University Parks – which continued uninterrupted for eight hours – and was sexually assaulted and exploited by the Baylor football players.

104.    Annie's damages include, but are not limited to, physical pain and mental anguish, disfigurement, physical impairment, costs of medical care, and lost earning capacity, all of which have occurred in the past and, in reasonable probability, will continue in the future. Such damages are in excess of the minimum jurisdictional limits of this Court.

105.    **Exemplary Damages:** Baylor's conduct constitutes gross negligence as set out in Tex. Civ. Prac. & Rem. Code § 41.003. Therefore, Annie also seeks exemplary damages.

## COUNT 5:
## ASSAULT
### *Tre'von Lewis*

106.    Annie hereby incorporates by reference paragraphs above as if fully set forth herein. Specifically, Annie alleges that Lewis is liable for assault.

107.    Lewis intentionally, knowingly, or recklessly made contact with Annie's person, by penetrating and contacting Annie's genitals with his mouth, hands, and genitals.

108.    Lewis's contact with Annie was made while Annie was incapacitated and was without Annie's consent.

109.    Lewis's conduct was a proximate and producing cause of damage to Annie.

110.    Annie's damages include, but are not limited to, physical pain and mental anguish, disfigurement, physical impairment, costs of medical care, and lost earning capacity, all of which have occurred in the past and, in reasonable probability, will continue in the future. Such damages are in excess of the minimum jurisdictional limits of this Court.

## COUNT 6:
## NEGLIGENCE
### *Tre'von Lewis*

111.    Annie hereby incorporates by reference paragraphs above as if fully set forth herein. Specifically, Annie alleges that Lewis is liable for negligence.

112.    Lewis breached the following duties:

    a.  the duty to prevent Arthur from engaging in sexual activity with Annie after (i) knowing Annie was unable to consent to sexual activity due to incapacitation from alcohol intoxication, and (ii) knowing that Arthur was attempting to engage in – and actually engaging in – sexual activity with Annie;

    b.  the duty to not engage in sexual activity with Annie after knowing Annie was unable to consent to sexual activity due to incapacitation from alcohol intoxication; and

    c.  the duty to obtain informed, affirmative consent from Annie before engaging in sexual activity with Annie.

113.    Lewis breached each of these duties.

114.    Lewis's conduct was a proximate and producing cause of damage to Annie.

115.    Annie's damages include, but are not limited to, physical pain and mental anguish, disfigurement, physical impairment, costs of medical care, and lost earning capacity, all of which have occurred in the past and, in reasonable probability, will continue in the future. Such damages are in excess of the minimum jurisdictional limits of this Court.

116.    **Exemplary Damages:** Lewis's conduct constitutes gross negligence as set out in Tex. Civ. Prac. & Rem. Code § 41.003. Therefore, Annie also seeks exemplary damages.

## COUNT 7:
## ASSAULT
### *John Arthur*

117.  Annie hereby incorporates by reference paragraphs above as if fully set forth herein. Specifically, Annie alleges that Arthur is liable for assault.

118.  Arthur intentionally, knowingly, or recklessly made contact with Annie's person, by penetrating and contacting Annie's genitals with his mouth and hands.

119.  Arthur's contact with Annie was made while Annie was incapacitated and was without Annie's consent.

120.  Arthur's conduct was a proximate and producing cause of damage to Annie.

121.  Annie's damages include, but are not limited to, physical pain and mental anguish, disfigurement, physical impairment, costs of medical care, and lost earning capacity, all of which have occurred in the past and, in reasonable probability, will continue in the future. Such damages are in excess of the minimum jurisdictional limits of this Court.


## COUNT 8:
## NEGLIGENCE
### *John Arthur*

122.  Annie hereby incorporates by reference paragraphs above as if fully set forth herein. Specifically, Annie alleges that Arthur is liable for negligence.

123.  Arthur breached the following duties:

   a. the duty to prevent Lewis from engaging in sexual activity with Annie after (i) knowing Annie was unable to consent to sexual activity due to incapacitation from alcohol intoxication, and (ii) knowing that Lewis was attempting to engage in – and actually engaging in – sexual activity with Annie;
   b. the duty to not engage in sexual activity with Annie after knowing Annie was unable to consent to sexual activity due to incapacitation from alcohol intoxication; and
   c. the duty to obtain informed, affirmative consent from Annie before engaging in sexual activity with Annie.

24

124.    Arthur breached each of these duties.

125.    Arthur's conduct was a proximate and producing cause of damage to Annie.

126.    Annie's damages include, but are not limited to, physical pain and mental anguish, disfigurement, physical impairment, costs of medical care, and lost earning capacity, all of which have occurred in the past and, in reasonable probability, will continue in the future. Such damages are in excess of the minimum jurisdictional limits of this Court.

127.    **Exemplary Damages:** Arthur's conduct constitutes gross negligence as set out in Tex. Civ. Prac. & Rem. Code § 41.003. Therefore, Annie also seeks exemplary damages.

## COUNT 9:
## ASSAULT
### *Dru Dixon*

128.    Annie hereby incorporates by reference paragraphs above as if fully set forth herein. Specifically, Annie alleges that Dixon is liable for assault.

129.    Dixon intentionally, knowingly, or recklessly made contact with Annie's person, by surreptitiously and non-consensually causing Annie to ingest alcohol.

130.    Dixon surreptitiously and non-consensually added alcohol to Annie's drink, thereby causing her to ingest an unknown amount of alcohol.

131.    Dixon's conduct was a proximate and producing cause of damage to Annie.

132.    Annie's damages include, but are not limited to, physical pain and mental anguish, disfigurement, physical impairment, costs of medical care, and lost earning capacity, all of which have occurred in the past and, in reasonable probability, will continue in the future. Such damages are in excess of the minimum jurisdictional limits of this Court.

## COUNT 10:
## INVASION OF PRIVACY (INTRUSION ON SECLUSION)
### *Justin Harris*

133.    Annie hereby incorporates by reference paragraphs above as if fully set forth herein. Specifically, Annie alleges that Harris is liable for invasion of privacy – intrusion on seclusion.

134.    Harris intentionally intruded on Annie's seclusion and private affairs by recording Annie in compromising interactions without her knowledge and without her consent.

135.    Harris surreptitiously and non-consensually recording Annie in compromising interactions would be highly offensive to a reasonably person.

136.    Harris's conduct was a proximate and producing cause of damage to Annie.

137.    Annie's damages include, but are not limited to mental anguish, reputational damage, and lost earning capacity, all of which have occurred in the past and, in reasonable probability, will continue in the future. Such damages are in excess of the minimum jurisdictional limits of this Court.

## COUNT 11:
## INVASION OF PRIVACY (PUBLIC DISCLOSURE OF PRIVATE FACTS)
### *Justin Harris*

138.    Annie hereby incorporates by reference paragraphs above as if fully set forth herein. Specifically, Annie alleges that Harris is liable for invasion of privacy – public disclosure of private facts.

139.    Harris publicly disclosed private facts about Annie by publicizing surreptitiously recorded videos of Annie in compromising interactions. Harris shared, *via* a freshman football Snapchat group, compromising recordings of Annie with the entire Baylor freshman football roster.

26

140.   Annie did not consent to being filmed, nor did she consent to the videos being shared with Baylor's freshman football roster.

141.   Harris's disclosure of Annie's compromising interactions would be highly offensive to a reasonably person.

142.   The matters Harris publicized are not of legitimate public concern.

143.   Harris's conduct was a proximate and producing cause of damage to Annie.

144.   Annie's damages include, but are not limited to mental anguish, reputational damage, and lost earning capacity, all of which have occurred in the past and, in reasonable probability, will continue in the future. Such damages are in excess of the minimum jurisdictional limits of this Court.

**COUNT 12:**
**NEGLIGENCE**
***Justin Harris***

145.   Annie hereby incorporates by reference paragraphs above as if fully set forth herein. Specifically, Annie alleges that Harris is liable for negligence.

146.   Harris breached the following duties:

    a.   the duty to obtain Annie's consent before publicly disclosing private facts about Annie to Baylor's freshman football roster;
    b.   the duty to obtain Annie's consent before filming her in compromising, and highly private, interactions;
    c.   the duty to not film or share private videos of Annie after (i) knowing that Annie did not affirmatively consent to such recording or sharing, and (ii) knowing Annie was unable to consent to filming or sharing due to incapacitation from alcohol intoxication.

147.   Harris breached each of these duties.

148.   Harris' conduct was a proximate and producing cause of damage to Annie.

149.    Annie's damages include, but are not limited to, physical pain and mental anguish, disfigurement, physical impairment, costs of medical care, and lost earning capacity, all of which have occurred in the past and, in reasonable probability, will continue in the future. Such damages are in excess of the minimum jurisdictional limits of this Court.

150.    **Exemplary Damages:** Harris' conduct constitutes gross negligence as set out in Tex. Civ. Prac. & Rem. Code § 41.003. Therefore, Annie also seeks exemplary damages.

**COUNT 13:**
**BREACH OF DUTY – SPECIAL RELATIONSHIP**
*Baylor University*

151.    Annie hereby incorporates by reference paragraphs above as if fully set forth herein.

152.    A "special, confidential or fiduciary" relationship existed between Annie and Baylor in that Annie was freshman student athlete recruited by Baylor. As part of her enrollment in Baylor and participation in the athletics program, Baylor recommended that Annie live at the University Parks Residence Hall.

153.    Baylor was in a superior position to know the condition and danger of living at University Parks Residence Hall.

154.    Baylor breached its special duties to Annie when it recommended that she live at University Parks Residence Hall.

155.    Baylor breached its special duties to Annie when it failed to warn her of danger of living at University Parks Residence Hall.

156.    As a result of Baylor's breach of duties to Annie, Annie suffered damages including mental anguish, reputational damage, and lost earning capacity, all of which have occurred in the past and, in reasonable probability, will continue in the future. Such damages are in excess of the minimum jurisdictional limits of this Court.

## X.
## JURY DEMAND

157.    Annie demands a trial by jury and has previously tendered the fee of $40.00, as required by Tex. Gov. Code § 51.604(a).

## XI.
## DAMAGES

158.    Annie requests that the Court enter judgment for her actual damages, consequential damages, special damages, punitive and exemplary damages, interest and costs. Annie also prays for such other and further relief to which she may be justly entitled in both law and equity.

## XII.
## CONCLUSION AND PRAYER

Wherefore, premises considered, Annie prays that Defendants be cited and required to appear herein, and that upon final judgment, Annie be awarded her actual damages, exemplary damages, lawful prejudgment interest, lawful interest on the judgment, costs, and all other relief to which she is otherwise entitled.

Respectfully submitted,

By:    */s/ Otis W. Carroll*
Otis W. Carroll
State Bar No. 03895700
Collin M. Maloney
State Bar No. 00794219
David P. Henry
State Bar No. 24027015
Mandy Nelson
State Bar No. 24055270
Kyle J. Nelson
State Bar No. 24056031
**CARROLL MALONEY
HENRY & NELSON, PLLC**
6101 South Broadway, Ste. 500

29

Tyler, Texas 75703
Telephone: (903) 561-1600
Facsimile: (903) 581-1071
otis@cmhnlaw.com
collin@cmhnlaw.com
david@cmhnlaw.com
mandy@cmhnlaw.com
kyle@cmhnlaw.com

David M. Gonzalez
State Bar No. 24012711
Corinne Sumpter
State Bar No. 24033525
Kristin Etter
State Bar No. 24038884
Ramanjeet Gill
State Bar No. 00796629
Worth D. Carroll
State Bar No. 24091192
**SUMPTER & GONZALEZ  L.L.P.**
3011 N. Lamar Blvd, Suite 200
Austin, Texas 78705
Telephone: (512) 381-9955
Facsimile: (512) 485-3121
david@sg-llp.com
corinne@sg-llp.com
kristin@sg-llp.com
rgill@sg-llp.com
worth@sg-llp.com

Tom A. Cunningham
State Bar No. 05244700
**TOM ALAN CUNNINGHAM, PLLC**
919 Milam St Ste 575
Houston, TX 77002-5430
Telephone: 713-255-5500
tac@tomalancunningham.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document has been served on counsel

of record pursuant to Tex. R. Civ. P. 21 and 21a on this 19th day of February, 2020.

*/s/ Worth D. Carroll*

30